<table>
<tr><td></td><td>

**FILED**

December 17, 2021
Jeanne A. Naughton, CLERK
United States Bankruptcy Court
Newark, NJ

By:_____*Sharon Moore*_____

Courtroom Deputy

</td></tr>
</table>

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>AHMED FAROOQ SAKHE,<br><br><br>      Debtor. | Case No.:    15-32238-RG |
| ERIC R. PERKINS, in his capacity as Chapter 7 Trustee for the bankruptcy estate of Ahmed Farooq Sakhe,<br><br><br>      Plaintiff,<br><br>v.<br><br>NORTH PARK REALTY MANAGEMENT, LLC, MICHAEL KHAKSHOOR, YOUSEF KHAKSHOOR, SION NOBEL, and MEHRAN KOHANSIEH a/k/a MIKE KOHANSIEH a/k/a MIKE KOHEN,<br><br><br>      Defendants. | Chapter 7<br><br><br>Adv. Pro. No. 16-01576- RG |

## OPINION

**APPEARANCES:**

ROBERT D. TOWEY, ESQ.
J. ALEX KRESS, ESQ.
Becker LLC
354 Eisenhower Parkway, Ste. 1500
Livingston, NJ 07039
Counsel for Plaintiff,
Chapter 7 Trustee, Eric R. Perkins

JOSEPH C. LANE, ESQ.
2600 Highway 35
Lawrenceville, NJ 08648
Counsel to Defendants, North Park Realty
Management, LLC, Yousef Khakshoor, Michael
Khakshoor, Sion Nobel, and Mehran Kohansieh
a/ka/ Mike Kohansieh a/k/a Mike Kohen

RICHARD GERACE, ESQ.[1]
Gerace Law Office
1515 Market Street, Ste. 1200
Philadelphia, PA 19102
Counsel for Plaintiff,
Chapter 7 Trustee, Eric R. Perkins

THOMAS A. FARINELLA, ESQ.[2]
Law Office of Thomas A. Farinella
260 Madison Avenue, 8th Fl.
New York, NY 10016
Counsel to Defendants, North Park Realty
Management, LLC, Yousef Khakshoor, Michael
Khakshoor, Sion Nobel, and Mehran Kohansieh
a/k/a Mike Kohansieh a/k/a Mike Kohen

ERIC R. PERKINS, ESQ.
Chapter 7 Trustee
Becker, LLC
354 Eisenhower Parkway, Ste. 1500
Livingston, NJ 07039

## ROSEMARY GAMBARDELLA, UNITED STATES BANKRUPTCY JUDGE

### MATTER BEFORE THE COURT

Before this Court is the Amended Adversary Complaint filed by the Chapter 7 Trustee,

Eric R. Perkins, Esq. ("Plaintiff" or "Trustee"). The defendants in this matter are Mr. Michael

Khakshoor[3] ("Michael"), Mr. Mehran Kohansieh a/k/a/ Mike Kohansieh a/k/a Mike Kohen

("Mehran"), Mr. Yousef Khakshoor ("Yousef"), Dr. Sion Nobel ("Dr. Nobel"), and North Park

Realty Management, LLC ("North Park") (collectively "Defendants" or individually

"Defendant"). Michael and Mehran jointly filed an Answer to the Amended Adversary

Complaint.[4] By way of their Answer, Michael and Mehran demanded this Court grant a judgment

in their favor dismissing the Amended Adversary Complaint, awarding fees and costs in

---

[1] By Order dated February 25, 2016, Gerace Law Office was authorized as special counsel.  15-32238, ECF 16.
[2] By Order dated February 8, 2018, Mr. Farinella was permitted to appear *pro hac vice*. ECF 31.
[3] Michael is also referred to as "Auro."  Trial Tr. 40:3-9, Nov. 25, 2019.
[4] ECF 35.

connection with this litigation, reasonable attorneys' fees and any other relief the Court deems just, proper and equitable.[5]  Dr. Nobel filed an Answer to the Amended Adversary Complaint.[6]

Plaintiff withdrew, without prejudice, all claims against Yousef.[7] However, references to Yousef remain in this decision for context purposes. This Court held a two-day trial on November 22, 2019 and November 25, 2019. Post-trial submissions include Plaintiff's Proposed Findings of Facts and Conclusions of Law,[8] Defendants' Proposed Findings of Fact and Conclusions of Law,[9] and Plaintiff's Response.[10] The following constitutes this Court's findings of fact and conclusions of law.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (H) and the Standing Order of Reference from the United States District Court for the District of New Jersey dated July 23, 1984, as amended September 18, 2012, referring all bankruptcy cases to the bankruptcy court.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (H).  Venue is proper in this Court pursuant to 28 U.S.C. § 1408.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Prior to the filing of his bankruptcy petition on December 21, 2011, Mr. Farooq Sakhe[11] (the "Debtor") filed a lawsuit in the Supreme Court of the State of New York, County of New York, against North Park  held commercial real estate consisting of a mall located at 17117 West Nine Mile Road,  Southfield, Michigan ("North Park Property"). Debtor sought at least $1.5 million in damages *inter alia* for alleged breach of contract, breach of fiduciary duty, and unjust

---

[5] ECF 35.
[6] ECF 78.
[7] Pl.'s Proposed Findings of Facts, ¶ 5, ECF 102.
[8] ECF 102.
[9] ECF 108.
[10] ECF 111.
[11] The Debtor is also referred to as "Ahmed F. Sakhe." Trial Tr. 38:6-19, Nov. 25, 2019.

enrichment in the Supreme Court of the State of New York, County of New York.  This matter is

captioned, *Farooq Sakhe v. North Park Realty Management, LLC, Michael Khakshoor and
Mehran Kohansieh a/k/a Mike Kohansieh or Mike Kohen*, Index No. 653545/2011, ("New York
State Court Action").[12] The matter proceeded through discovery.

On November 25, 2015, the Debtor filed a voluntary petition for relief under Chapter 7 of
the Bankruptcy Code.[13] The Debtor was represented by Tomas Espinosa, Esq.  On November 30,
2015, Eric R. Perkins was appointed as Chapter 7 Trustee by the United States Trustee.   On
February 23, 2016, the Debtor removed the pending State Court Action to the United States District
Court for the Southern District of New York. On April 14, 2016, Trustee and Debtor filed a Motion
to Change Venue to the District of New Jersey where Debtor's Chapter 7 bankruptcy petition had
been filed. On that same date the Trustee and Debtor, filed a motion to substitute the Trustee in
place of the Debtor. On May 17, 2016, Hon. John G. Koeltl, United States District Court, Southern
District of New York, granted the Motion to substitute the Chapter 7 Trustee and the Motion to
Change Venue and transferred the case to the District of New Jersey. On June 7, 2016, pursuant
to 28 U.S.C. § 157(a). The Hon. Madeline Cox Arleo, United States District Court, District of New
Jersey, referred the matter to this Court.[14]  On October 6, 2017 the Chapter 7 Trustee filed a motion
in this Court to file an Amended Complaint pursuant to Fed. R. Bankr. P. 7015 and Fed. R. Civ.
P. 15.

---

[12] Defs.' Proposed Findings of Fact, Ex. D, ECF 108.
[13] Main Case, ECF 1.
[14] ECF 1.

4

### *The Parties*

The relevant parties in this matter are Ahmed Farooq Sakhe is the Debtor and the defendants are North Park, Michael, Yousef, Dr. Nobel, and Mehran. Plaintiff's claims are rooted in two transactions that took place over a two-and-a-half-month period between October 25, 2007 and January 11, 2008.

The Defendants have relationships with one another that precede the transactions in this case. Specifically, Michael and Yousef are brothers.[15] Dr. Nobel is related to Michael and Yousef through marriage (Dr. Nobel's wife is the sister of Michael and Yousef.)[16] Therefore, Dr. Nobel is Michael's brother-in-law.[17] Michael's wife and Mehran's wife are second cousins.[18]

The Debtor and Mehran also knew each other prior to the relevant transactions.[19] Additionally, Mehran was in the textile business and had done business with the Debtor.[20] Debtor ran a business known as It's a Material World, Inc ("Material World") until approximately 2008.[21] The Debtor sold fabrics and garments through Material World.[22] Material World was part of a Chapter 7 Bankruptcy petition that was filed by the Debtor in 2015.[23]

---

[15] Trial Tr. 90:18, Nov. 22, 2019.
[16] Ex. P-17, Dr. Nobel Dep. 26:15-25, June 26, 2019; Trial Tr. 85:12-15, Nov. 22, 2019.
[17] Trial Tr. 85: 5-8, Nov. 22, 2019.
[18] Ex. P-16, Michael Khakshoor Dep. 8:13-15, May 30, 2019; Trial Tr. 84:21-25 to 85:2-4, Nov. 22, 2019.
[19] The Debtor testified that he knew Mehran "for a long time [and] trust[ed] him [with his] last penny." Trial Tr. 23:23-25 to 24:1-4, Nov. 22, 2019.
[20] Trial Tr. 82:10-15, Nov. 25, 2019.
[21] There is conflicting testimony as to when Material World closed. The Debtor testified in his deposition that Material World closed in 2012 and then testified at trial that Material World closed in 2008. Trial Tr. 46:1-18, Nov. 22, 2019; Trial Tr. 43:8, Nov. 22, 2019.
[22] Trial Tr. 44:9-10, Nov. 22, 2019.
[23] Trial Tr. 42:25 to 43:1-22, Nov. 22, 2019.

**Transactions**

This matter involves three separate transactions; two are associated with North Park and a third is associated with River City Mall, Inc., which is a corporation organized and existing under the laws of the State of Iowa.[24]

### *(1)* ***North Park Transactions***

North Park involves two separate transactions made by the Debtor on or about October 25, 2007 and October 26, 2007.[25] These transactions resulted in the Debtor transferring a total of $1.5 million.[26] As for the first transaction, the Debtor wired $300,000 from his personal bank account to a title company ("First Transaction") to purchase the North Park Property at 17117 West Nine Mile Road, Southfield, Michigan.[27] The First Transaction involves the Debtor, North Park, Dr. Nobel, Michael, Mehran and Yousef. Additionally, the First Transaction established North Park and was memorialized in the "Amended and Restated Limited Liability Company Operating Agreement of North Park Realty Management, LLC" ("North Park Agreement"), dated October 25, 2007.[28] In the second transaction ("Second Transaction"), the Debtor wired $1.2 million from his personal bank account to Dr. Nobel's account. This account was named "5 garden 26 family trust"[29] ("Trust").[30] These funds were wired to finalize the sale of the North Park Property.[31]

---

[24] Ex. P-3 at 1, "Assignment and Assumption of Stock."
[25] Am. Adv. Compl. at 4, ¶ 15. ECF 11.
[26] This is consistent with North Park's accounting records which show the Debtor contributed a total of $1.5 million. The Debtor received a 29% interest in North Park and a credit of $1.5 million. Ex. P-18 at "Nobel-000005."
[27] Trial Tr. 21:14-17, Nov. 22, 2019.
[28] Ex. P-1.
[29] This document purports to show the Debtor authorizing the transfer of $1.2 million from his personal account to a Washington Mutual account called "The 5 garden 26 family trust." Ex. P-2.
[30] Ex. P-8.
[31] Trial Tr. 21:15-17, Nov. 22, 2019.

### *(2) River City Mall, Inc. Transaction*

Additionally, this matter involves a third transaction whereby the Debtor transferred $100,000 ("Third Transaction") in connection with River City Mall, Inc. ("River City"), a preexisting entity.[32] This transaction involved commercial real estate in Story City, Iowa.[33] This Third Transaction involved the Debtor, Michael and Mehran and is governed by the "Assignment and Assumption of Stock,"[34] dated January 11, 2008 ("River City Agreement").

### *The Agreements*

### *(1) North Park Agreement*

The Debtor, Michael, Mehran, and Yousef executed the North Park Agreement.[35] North Park's registered office is 48 West 48th Street, New York, New York.[36] This office was Mehran's office as a jeweler  as well as the office for the Sandburg Mall, LLC.[37]

North Park Agreement's assets mainly consisted of the property located at 17117 West Nine Mile Road, Southfield, Michigan 48075. Prior to investing in the North Park Property, the Debtor retained the legal services of Tony Chang, Esq. ("Mr. Chang")  to review the North Park Agreement.[38]  The Debtor obtained a 29% interest in North Park upon completing the First Transaction.[39] Thereafter, the Debtor completed the Second Transaction to finalize the purchase of the North Park Property.[40]  Under section 4.3 of the North Park Agreement, "Special

---

[32] Trial Tr. 29:11-12, Nov. 22, 2019.
[33] Am. Adv. Compl. at 5, ¶ 18. ECF 11.
[34] Ex. P-3.
[35] Ex. P-1 at 11.
[36] Trial Tr. 87:25 to 88:1, Nov. 22, 2019; Ex. P-1 at 1, ¶ 1.3.
[37] Trial Tr. 88:3-11, Nov. 22, 2019.
[38] Trial Tr. 19:18-25 to 20:1-6, Nov. 22, 2019.
[39] Paragraph "1.4 Members:" indicates the Debtor obtained a 29% interest or the equivalent of 29 shares through the North Park Agreement.  Ex. P-1 at 1, ¶1.4.
[40] The Debtor testified he wired $1.2 million to the Trust which was in Dr. Nobel's name.  Trial Tr. 38:7-11, Nov. 22, 2019.  The Debtor questioned Mehran as to where his $1.2 million was going to and Mehran explained that the Debtor's $1.2 million was for the Debtor's investment in the North Park Property.  Trial Tr. 40:1-5, Nov. 22, 2019.

Distribution to Sakhe," the Debtor was entitled to $7,000 a month.[41] Beginning October 2007, the Debtor received these payments for approximately one year.[42]

### (2) *River City Agreement*

Under section 9(c) of the River City Agreement, "Special Distribution to Sakhe," the Debtor was assigned 20% of the stock owned by Michael and Mehran in exchange for the Debtor investing $100,000 in River City.[43] Additionally, section 9(c) provides that the Debtor receive $1,000 monthly special contribution with the first distribution to be paid on January 30, 2008. Michael and Mehran personally guaranteed to repay the Debtor his $100,000 investment. The Debtor testified that for a few months he received these $1,000 monthly payments.[44]

### *Sandburg*

This matter also involves another real estate company, Sandburg Mall Realty Management, LLC ("Sandburg Mall") with an address of "c/o" Dr. Nobel, 10306 North Sepulveda Boulevard, Mission Hills, California.[45] Sandburg Mall was an Illinois limited liability Company with a principal place of business located at 1150 West Carl Sandburg Drive, Gatesburg, Illinois. Throughout this litigation, various references to "Sandburg Mall," and "Sandburg LLC" are hereinafter collectively referred to as ("Sandburg"). Sandburg was owned by Michael, Mehran, Dr. Nobel and Yousef.[46] The Debtor was never involved with Sandburg Mall.[47] Sandburg Mall

---

[41] Ex. P-1 at 4, ¶ 4.3.
[42] Trial Tr. 72:9-13, Nov. 25, 2019. The record supports the finding the Debtor received these payments from November 2007 until March 2009. Trial Tr. 106:1-7, Nov. 25, 2019.
[43] Provision 9(g) "Limitations to Special Distributions" provides:
  Upon full satisfaction of the aforementioned Amended and Restated Assignment and Assumption
  of Stock, the Assignors shall issue stock certificate (2) of the Company in the amount of 20% equity
  interest of all outstanding issued stock to the Assignee as provided for hereinabove. Ex. P-3.
[44] Trial Tr. 30:1-3, Nov. 22, 2019.
[45] Ex. P-4 at 4.
[46] Trial Tr. 91:6-13, Nov. 22, 2019.
[47] Trial Tr. 34:14-15, Nov. 22, 2019 and Trial Tr. 91:14-15, Nov. 22, 2019.

was under Dr. Nobel's control.[48] On June 5, 2014 Sandburg Mall filed for Chapter 11 Bankruptcy in the United States Bankruptcy Court for the Central District of Illinois.  On April 28, 2015 the case was converted to a Chapter 7 case.[49]

### *2008 Financial Crisis*

The 2008 financial crisis negatively impacted North Park and all of the Defendants lost money.[50]  North Park Property's largest commercial tenant, United Healthcare, was paying approximately $35,000 to $60,000 in rent per month.[51]  United Healthcare vacated the premises in March 2009.[52] United Healthcare paid rent every month in 2008 and only a couple of months in 2009.[53] A year or so later, North Park could not pay its expenses nor the special compensation to the investors. In an attempt to save North Park, Sandburg Mall was pledged as collateral to secure a lower interest rate on North Park Property's mortgage, which  was reduced from 17% to 6%.[54] Ultimately, the Defendants could not pay the mortgage and expenses associated with North Park Property.[55] The North Park Property was eventually foreclosed.[56] Prior to the Debtor's bankruptcy filing, the Debtor, owned real property located in Fort Lee, New Jersey.[57]  The Debtor testified he purchased this property for approximately $550,000 but owed $350,000.[58] The Debtor also testified this property was ultimately foreclosed upon in 2016 as the Debtor was unable to pay his mortgage.[59]

---

[48] *In Re:Sandburg Mall Realty Management, LLC, Debtor, Case No. 14-81063*; Trial Tr. 39:23-25, Nov. 25, 2019.
[49] Trial Tr. 75:19, Nov. 25, 2019 and Trial Tr. 76:12-16.
[50] Trial Tr. 9:21-23, Nov. 22, 2019.
[51] Trial Tr. 84:23-24, Nov. 25, 2019.  Testimony is conflicted.  Michael testified United Healthcare was paying $50,000 to $60,000 per month whereas Mehran testified that the tenant United was paying $35,000 per month. Trial Tr. 105:14-17, Nov. 22, 2019; Trial Tr. 64:5-6, Nov. 25, 2019.
[52] Trial Tr. 114:15-16, Nov. 25, 2019.
[53] Trial Tr. 100:1-7, Nov. 25, 2019.
[54] Trial Tr. 138:11-18, Nov. 22, 2019; Trial Tr. 138:22-25, Nov. 22, 2019.
[55] Trial Tr. 121:20-22, Nov. 22, 2019.
[56] Trial Tr. 9:21-23, Nov. 22, 2019.
[57] Trial Tr. 54:18-20, Nov. 22, 2019.
[58] Trial Tr. 55:8-13, Nov. 22, 2019.
[59] Trial Tr. 55:17-23, Nov. 22, 2019.

**<u>Amended Adversary Complaint[60] [ECF 11]</u>**

On November 8, 2017, the Trustee filed an Amended Adversary Complaint pursuant to this Court's Order dated November 6, 2017[61] which granted Trustee's Motion for Leave to File an Amended Complaint pursuant to Fed. R. Bank. P. 7015 and Fed. R. Civ. P. 15. North Park, Michael, Yousef, Dr. Nobel and Mehran are named as defendants.

The Amended Adversary Complaint alleges twenty-four counts.[62]  Counts One, Two, Three, Four, and Five allege breach of contract pursuant to 11 U.S.C. § 541; Count Six alleges breach of fiduciary duty pursuant to 11 U.S.C. § 541; Count Seven alleges the corporate veil should be pierced pursuant to 11 U.S.C. § 541; Count Eight alleges fraudulent transfer pursuant to 11 U.S.C. § 544(b), N.J.S.A. § 25:2-25(b) and N.J.S.A. § 25:2-30; Count Nine alleges fraudulent transfer pursuant to 11 U.S.C. § 544(b), N.J.S.A. § 25:2-27(a) and N.J.S.A. § 25:2-30; Count Ten alleges transferee liability pursuant to 11 U.S.C. § 550; Counts Eleven and Twelve allege common law fraud pursuant to 11 U.S.C. § 544(b) and N.J.S.A. § 25:2-32; Count Thirteen alleges conspiracy to commit fraud pursuant to 11 U.S.C. § 544(b) and N.J.S.A. § 25:2-32; Count Fourteen alleges negligent misrepresentation pursuant to 11 U.S.C. § 544(b) and § N.J.S.A 25:2-32; Count Fifteen alleges unjust enrichment pursuant to 11 U.S.C. § 544(b) and N.J.S.A. § 25:2-32; Count Sixteen alleges common law conversion pursuant to 11 U.S.C. § 544(b) and N.J.S.A. § 25:2-32; Counts Seventeen and Eighteen allege common law fraud pursuant to 11 U.S.C. § 541; Count Nineteen alleges conspiracy to commit fraud pursuant to 11 U.S.C.  § 541; Count Twenty alleges negligent misrepresentation pursuant to 11 U.S.C. § 541; Count Twenty-One alleges unjust enrichment pursuant to 11 U.S.C. § 541; Count Twenty-Two alleges common law conversion

---

[60] ECF entitles this document as "Amended Complaint," whereas the document is entitled "Amended Adversary Complaint."  For consistency purposes, this is referred to as the "Amended Adversary Complaint" herein. ECF 11.
[61] ECF 9.
[62] ECF 11.

pursuant to 11 U.S.C. § 541; Count Twenty-Three requests this Court order a full accounting of all of the Defendants' financial and real estate transactions related to North Park, River City, Sandburg, LLC and the Trust; and Count Twenty-Four requests this Court enter an Order (1) finding Dr. Nobel in contempt and imposing sanctions against him; (2) attorneys' fees; and (3) granting such other relief as this Court finds equitable and just.

Prior to the disposition of this matter, Counts Thirteen and Nineteen ("Conspiracy to Commit Fraud"), Count Twenty-Three ("Demand for an Accounting"), and Count Twenty-Four ("Contempt") were withdrawn. Plaintiff withdrew these claims in "Plaintiff's Proposed Findings of Facts and Conclusions of Law" which provides "[t]o narrow claims, Plaintiff eliminates counts Thirteen and Nineteen, ("Conspiracy to Commit Fraud"), Twenty-Three ("Demand for an Accounting") and Twenty-Four ("Contempt")." Each count is addressed more fully herein.

### *Count One - Breach of Contract of the North Park Agreement*

In Count One of the Amended Adversary Complaint, Plaintiff alleges Michael, Mehran, and Yousef violated 11 U.S.C. § 541 by breaching section 4.3 of the North Park Agreement for failing to pay monthly special distribution payments of $7,000 to the Debtor since December 2008. Additionally, Plaintiff alleges Michael, Mehran, and Yousef refused to tender the monies that are due and owing to the Debtor. Plaintiff demands judgment in his favor and against Michael and Mehran for: (1) all amounts due and owing since December 2008; (2) the default penalty interest rate of 8% per annum on all amounts past due; (3) punitive damages; (4) reasonable attorneys' fees and costs; and (5) granting such other and further relief as the Court finds equitable and just in the circumstances.

### *Count Two - Breach of § (9)(c) of the River City Agreement*

In Count Two of the Amended Adversary Complaint, Plaintiff alleges Michael and Mehran violated 11 U.S.C. § 541 by breaching section 9(c) of the River City Agreement by failing to pay monthly special distribution payments of $1,000 to the Debtor since December 2008. Additionally, Plaintiff alleges Michael and Mehran refused to tender the monies that are due and owing. Therefore, Plaintiff demands judgment in his favor and against Michael and Mehran for: (1) all amounts due and owing since December 2008; (2) interest on all amounts past due; (3) punitive damages; (4) reasonable attorneys' fees and costs; and (5) granting such other and further relief as the Court finds equitable and just in the circumstances.

### *Count Three - Breach of § (2) of the River City Agreement*

In Count Three of the Amended Adversary Complaint, Plaintiff alleges Michael and Mehran violated 11 U.S.C. § 541 by breaching section 2 of the River City Agreement for failing to return Debtor's $100,000 investment. Plaintiff contends section 2 of the River City Agreement contains a binding and effective provision providing for the return of the Debtor's $100,000 investment upon default of any of the terms contained therein. Additionally, Plaintiff alleges Michael and Mehran refused to tender the monies that are due and owing. Therefore, Plaintiff demands judgment in his favor and against Michael and Mehran for: (1) at least $100,000; (2) interest on all amounts awarded; (3) punitive damages; (4) reasonable attorneys' fees and costs; and (5) granting such other and further relief as the Court finds equitable and just in the circumstances.

### *Count Four - Breach of Contract of the North Park Agreement*

In Count Four of the Amended Adversary Complaint, Plaintiff alleges North Park violated 11 U.S.C. § 541 by breaching section 4.3 of the North Park Agreement by failing to tender monthly payments of $7,000 to the Debtor since December 2008.  Additionally, Plaintiff alleges North Park refused to tender the monies that are due and owing.  Therefore, Plaintiff demands judgment in his favor and against North Park: (1) on  all amounts due and owing since December 2008; (2) default penalty interest rate of   8% per annum on all amounts past due; (3) punitive damages; (4) reasonable attorneys' fees and costs; and (5) granting such other and further relief as the Court finds equitable and just in the circumstances.

### *Count Five - Breach of Contract of the River City Agreement*

In Count Five of the Amended Adversary Complaint, Plaintiff alleges River City[63] violated 11 U.S.C. § 541 by breaching section 9(c) of the River City Agreement for failing to pay monthly special distribution payments of $1,000 since December 2008.  Additionally, Plaintiff alleges River City refused to tender the monies that are due and owing.  Therefore, Plaintiff demands judgment in his favor and against River City for: (1) all amounts due and owing  since December 2008; (2) interest on all amounts past due; (3) punitive damages; (4) reasonable attorneys' fees and costs; and (5) granting such other and further relief as the Court finds equitable and just in the circumstances.

### *Count Six - Breach of Fiduciary Duty*

In Count Six of the Amended Adversary Complaint, Plaintiff alleges Mehran and Michael violated 11 U.S.C. § 541 by breaching their fiduciary duties as managing members of North Park. Additionally, Plaintiff alleges Mehran and Michael breached their fiduciary duties through their

---

[63] River City is not named as a defendant in this matter.  Accordingly, no relief shall be entered against it.

mismanagement, neglect, misappropriation or wrongful conversion of assets, and self-dealing. Through these actions, Plaintiff alleges Mehran and Michael individually and jointly benefited from their systematic behavior of misappropriation and embezzlement of corporate assets. Specifically, Plaintiff alleges Mehran and Michael neglected management, supervision, and operation of North Park by failing to: (i) supervise staff and vendors; (ii) maintain tenant leases; (iii) perform all obligations as a landlord; (iv) make necessary repairs; and (v) pay all essential utilities and bills when due and owing.  Therefore, Plaintiff demands judgment in his favor and against Mehran and Michael: (1) of at least $1.5 million; (2) interest on all amounts awarded; (3) punitive damages; (4) reasonable attorneys' fees and costs; and (5) granting such other and further relief as the Court finds equitable and just in the circumstances.[64]

### _Count Seven - Piercing the Corporate Veil_

In Count Seven of the Amended Adversary Complaint, Plaintiff alleges the corporate veil should be pierced pursuant to 11 U.S.C. § 541 because Mehran and Michael engaged in and committed wrongful and negligent acts in their management of North Park.  Specifically, Plaintiff alleges Mehran and Michael (i) comingled corporate funds with their personal assets; (ii) misappropriated and embezzled corporate assets for their personal use; (iii) fraudulently transferred corporate assets to other personal investments; (iv) misrepresented material facts regarding the financial condition of North Park to the Debtor; and (v) managed North Park as a sole proprietorship.  Additionally, Plaintiff alleges that, as a result of the aforementioned, the Debtor suffered severe and continuous economic damages of no less than $1.5 million.  Plaintiff demands judgment in his favor and against Michael and Mehran for (1) piercing the corporate veil

---

[64] At times the Trustee seeks "$1.5 million" or "at least $1.5 million." Am. Adv. Compl., ECF 11.  This Court notes this matter involves three transactions totaling $1.6 million.  In the First Transaction the Debtor transferred $300,000; in the Second Transaction the Debtor transferred $1.2 million; and in the Third Transaction the Debtor transferred $100,000. Pl.'s ¶ 9, ECF 102.

of North Park; (2) judgment against Michael and Mehran individually of at least $1.5 million; (3)

interest on all amounts awarded; (4) punitive damages; (5) reasonable attorneys' fees and costs;

and (6) granting such other and further relief as the Court finds equitable and just in the

circumstances.

### *Count Eight - Fraudulent Transfer of $1.5 Million*

In Count Eight of the Amended Adversary Complaint, Plaintiff seeks relief for fraudulent

transfers pursuant to 11 U.S.C. § 544(b), N.J.S.A. § 25:2-25(b) and N.J.S.A. § 25:2-30.  Plaintiff

alleges in 2007 that the Debtor transferred $1.5 million to the Defendants.  Specifically, Plaintiff

alleges this transfer was fraudulent as to the Internal Revenue Service, as well as to other creditors,

because the Debtor did not receive a reasonably equivalent value in exchange for this transfer and

(i) he was engaged or was about to engage in a business or transaction for which the  remaining

assets were unreasonably small in relation to the business or transaction; or (ii) Debtor  reasonably

should have believed that he would incur, debts beyond his ability to pay as they became due.

Therefore, Plaintiff demand s  judgment in his favor and against the Defendants for (1) avoiding

the Debtor's $1.5 million transfer; (2) recovering the Debtor's $1.5 million transfer, or the value

thereof, from the Defendants for the benefit of the Debtor's bankruptcy estate; (3) attorneys' fees;

(4) interest from the time of the Debtor's $1.5 million transfer; (5) punitive damages; and (6)

granting such other and further relief as the Court finds equitable and just in the circumstances.

### *Count Nine - Fraudulent Transfer*

In Count Nine of the Amended Adversary Complaint, Plaintiff contends the Debtor's $1.5

million transfer constitutes a transfer within the meaning of the New Jersey Fraudulent Transfer

Act.  Additionally, Plaintiff alleges this transfer is fraudulent based on the Internal Revenue

Service because (i) its claim arose before the Debtor transferred $1.5 million; (ii) the Debtor made

this transfer without receiving a reasonably equivalent value in exchange for this transfer; and (iii) Debtor was rendered insolvent at that time or became insolvent as a result of this transfer. In light of the aforementioned, Plaintiff contends, pursuant to 11 U.S.C. § 544(b), N.J.S.A. § 25:2-27(a) and N.J.S.A. § 25:2-30, this transfer may be avoided. Plaintiff demands judgment in his favor and against the Defendants for (1) avoiding the Debtor's transfer of $1.5 million; (2) recovering the Debtor's transfer of $1.5 million, or the value thereof from the Defendants for the benefit of the Debtor's bankruptcy estate; (3) attorneys' fees; (4) interest from the time the Debtor transferred the $1.5 million; (5) punitive damages; and (6) granting such other and further relief as the Court finds equitable and just in the circumstances.

### *Count Ten - Transferee Liability*

In Count Ten of the Amended Adversary Complaint, in relying on claims made in Counts Eight and Nine and the preceding paragraphs of the Amended Adversary Complaint, Plaintiff alleges Dr. Nobel is the initial transferee of the Debtor's transfer of $1.5 million and the Debtor's assets. Plaintiff demands an Order and judgment that: (1) Debtor's $1.5 million transfer should be avoided pursuant to 11 U.S.C. § 550, which allows the Trustee to recover the value of the Debtor's $1.5 million transfer from Dr. Nobel; (2) attorneys' fees; (3) interest from the time the Debtor transferred the $1.5 million; (4) punitive damages; and (5) granting such other and further relief as the Court finds equitable and just in the circumstances.

### *Count Eleven - Common Law Fraud*

In Count Eleven of the Amended Adversary Complaint, Plaintiff seeks relief for common law fraud pursuant to 11 U.S.C. § 544(b) and N.J.S.A. § 25:2-32. Plaintiff argues that he may pursue other recognizable causes of action against the Defendants pursuant to N.J.S.A. § 25:2-25(b), N.J.S.A. § 25:2-27(a), and N.J.S.A. § 25:2-32, to the extent the facts underlying the

Trustee's fraudulent conveyance claim under N.J.S.A. § 25:2-32 support these claims. Additionally, Plaintiff alleges the Defendants committed common law fraud by (i) representing to the Debtor that the Debtor's $1.5 million transfer was for the purchase of the real property located at 17117 West Nine Mile Road, Southfield, Michigan; (ii) the Defendants knew that this representation was untrue; (iii) it was the Defendants' intention that the Debtor would rely on this representation; (iv) it was reasonable for Debtor to rely on this representation; and (v) the Debtor lost $1.5 million due to these actions by the Defendants.  Plaintiff demands  judgment in his favor and against the Defendants for: (1) avoiding the Debtor's $1.5 million transfer; (2) a money judgment of $1.5 million; (3) attorneys' fees; (4) interest from the time the Debtor transferred the $1.5 million; (5) punitive damages; and (6) granting such other and further relief as the Court finds equitable and just in the circumstances.

### *Count Twelve - Common Law Fraud*

In Count Twelve of the Amended Adversary Complaint, Plaintiff seeks relief for common law fraud pursuant to 11 U.S.C. § 544(b) and N.J.S.A. § 25:2-32.  Plaintiff contends that he may pursue other recognizable causes of action against the Defendants pursuant to  N.J.S.A. § 25:2--5(b), and N.J.S.A. § 25:2-27(a), and to the extent the facts underlying the Trustee's fraudulent conveyance claim under N.J.S.A 25:2-32 to support these claims.  Additionally, Plaintiff alleges to the detriment of the Internal Revenue Service, the Defendants committed common law fraud by (i) representing that North Park would not incur, guaranty, or assume any other indebtedness unrelated to the North Park Property; (ii) the Defendants knew that this representation was untrue; (iii) it was the Defendants' intention that the Debtor would rely on this representation; (iv) it was reasonable for the Debtor to rely on this representation; and (v) the Debtor lost $1.5 million due to the Defendants' actions. Plaintiff demands  judgment in his favor

and against the Defendants for: (1) avoiding the Debtor's transfer of $1.5 million; (2) a money judgment of $1.5 million; (3) attorneys' fees; (4) interest from the time the Debtor transferred the $1.5 million; (5) punitive damages; and (6) granting such other and further relief as the Court finds equitable and just in the circumstances.

### *Count Thirteen - Conspiracy to Commit Fraud*

Count Thirteen of the Amended Adversary Complaint was withdrawn prior to the disposition of this matter.[65]   However, this Court notes, in Count Thirteen of the Amended Adversary Complaint that Plaintiff seeks relief for conspiracy to commit fraud pursuant to 11 U.S.C. § 544(b) and N.J.S.A. § 25:2-32.   Plaintiff contends he may pursue other recognizable causes of action against the Defendants pursuant to   N.J.S.A. § 25:2-25(b) and N.J.S.A. § 25:2-27(a), to the extent the facts underlying the Trustee's fraudulent conveyance claim under N.J.S.A 25:2-32 support these claims.   Additionally, Plaintiff alleges to the detriment of the Internal Revenue Service that the Defendants engaged in a civil conspiracy to commit fraud against the Debtor by: (i) acting in concert to induce the Debtor into investing at least $1.5 million; (ii) creating phony business opportunities in North Park and River City; (iii) representing to the Debtor that he would receive a dividend of profits and special contribution disbursements each month of at least $7,000 and $1,000, even though the Defendants  knew these representations were untrue and that the Debtor would reasonably rely on these representations; and (iv) the Debtor incurred $1.5 million in damages.   The Plaintiff demands judgment in his favor and against the Defendants for: (1) avoiding the Debtor's $1.5 million transfer; (2) a money judgment of $1.5 million; (3) attorneys' fees; (4) interest from the time the Debtor transferred the $1.5 million; (5) punitive

---

[65] Pl.'s Proposed Findings of Facts, ¶ 6, ECF 102.

damages; and (6) granting such other and further relief as the Court finds equitable and just in the circumstances.

### *Count Fourteen - Negligent Misrepresentation*

In Count Fourteen of the Amended Adversary Complaint, Plaintiff seeks relief for negligent misrepresentation pursuant to 11 U.S.C. § 544(b) and N.J.S.A. § 25:2-32.  Plaintiff contends he may pursue other recognizable causes of action against the Defendants pursuant to N.J.S.A. § 25:2-25(b) and N.J.S.A. § 25:2-27(a), to the extent the facts underlying the Trustee's fraudulent conveyance claim under N.J.S.A 25:2-32 support these claims.  Plaintiff alleges to the detriment of the Internal Revenue Service that the Defendants engaged in negligent misrepresentation involving the Debtor by: (i) making incorrect statements; (ii) such statements were negligent; (iii) the Debtor justifiably relied upon these statements; and (iv) the Debtor incurred $1.5 million in damages for economic loss sustained as a consequence of that reliance. Plaintiff demands judgment in his favor and against the Defendants for:  (1) avoiding the Debtor's transfer of $1.5 million; (2) a money judgment of $1.5 million; (3) attorneys' fees; (4) interest from the time the Debtor transferred the $1.5 million; (5) punitive damages; and (6) granting such other and further relief as the Court finds equitable and just in the circumstances.

### *Count Fifteen - Unjust Enrichment*

In Count Fifteen of the Amended Adversary Complaint, Plaintiff seeks relief for unjust enrichment pursuant to 11 U.S.C. § 544(b) and N.J.S.A. § 25:2-32.  Plaintiff contends he may pursue other recognizable causes of action against the Defendants pursuant to  N.J.S.A. § 25:2-25(b) and N.J.S.A. § 25:2-27(a),  to the extent the facts underlying the Trustee's fraudulent conveyance claim under N.J.S.A 25:2-32 support these claims.  Plaintiff alleges to the detriment of the Internal Revenue Service that the Defendants were unjustly enriched by fraudulently

inducing the Debtor to invest $1.5 million of his money in North Park and River City from which

the Defendants directly benefited and further that their retention of the Debtor's money would be

unjust. Plaintiff demands judgment in his favor and against the Defendants for: (1) avoiding the

Debtor's $1.5 million transfer; (2) a money judgment of $1.5 million; (3) attorneys' fees; (4)

interest from the time the Debtor transferred the $1.5 million; (5) punitive damages; and (6)

granting such other and further relief as the Court finds equitable and just in the circumstances.

### *Count Sixteen - Common Law Conversion*

In Count Sixteen of the Amended Adversary Complaint, Plaintiff seeks relief for common

law conversion pursuant to 11 U.S.C. § 544(b) and N.J.S.A. § 25:2-32. Plaintiff contends he may

pursue other recognizable causes of action against the Defendants pursuant to N.J.S.A.

§ 25:2-25(b) and N.J.S.A. § 25:2-27(a), to the extent the facts underlying the Trustee's fraudulent

conveyance claim under N.J.S.A 25:2-32 support these claims. Plaintiff alleges to the detriment

of the Internal Revenue Service that Defendants engaged in common law conversion by utilizing

the Debtor's $1.5 million investment, intended solely for the operation of North Park and River

City, to fund and operate Sandburg without the consent or knowledge of the Debtor. Plaintiff

demands judgment in his favor and against the Defendants for: (1) avoiding the Debtor's $1.5

million transfer; (2) a money judgment of $1.5 million; (3) attorneys' fees; (4) interest from the

time the Debtor transferred the $1.5 million; (5) punitive damages; and (6) granting such other and

further relief as the Court finds equitable and just in the circumstances.

### *Count Seventeen - Common Law Fraud*

In Count Seventeen of the Amended Adversary Complaint, Plaintiff seeks relief for

common law fraud pursuant to 11 U.S.C. § 541. Plaintiff contends the Defendants committed

common law fraud by: (i) representing to the Debtor that the Debtor's $1.5 million transfer was

for the purchase of the North Park Property; (ii) Defendants knew that this representation was untrue; (iii) it was the Defendants' intention that the Debtor would rely on this representation; and (v) Debtor lost $1.5 million due to Defendants' actions. Plaintiff demands judgment in his favor and against the Defendants for: (1) avoiding the Debtor's $1.5 million transfer; (2) a money judgment of $1.5 million; (3) attorneys' fees; (4) interest from the time the Debtor transferred the $1.5 million (5) punitive damages; and (6) granting such other and further relief as the Court finds equitable and just in the circumstances.

### *Count Eighteen - Common Law Fraud*

In Count Eighteen of the Amended Adversary Complaint, Plaintiff seeks relief for common law fraud pursuant to 11 U.S.C. § 541. Plaintiff contends the Defendants committed common law fraud by: (i) representing to the Debtor that the Debtor's $1.5 million transfer was for the purchase of the North Park Property; (ii) Defendants knew that this representation was untrue; (iii) Defendants intended that the Debtor would rely on this representation; (iv) it was reasonable for the Debtor to rely on this representation; and (v) Debtor lost $1.5 million due to Defendants' actions. Plaintiff demands judgment in his favor and against the Defendants for: (1) avoiding the Debtor's $1.5 million transfer; (2) a money judgment of $1.5 million; (3) attorneys' fees; (4) interest from the time the Debtor transferred the $1.5 million; (5) punitive damages; and (6) granting such other and further relief as the Court finds equitable and just in the circumstances.

### *Count Nineteen - Conspiracy to Commit Fraud*

Count Nineteen of the Amended Adversary Complaint was withdrawn prior to the disposition of this matter.[66] However, this Court notes, in Count Nineteen of the Amended Adversary Complaint that Plaintiff seeks relief for conspiracy to commit fraud pursuant to 11

---

[66] Pl.'s Proposed Findings of Facts, ¶ 6, ECF 102.

U.S.C. § 541.  Plaintiff contends the Defendants engaged in a civil conspiracy to commit fraud against the Debtor by: (i) acting in concert to induce the Debtor to into investing at least $1.5 million; (ii) creating phony business opportunities in North Park and River City; (iii) representing to the Debtor that he would receive a dividend of profits and special contribution disbursements each month for at least $7,000 and $1,000, even though Defendants  knew these representations were untrue and that the Debtor would reasonably rely on these representations; and (iv) the Debtor incurred $1.5 million in damages.  Plaintiff demands judgment in his favor and against Defendants for:  (1) avoiding the  Debtor's $1.5 million transfer; (2) a money judgment of $1.5 million; (3) attorneys' fees; (4) interest from the time  the Debtor transferred $1.5 million; (5) punitive damages; and (6) granting such other and further relief as the Court finds equitable and just in the circumstances.

### *Count Twenty - Negligent Misrepresentation*

In Count Twenty of the Amended Adversary Complaint, Plaintiff seeks relief for negligent misrepresentation pursuant to 11 U.S.C. § 541.   Plaintiff alleges Defendants' negligent misrepresentations resulted in injury to the Debtor.  Plaintiff further alleges this injury occurred when the Defendants made incorrect statements, which the Plaintiff alleges were negligent, and justifiably relied upon by the Debtor which resulted in the Debtor incurring $1.5 million in damages for the economic loss sustained as a consequence of that reliance.  Plaintiff demands judgment in his favor and against the Defendants for:  (1) avoiding the Debtor's $1.5 million transfer; (2) a money judgment of $1.5 million; (3) attorneys' fees; (4) interest from the time the Debtor transferred $1.5 million; (5) punitive damages; and (6) granting such other and further relief as the Court finds equitable and just in the circumstances.

### *Count Twenty-One - Unjust Enrichment*

In Count Twenty-One of the Amended Adversary Complaint, Plaintiff seeks relief for unjust enrichment pursuant to 11 U.S.C. § 541.  Plaintiff alleges the Defendants were unjustly enriched by fraudulently inducing the Debtor to invest $1.5 million of his money in North Park and River City from which the Defendants directly benefited, and their retention of the Debtor's money would be unjust.  Plaintiff demands judgment in his favor and against the Defendants for: (1) avoiding the Debtor's $1.5 million transfer; (2) a money judgment of $1.5 million; (3) attorneys' fees; (4) interest from the time the Debtor transferred $1.5 million; (5) punitive damages; and (6) granting such other and further relief as the Court finds equitable and just in the circumstances.

### *Count Twenty-Two - Common Law Conversion*

In Count Twenty-Two of the Amended Adversary Complaint, Plaintiff seeks relief for common law conversion pursuant to 11 U.S.C. § 541. Plaintiff alleges the Defendants engaged in common law conversion by utilizing the Debtor's $1.5 million investment, which was intended solely for the operation of North Park and River City, and to fund and operate Sandburg without the consent or knowledge of the Debtor.  Plaintiff demands judgment in his favor and against the Defendants for: (1) avoiding the Debtor's $1.5 million transfer; (2) a money judgment of $1.5 million; (3) attorneys' fees; (4) interest from the time the Debtor transferred $1.5 million; (5) punitive damages; and (6) granting such other and further relief as the Court finds equitable and just in the circumstances.

### *Count Twenty-Three - Demand For Accounting*

Count Twenty-Three of the Amended Adversary Complaint was withdrawn prior to the disposition of this matter.  However, this Court notes, in Count Twenty-Three of the Amended

Adversary Complaint, Plaintiff contends the Trustee and his professionals expended additional efforts to conduct due diligence regarding the Debtor's financial affairs in connection with North Park and River City because of the Defendants' failure to maintain and/or provide books and records. Plaintiff demands judgment in his favor: (1) requiring the Defendants to provide a full accounting of the financial transactions in relation to North Park, River City, Sandburg, and the Trust; (2) attorneys' fees; and (3) granting such other and further relief as the Court finds equitable and just in the circumstances.

### *Count Twenty-Four - Contempt*

Count Twenty-Four of the Amended Adversary Complaint was withdrawn prior to the disposition of this matter.[67] However, this Court notes, in Count Twenty-Four of the Amended Adversary Complaint, that Plaintiff alleges Dr. Nobel repeatedly engaged in dilatory tactics to avoid responding to the Trustee's Rule 2004 subpoena. Additionally, Plaintiff alleges on July 17, 2017, the Trustee filed a motion for an Order compelling Dr. Nobel to provide documents in response to the subpoena. Then, by Order dated August 22, 2017, the Court granted the Trustee's motion and directed Dr. Nobel to respond to the request for documents within fourteen days or, alternatively, Dr. Nobel may face sanctions as further ordered by the Court. Plaintiff demands a judgment in his favor for: (1) finding Dr. Nobel in contempt and imposing sanctions against him; (2) attorneys' fees; and (3) granting such other and further relief as the Court finds equitable and just in the circumstances.

As pled in paragraphs 162-171 of the Amended Adversary Complaint, Plaintiff seeks (1) compensatory damages in the amount of $1.5 million; (2) avoiding and recovering any fraudulent transfers pursuant to 11 U.S.C. §§ 544 and 550; (3) providing a full accounting of the Defendants'

---

[67] Pl.'s Proposed Findings of Facts ¶ 6, ECF 102.

financial transactions and affairs in relation to North Park, Sandburg, the Trust and River City; (4) granting judgment in the amount of $1.5 million against the Defendants pursuant to 11 U.S.C. § 544 and N.J.S.A. § 25:2-30(a) and (b); (5) granting judgment in the amount of $1.5 million against the Defendants pursuant to 11 U.S.C. § 550, plus such other amounts as may be proven at trial, plus prejudgment interest and costs; (6) granting judgment in the amount $1.5 million against the Defendants pursuant to 11 U.S.C. § 544 and N.J.S.A. § 25:2-32 for common law fraud, conspiracy to commit fraud, negligent misrepresentation, unjust enrichment, and/or common law conversion; (7) granting judgment piercing the corporate veil of North Park; (8) granting judgment in the amount of $1.5 million against the Defendants pursuant to 11 U.S.C. § 541 for breach of contract, breach of fiduciary duty, common law fraud, conspiracy to commit fraud, negligent misrepresentation, unjust enrichment, and/or common law conversion; (9) granting judgment in the amount of $100,00 against River City pursuant to 11 U.S.C. § 541 for breach of contract; and (10) awarding the Trustee reasonable attorneys' fees and costs, punitive damages, and for such other relief as this Court deems just and equitable.

### *Defendants Michael Khakshoor and Mehran Kohansieh's Answer [ECF 35]*

On February 26, 2018, defendants, Michael and Mehran, jointly filed an Answer to the Amended Adversary Complaint. Michael and Mehran asserted thirty-two affirmative defenses, including: (1) Plaintiff's injuries or damages, if any, were caused, aggravated or contributed to by the Plaintiff's failure to mitigate damages;[68] (2) the Amended Adversary Complaint fails to state sufficient facts to constitute a cause of action against the Defendants;[69] (3) Plaintiff's failure to join necessary parties to this action;[70] (4) Plaintiff does not have standing to bring this claim against

---

[68] Michael Khakshoor and Mehran Kohansieh's Ans. at 27, ¶ 172. ECF 35.
[69] *Id*. at 28, ¶ 173. ECF 35.
[70] *Id*. at 28, ¶ 174. ECF 35.

the Defendants;[71] (5) Plaintiff failed to perform all conditions precedent under the North Park

Agreement and River City Agreement alleged in the Amended Adversary Complaint;[72] (6) this

Court lacks subject matter jurisdiction;[73] (7) service of process was insufficient and not properly

effected;[74] (8) the Amended Adversary Complaint and each Count fails to state a cause of action

upon which relief may be granted;[75] (9) Defendant has not breached nor violated any statutory,

contractual, fiduciary, common law nor other duty nor obligation, if any, owed to Plaintiff;[76] (10)

Plaintiff's claims are barred and unenforceable by reason of fraud, equitable fraud, deceit or other

fraudulent conduct engaged in by Plaintiff or Plaintiff's agents, employees or representatives;[77]

(11) Plaintiff's claims are barred and unenforceable by reason of the unconscionable conduct,

overreaching and deception by Plaintiff which induced Defendants' to disclose and/or transfer

Defendants' property to or for the use or benefit of Plaintiff based upon false promises,

misrepresentations, and failure to disclose the true facts to Defendants;[78] (12) neither the

Defendants nor Defendants' conduct were the proximate cause of any damage or loss allegedly

suffered or sustained by Plaintiff;[79] (13) the Amended Adversary Complaint should be dismissed

and all of the Counts thereof barred by reason of the unclean hands of Plaintiff;[80] (14) the Amended

Adversary Complaint and each Count thereof should be barred and dismissed by reason of the

doctrine of estoppel;[81] (15) the Amended Adversary Complaint and each Count thereof should be

barred and dismissed by reason of the Plaintiff's infringement of Defendants' name, tradename,

---

[71]  *Id*. at 28, ¶ 175. ECF 35.
[72]  *Id*. at ¶ 176. ECF 35.
[73]  *Id*. at ¶ 177. ECF 35.
[74]  *Id*. at ¶ 178. ECF 35.
[75]  *Id*. at ¶ 179. ECF 35.
[76]  *Id*. at 29, ¶ 180. ECF 35.
[77]  *Id*. at ¶ 181. ECF 35.
[78]  *Id*. at ¶ 182. ECF 35.
[79]  *Id*. at ¶ 183. ECF 35.
[80]  *Id*. at ¶ 184. ECF 35.
[81]  *Id*. at ¶ 185. ECF 35.

trademark, or service mark or other illegality of the conduct of Plaintiff;[82] (16) Plaintiff's claim

should be barred and dismissed by reason of Plaintiff's own breach of duty owed to Defendants;[83]

(17) Plaintiff is entitled to no relief against Defendants by reason that Plaintiff frustrated and

prevented the dealings of the parties and verbally agreed and/or contemplated;[84] (18) Plaintiff's

claims should be barred or dismissed by reason of the doctrine of waiver;[85] (19) Plaintiff's claims

are barred and should be dismissed by reason that any damage or loss allegedly sustained or

suffered by Plaintiff came about solely by reason of Plaintiff's own conduct and not by reason of

any conduct on the part of Defendants;[86] (20) Plaintiff's claims for loss or damage allegedly

sustained or suffered are barred by the applicable statute of frauds;[87] (21) Plaintiff's claims for loss

or damage allegedly sustained or suffered are barred by reason of Plaintiff's own breach of

Plaintiff's own express or implied agreements with Defendants;[88] (22) the Amended Adversary

Complaint and each Count thereof is barred and should be dismissed by reason of the doctrine of

avoidable consequences;[89] (23) Plaintiff should be barred from recovery as the Amended

Adversary Complaint has no legitimate purpose other than to make a spurious claim and create a

smokescreen or diversion from  Plaintiff's own conversion and infringement of Defendants'

property and rights;[90] (24) Plaintiff is barred from recovery on any of its allegations or claims

based, in whole or in part, upon alleged defamation by reason that statements made by Defendants,

if any, were made in the natural and ordinary meaning;  were true in substance and in fact; were

made concerning matters of genuine concern in the community; were fair, and were made without

---

[82] *Id*. at ¶ 186. ECF 35.
[83] *Id*. at 30, ¶ 187. ECF 35.
[84] *Id*. at ¶ 188. ECF 35.
[85] *Id*. at ¶ 189. ECF 35.
[86] *Id*. at ¶ 190. ECF 35.
[87] *Id*. at ¶ 191. ECF 35.
[88] *Id*. at ¶ 192. ECF 35.
[89] *Id*. at ¶ 193. ECF 35.
[90] *Id*. at 31, ¶ 194. ECF 35.

malice and/or otherwise emanated from a reliable source without reason to doubt the truth of the matter so stated;[91] (25) any statement made or conduct of the Defendants to or with respect to Plaintiff in connection with any subject matter pertaining to this lawsuit or otherwise, or as alleged in the Amended Adversary Complaint, was truthful, accurate, reasonable, made or done in good faith, without malice and without any intent to misrepresent, mislead, or wrongfully damage Plaintiff;[92] (26) the Amended Adversary Complaint should be dismissed for failure to join an indispensable party;[93] (27) Plaintiff's claims are barred and the Amended Adversary Complaint should be dismissed by reason that Plaintiff materially breached its agreements and promised performance with Defendants, thereby excusing any further performance or obligation thereunder on the part of the Defendants;[94] (28) Plaintiff's claims are barred and each Count of the Amended Adversary Complaint should be dismissed by reason of the doctrine of failure of consideration;[95] (29) Plaintiff's claims are barred and each Count of the Amended Adversary Complaint should be dismissed by reason of the doctrine of lack of consideration;[96] (30) the Amended Adversary Complaint should be dismissed by reason of the Plaintiff's breach of its duty to deal in good faith and fairly with Defendants;[97] (31) Plaintiff's claims are barred and each Count of the Amended Adversary Complaint should be dismissed by reason that any loss or damage allegedly sustained or suffered by Plaintiff in Plaintiff's relationship or dealings with Defendants, was directly or indirectly proximately caused by Plaintiff's own voluntary decisions and conduct whereby Plaintiff assumed all risk and consequences of its decisions and conduct;[98] and (32) in the

---

[91] *Id*. at ¶ 195. ECF 35.
[92] *Id*. at ¶ 196. ECF 35.
[93] *Id*. at ¶ 197. ECF 35.
[94] *Id*. at ¶ 198. ECF 35.
[95] *Id*. at 32, ¶ 199. ECF 35.
[96] *Id*. at ¶ 200. ECF 35.
[97] *Id*. at ¶ 201. ECF 35.
[98] *Id*. at ¶ 202. ECF 35.

alternative, Defendants assert set offs against Plaintiff which may be considerably  greater than any amounts claimed by Plaintiff.[99]

### *Defendant Sion Nobel's Answer [ECF 78]*

On January 15, 2019, Dr. Nobel filed an Answer. This Answer mirrors the thirty twenty affirmative defenses asserted in the Answer filed by Michael and Mehran.

### *Stipulation Agreement Vacating Default and Providing Other Relief [ECF 61]* [100]

On June 14, 2018, Hon. Stacey L. Meisel, United States Bankruptcy Court for the District of New Jersey entered a Stipulation Agreement Vacating and Providing Other Relief whereby the parties agreed to (1) vacate the default entered against Michael and deemed his Answer as having been filed timely; and (2) vacate the default against North Park.

### Order Pursuant to Fed. R. Bankr. P. 7037(a) and 11 U.S.C. §105(a) Compelling Defendants, Michael Khakshoor, Mehran Kohansieh and Sion Nobel, to Respond to Discovery Requests and Granting Related Relief

On May 23, 2019, Hon. Andrew Altenburg, United States Bankruptcy Court for the District of New Jersey, entered an Order Pursuant to Fed. R. Bankr. P. 7037(a) and 11 U.S.C. §105(a) Compelling Defendants, Michael, Mehran, and Dr. Nobel, to Respond to Discovery Requests and Granting Related Relief.

### *The Trial Held November 22 and November 25, 2019*

On November 22 and November 25, 2019, this Court held a trial.

During opening arguments, the Trustee, through counsel, argued that Dr. Nobel's money was used to arrange and purchase the North Park Property.[101] Counsel for the Trustee further argued Dr. Nobel indicated to Mehran and Michael that he wanted out of the North Park investment

---

[99] *Id.* at 32, ¶ 203. ECF 35.
[100] Defendants originally demanded a jury trial on all counts and third party claims herein but ultimately proceeded to a bench trial before this Court.
[101] Trial Tr. 5:1-3, Nov. 22, 2019.

and this was accomplished by selling Dr. Nobel's shares in the North Park Property to the Debtor.[102] The Debtor paid or transferred $1.5 million to or to the control of North Park.[103]  Of the $1.5 million, a total of $1.2 million was directly wired from the Debtor's account at HSBC Bank to Dr. Nobel.[104] Within a year of the execution of the North Park Agreement, the North Park Property investment was unsuccessful.[105]   During opening arguments, counsel for the Trustee further asserted the only reason the Debtor agreed to pay  $1.5 million was because he expected to receive $7,000 per month.[106]   That payment was paid for twelve to thirteen  months and then ceased.[107]

The Trustee asserted that money from the North Park Property was commingled with Sandburg.[108]  Such commingling was prohibited by the North Park Agreement.[109] The Trustee elaborated that violations of the North Park Agreement include: the failure of the creation of capital accounts; the failure to prepare and file tax returns in a timely manner; and the failure to offer or  provide  reports to the Debtor.[110]   Further, upon completing the First and Second Transactions which totaled $1.5 million and then completing the Third Transaction which totaled $100,000, the Debtor was insolvent (collectively, the "Transactions").[111]

Defendants, through counsel, assert that this is simply a business investment that went bad, and Debtor was represented by counsel in the transaction. Defendants emphasized that these Transactions took place in 2008 when the real estate and financial markets throughout the country

---

[102] Trial Tr. 5:4-9, Nov. 22, 2019.
[103] Trial Tr. 5:13-15, Nov. 22, 2019.
[104] Ex. P-2.
[105] Trial Tr. 5:16-17, Nov. 22, 2019.
[106] Trial Tr. 5:17-21, Nov. 22, 2019.
[107] Trial Tr. 5:20-21, Nov. 22, 2019.
[108] Trial Tr. 6:6-12, Nov. 22, 2019.
[109] Trial Tr. 6:15-17, Nov. 22, 2019.
[110] Trial Tr. 6:20-22, Nov. 22, 2019.
[111] Trial Tr. 7:1-3, Nov. 22, 2019.

crashed. During this time, Sandburg lost its largest tenant, United Healthcare. Nevertheless, Defendants attempted to save the North Park Property by encumbering Sandburg for the benefit of North Park. Further, the Defendants lost their respective investments. He asserted that the Supreme Court of the State of New York, County of New York determined that the alleged fraud was not compelling. In opening arguments, counsel for the Defendants  noted that the Debtor omitted the fact that he operated a business.[112]   However, Debtor's counsel in the Chapter 7 Bankruptcy case filed amended schedules, and asserted that while there was no indication the Debtor operated a business, the Debtor testified at his deposition that occurred on June 28, 2019[113] that he operated his business until 2012.[114]

Next, with respect to insolvency, through Counsel, Defendants argue that the Debtor could not have been insolvent as he continued to operate his business.[115] However, they also argue that in order for the Trustee's Complaint not to be time barred by the statute of limitations there needs to be a demonstration of fraud.[116] This fraud was allegedly uncovered in a deposition of Mehran in the New York State Supreme Court.[117] However the New York State Supreme Court did not find this compelling, as the Debtor has not produced any documents or evidence in support, despite the fact that Debtor testified he had bank records, tax returns, and other business records for the years preceding the 2008 transaction.[118] Counsel for the Defendants concludes that the business was functioning, operating, even thriving, not insolvent, and the fraudulent transfer action fails.[119]

---

[112] Trial Tr. 12:5-8, Nov. 22, 2019.
[113] Trial Tr. 51:10-18, Nov. 22, 2019.
[114] Trial Tr. 12:5-16, Nov. 22, 2019; Ex. D-B, 30:8-23.
[115] Ex. D-B, Dep. Of Debtor, June 28, 2019.
[116] Trial Tr. 13:7-10, Nov. 22, 2019.
[117] Trial Tr. 13:12-16, Nov. 22, 2019.
[118] Trial Tr. 13:16-20, Nov. 22, 2019.
[119] Trial Tr. 14:48, Nov. 22, 2019.

Next, through counsel the Defendants argue that any monies transferred from the business, for example, the alleged First Transaction, Second Transaction, and Third Transaction, which totaled $1.6 million, is protected as an incorporated business and as such  would not be forced to transfer monies to the Trustee.[120] Essentially, counsel for the Defendants concludes that the case itself hinges on evidence not presented to the Court, and the case is about a bad business transaction, not fraud.

In response, the Trustee argues that the New York Supreme Court issued no dispositive orders, and any order issued was declared moot.[121] Also, proof that the Debtor wired $300,000 and then $1.2 million comes from admissions of all deposed Defendants.[122]

Defendants then argue if there is no ability to ascertain where the monies came from, the Defendants cannot be held liable as it cannot be held that the monies were property of the bankruptcy estate.[123]

On direct, the Debtor indicated that the North Park investment was brought to his attention by Mehran to which he agreed to invest his money in the North Park Property because he was told it was a great building with potential of good income, and in return the Debtor would receive $7,000 a month.[124]  This was memorialized in the North Park Agreement.[125]  The Debtor and his lawyer, Mr. Chang, reviewed the North Park Agreement. Additionally, the North Park Agreement shows the Debtor owned 29% of the business. The Debtor indicated two transfers took place. The First Transaction involved the transfer of the sum of $300,000 to a title company.  Then the Second Transaction involved the sum of $1.2 million to Dr. Nobel. When questioned, the Debtor initially

---

[120] Trial Tr. 14:22-25 to 15:1-5, Nov. 22, 2019.
[121] Trial Tr. 16:11-13, Nov. 22, 2019.
[122] Trial Tr. 16:13-17, Nov. 22, 2019.
[123] Trial Tr. 16:22-24, Nov. 22, 2019.
[124] Trial Tr. 18:24-25; Trial Tr. 19:9-12; Trial Tr. 19:13-15, Nov. 22, 2019.
[125] Ex. P-1.

32

did not recall the name of Dr. Nobel's account.[126] Then the Debtor was shown, a document to refresh his recollection.[127] Upon reviewing this document, the Debtor was able to identify that he transferred funds from his account to a Washington Mutual account, and also sent an email to his bank to release his monies.[128] He continued that he trusted Mehran as a businessman as "[Mehran] was very big in real estate in New York City" as the Debtor knew "him for a long time".[129] Specifically, the Debtor trusted Mehran so much that the Debtor stated he "trust[ed] him for [his] last penny, to give him for [his] last penny."[130] Additionally, the Debtor wired $1.2 million to Dr. Nobel's account before signing the North Park Agreement, and then signed the North Park Agreement along with Mehran, Michael, and Yousef.[131] The Debtor was advised by his attorney that North Park was a great investment, as it provided, Debtor with $7,000 per month. However, the monthly payment of $7,000 lasted for only about a year.[132]

The Debtor further testified that he also entered into the River City investment with Mehran.[133] This was the Third Transaction in which the Debtor invested an additional $100,000 and in exchange, he would receive 40% equity as well as $1,000 per month.[134] This was memorialized in the River City Agreement.[135] The Debtor indicated Mehran personally guaranteed the loan.[136] Mehran testified that he personally guaranteed this $100,000.[137] The River City Agreement was also signed by Michael and Mehran.[138] As a timing note, during

---

[126] Trial Tr. 22:11-25, Nov. 22, 2019.
[127] *Id.*
[128] Trial Tr. 23:1-11, Nov. 22, 2019.
[129] Trial Tr. 24:1-4, Nov. 22, 2019.
[130] *Id.*
[131] Trial Tr. 24:5-9, Nov. 22, 2019.
[132] Trial Tr. 24:22-23, Nov. 22, 2019.
[133] Trial Tr. 27:9-12; 28:10-14, Nov. 22, 2019.
[134] Trial Tr. 26:25 to 27:1-2, Nov. 22, 2019.
[135] Ex. P-3.
[136] Trial Tr. 27:1-2, Nov. 22, 2019.
[137] Trial Tr. 26:22-25, Nov. 25, 2019.
[138] Trial Tr. 28:10-14, Nov. 22, 2019.

October 2007, Debtor invested in North Park, and a few months later, he invested in River City.[139]

Mehran advised Debtor that the River City Mall had "very good potential," and that the Debtor

was going to "make good money."[140] As previously noted, the River City Agreement  provided

that the Debtor receive $1,000 per month.[141]  The Debtor testified that he was paid $1,000 for a

few months, and after executing the North Park Agreement and River City Agreement, the Debtor

contended he did not have any remaining funds and owed bank loans of approximately

$200,000.[142]

The Debtor  also testified that his lawyer, Mr. Chang, who represented him with respect to

the North Park Agreement, indicated that Mehran, Michael, and Yousef, invested their requisite

sums in accordance with section 3.1 of the agreement.[143] Upon the Defendants failing to remit the

$7,000 monthly payments to the Debtor, the Debtor notified Mr. Chang.[144] In response Mr. Chang

requested bank statements, that were provided, which indicated monies in the amount of

$150,000.[145]  These funds went to a title company.[146] The Debtor indicated that upon failure to

receive the $7,000 monthly payments, he was unable to pay his bills, including the mortgage on

his property in Fort Lee, New Jersey.[147] This property was subsequently foreclosed.[148] The Debtor

testified that he was never involved with the Sandburg Mall and was not told by either Mehran or

Michael that they were involved with the Sandburg Mall.[149]

---

[139] Trial Tr. 29:4-13, Nov. 22, 2019.
[140] Trial Tr. 29:23-25, Nov. 22, 2019.
[141] Trial Tr. 29:25-30:1, Nov. 22, 2019.
[142] Trial Tr. 30:1-3; Trial Tr. 30:14-18, Nov. 22, 2019.
[143] Trial Tr. 31:24-25-32:1, Nov. 22, 2019.
[144] Trial Tr. 32:12-17, Nov. 22, 2019.
[145] Trial Tr. 32:14-16; Trial Tr. 33:1-3, Nov. 22, 2019.
[146] Trial Tr. 33:1-3, Nov. 22, 2019.
[147] Trial Tr. 55:8-21, Nov. 22, 2019.
[148] *Id.*
[149] Trial Tr. 34:16-18, Nov. 22, 2019.

During cross-examination, Debtor testified he operated Material World, a business located in New York City that sold fabrics and garments.[150]  There was conflicting testimony as to whether Material World ceased operations in 2008 or 2012.  At trial, the Debtor testified that Material World terminated in 2008.[151]  However, the Debtor testified at his deposition that Material World closed in 2012.[152]  At trial, the Debtor recalled that he was asked to provide documents showing that he possessed the $1.5 million. Counsel for the Defendants indicated that he was not provided with any evidence or records establishing that the Debtor had $1.5 million either in a bank account or by some other means.[153]  Counsel for the Defendants indicates that these documents were requested in post-deposition demands as the deposition occurred on June 28, 2019.[154] On cross-examination, the Debtor  was asked how he managed to avoid bankruptcy until 2015 as he had not been paid since 2008.[155]  The Debtor responded that he was behind on all his debts.[156] Additionally, the Debtor testified that his property in Fort Lee, New Jersey, which was purchased in 2007, was foreclosed upon because the Debtor was unable to pay the mortgage.[157]  The Debtor also testified that he owned real properties in Manhattan, New York City in 2006 and 2005 and sold these properties for a profit. [158]  The Debtor further testified that the profit from the sale of these properties was used to finance his share in North Park.[159]

---

[150] Trial Tr. 42:10-14, Nov. 22, 2019.
[151] Trial Tr. 43:7-8, Nov. 22, 2019.
[152] Trial Tr. 43:10-25 to 44:7-8, Nov. 22, 2019.
[153] Trial Tr. 49:15-22; Trial Tr. 50:1-14; Trial Tr. 51:1, Nov. 22, 2019.
[154] Trial Tr. 51:10-18, Nov. 22, 2019.  Additionally, this Court was not provided with the Debtor's deposition transcript dated June 28, 2019 but was provided with excerpts from the Debtor's deposition dated March 20, 2013. (Ex. P-8).
[155] Trial Tr. 53:8-25, Nov. 22, 2019.
[156] Trial Tr. 53:12-25, Nov. 22, 2019.
[157] Trial Tr. 55-56, Nov. 22, 2019.
[158] Trial Tr. 56:19-25; Trial Tr. 57:1-3, Nov. 22, 2019.
[159] Trial Tr. 57:1-3, Nov. 22, 2019.

The Debtor testified that the proceeds that he invested in North Park came from his savings

and business investments.[160]  The Debtor admits to wiring funds to the Trust[161], believing the North

Park Agreement was viable:

> MR. GERACE:        Okay. Did you ultimately agree to invest in North Park?
>
> DEBTOR:            A Yes.
>
> MR. GERACE:        Tell the Court why.
>
> DEBTOR:            The way Mr. Kohanseih explained it, it was a great building
>                    with potential of good income, and they're willing to give
>                    me money for my monthly expenses and I would invest my
>                    money to the building.[162]
>
> ***
>
> DEBTOR:            Well, according to Mike Kohan (sic), my friend, he said it
>                    was a very good investment and bring all your money, invest
>                    in this building and we give you $7,000 a month. And
>                    according to this agreement and my lawyer who read it that
>                    was a great deal and I decided to go for this deal.[163]

The Debtor testified  that he did not recall ever stating his income was healthy in 2010, and no

evidence presented at the time contradicted that statement.[164] Lastly, it was emphasized through

cross-examination and in the Amended Adversary Complaint that the $7,000 per month payment

lasted approximately one year.[165]

---

[160] Trial Tr. 49:10-12, Nov. 22, 2019.
[161] Trial Tr. 63:9-14; Trial Tr. 64:2-4, Nov. 22, 2019.
[162] Trial Tr. 19:6-12, Nov. 22, 2019.
[163] Trial Tr. 20:18-22, Nov. 22, 2019.
[164] Trial Tr. 68:19-21, Nov. 22, 2019.
[165] Trial Tr. 72:4-8, Nov. 22, 2019.
Paragraph 79 of the Amended Adversary Complaint provides:

> The failure of North Park to pay the special distribution of $7,000 per month since December
> 2008 constitutes a breach of contract. ECF 11.

In response, the Defendants denied these allegations as Defendants' Answer states:

On redirect, the Debtor indicated that other than recent discovery requests, no other documents or responses to interrogatories were requested of him.[166] Further, he indicated the monies sent to the Trust was for North Park, and that he was directed to do so by Mehran.[167] The Debtor also indicated he did not know whether Mehran, Michael or Dr. Nobel lost money in North Park.[168] Further, the Debtor noted he was not informed about the mortgage involving the Sandburg Mall and North Park and the Debtor only learned of this mortgage upon the commencement of this litigation. Lastly, the Debtor concluded that he saved money for many years, invested to make a profit, was promised "good money," but due to the Defendants' failure to pay the Debtor $7,000 per month, the Debtor became financially "broke," which meant he had "nothing left."[169]

On further redirect, the Debtor indicated that he lost his home in about 2016 and stopped making payments when the $7,000 monthly payments ceased.[170] However, during further testimony, the Debtor was unable to demonstrate or provide any evidence showing he had not paid his mortgage since 2008.[171]

During direct examination, Michael testified that he was part of the management of North Park along with Mehran.[172] Michael was the only manager allowed to write checks.[173] The Debtor was not required to do anything in connection with the North Park Agreement.[174] Additionally, Michael indicated he did not read the entire North Park Agreement nor did he have anyone review

---

Paragraph "79" purports to state legal conclusions as to which no response is required; to the extent (if any) that any further response is required, Defendants deny the allegations of Paragraph "79." ECF 35.

[166] Trial Tr. 73:1-12, Nov. 22, 2019.
[167] Trial Tr. 73:14-17, Nov. 22, 2019.
[168] Trial Tr. 75:11-15, Nov. 22, 2019.
[169] Trial Tr. 76:22-25 to 77:1, Nov. 22, 2019.
[170] Trial Tr. 80:2-8, Nov. 22, 2019.
[171] Trial Tr. 80:11-20, Nov. 22, 2019.
[172] Trial Tr. 83:3-6, Nov. 22, 2019; Trial Tr. 83:7-10, Nov. 22, 2019.
[173] Trial Tr. 83:13-19, Nov. 22, 2019.
[174] Trial Tr. 84:17-18, Nov. 22, 2019.

the agreement prior to signing same.[175] Michael acknowledged that his wife and Mehran's wife

are second cousins, and his  sister is Dr. Nobel's wife.[176] Michael further testified that he, Mehran,

Yousef, Dr. Nobel, and the Debtor all contributed monies for the North Park investment but he

could not remember the exact amount each person contributed.[177] Michael agreed with the

assertion that the Debtor contributed approximately $1.2 million and another $300,000 in

connection with North Park.[178] With respect to the North Park Agreement, Michael and Mehran

had a 30.5% interest, his brother, Yousef, had a 10 % interest, and the Debtor had 29% interest.[179]

Michael testified that he, Dr. Nobel, Yousef, Mehran, were owners of Sandburg Mall which was

formed before North Park, and the Debtor was not an owner of Sandburg Mall.[180] He further

testified that after the 2008 financial crash, taxes in connection with North Park were not filed on

a year-to-year basis as required by the North Park Agreement.[181]  Furthermore, Michael was unable

to recall whether any tax returns had been filed for North Park in years 2007, 2008, 2009, or

2010.[182]  The testimony provides:

| | |
|---|---|
| MR. GERACE: | And in fact, the tax returns weren't done until 2014; isn't that true? |
| MICHAEL: | That's 2008 things crashed and that, you know, just worrying about covering, the you know – |
| MR. GERACE: | I understand. |
| MICHAEL: | -- the expenses. So – |
| MR. GERACE: | I'm just asking about the tax return. |

---

[175] Trial Tr. 84:2-14, Nov. 22, 2019.
[176] Trial Tr. 84:23-25 to 85:1-15, Nov. 22, 2019.
[177] Trial Tr. 86:2-12, Nov. 22, 2019.
[178] Trial Tr. 86:21-25 to 87:1-2, Nov. 22, 2019.
[179] Trial Tr. 88:13-20, Nov. 22, 2019; Trial Tr. 88:17-24, Nov. 22, 2019.
[180] Trial Tr. 91:6-19, Nov. 22, 2019.
[181] Trial Tr. 93:22-25, Nov. 22, 2019.
[182] Trial Tr. 93:12-25, Nov. 22, 2019.

> MICHAEL:                We are not worrying about paying the, you know, to file the
>                         taxes.  We were trying to save the property.[183]

Michael also testified that he tried to save North Park using the Sandburg Mall property.[184]

He testified that Mehran was essentially running North Park and Sandburg and making all the

decisions.[185]   With respect to North Park, he testified that the market crashed in 2008 and

approximately 80% of the commercial property crashed, and North Park lost big tenants, including

a healthcare company that was paying approximately $50,000 to $60,000 per month in rent.[186]

On direct examination Michael testified that the Debtor wired $1.2 million to purchase

North Park and then the Debtor wired an additional $300,000 for North Park.[187]   Michael further

testified that he did not know where the $1.2 million and $300,000 originated but testified these

monies were used by the Debtor to purchase "his share" in North Park.[188]   The North Park

transaction took place in 2007.[189]  Michael stated that Debtor's $1.5 million investment in North

Park  included monies obtained from the Debtor's business.[190]  The Debtor indicated to Michael

"That he has money in his business account he's gonna wire it."[191]    Michael testified that the

monies the Debtor was investing in North Park came from the Debtor's business account.[192]

Michael further testified these monies were sent to Dr. Nobel.[193]  Michael testified that he invested

$690,000 but he could not remember where he sent this money.[194]  However, Michael testified that

---

[183] Trial Tr. 93:22-25; 94:4-5, Nov. 22, 2019.
[184] Trial Tr. 98:25 to 99:1, Nov. 22, 2019.
[185] Trial Tr. 104:15-21, Nov. 22, 2019.
[186] Trial Tr. 105:9-17, Nov. 22, 2019.
[187] Trial Tr. 86:21-25 to 87:1-2, Nov. 22, 2019.
[188] Trial Tr. 87:8-13, Nov. 22, 2019; Trial Tr. 89:2-13, Nov. 22, 2019.
[189] Trial Tr. 112:15-23, Nov. 22, 2019.  Note, at first Michael testified the North Park transaction occurred in 2008, but upon an objection by Mr. Gerace, the record was corrected. Michael testified that the North Park transaction occurred in 2007.  Trial Tr. 112:15-23, Nov. 22, 2019.
[190] Trial Tr. 113:12-17, Nov. 22, 2019.
[191] Trial Tr. 113:21-22, Nov. 22, 2019.
[192] Trial Tr. 114:15-18, Nov. 22, 2019.
[193] Trial Tr. 89:15-16, Nov. 22, 2019.
[194] Trial Tr. 89:18-22, Nov. 22, 2019.

Mehran advised him where to send his monies.[195]  Michael further testified that Mehran found the property and knew what payments to make in connection with the property.[196]  At Mehran's direction, Michael paid the bills for North Park and Sandburg Mall.[197]

Michael testified that he, Dr. Nobel, Mehran, and Yousef were all owners of the Sandburg Mall but the Debtor was not.[198]  Michael also testified that the North Park Agreement required him to keep books, records, tax returns, financial reports, and capital accounts.[199] He testified that he did not understand the meaning of a "capital account" and he was unaware as to whether North Park ever formed or opened a capital account.[200]  With respect to tax returns, Michael could not recall whether a tax returns for North Park were submitted at the end of years 2007, 2008, 2009, and 2010.[201]  Michael testified that eventually the tax returns for North Park were completed, but he could not recall the specific year they were completed.[202]

With respect to the River City Agreement, Michael indicated that Debtor did not wire or pay him $100,000.[203]  Michael testified that he wrote the monthly $1,000 checks to the Debtor in connection with the River City Agreement because he was the only person that was authorized to write these checks.[204]  Michael also testified that he wrote the monthly $7,000 checks to the Debtor in connection with North Park.[205]  North Park stopped paying the Debtor the $7,000 monthly checks so when Michael was asked why he stopped writing the monthly $1,000 checks to the Debtor in connection with the River City Agreement, he responded that "[b]ecause after a few

---

[195] Trial Tr. 89:23-25, Nov. 22, 2019.
[196] Trial Tr. 90:5-8, Nov. 22, 2019.
[197] Trial Tr. 90:11-17, Nov. 22, 2019.
[198] Trial Tr. 91:6-16, Nov. 22, 2019.
[199] Trial Tr. 92:3-16, Nov. 22, 2019.
[200] Trial Tr. 92:21-25; Trial Tr. 93:1-3, Nov. 22, 2019.
[201] Trial Tr. 93:4:4-21, Nov. 22, 2019.
[202] Trail Tr. 94:6-15, Nov. 22, 2019.
[203] Trial Tr. 95:1-13, Nov. 22, 2019.
[204] Trial Tr. 95:15-20, Nov. 22, 2019.
[205] Trial Tr. 96:11-15, Nov. 22, 2019.

months we lost the other property also."[206]  Michael contended the property was lost because the

owner of the River City Mall swindled them.[207]  Michael testified that he was unsure as to exactly

what happened with River City but soon after this transaction, they realized they had lost money

in connection with River City.[208]  Michael testified that North Park and Sandburg Mall were

involved in a mortgage with First Trust because North Park "had a problem" so they guaranteed

this mortgage with the Sandburg Mall.[209] When questioned, Michael recalled that Sandburg Mall

had filed bankruptcy and he, Mehran, Dr. Nobel, and Yousef, were listed as creditors.[210] Neither

the Debtor nor North Park were not listed as creditors in the Sandburg Mall bankruptcy.[211]  Michael

testified that as of the date of his trial testimony, November 22, 2019, he was not involved in any

real estate investments with Mehran or Dr. Nobel.[212]  Michael testified that he wished he had

completed better due diligence on North Park prior to investing in it.[213]  With respect to North

Park, Michael testified:

> MICHAEL:    Yeah. It was 2008. Everybody, 80 percent of the property,
> commercial property crashed. We lost big tenants. We lost a health
> care company. It was paying 50, $60,000-a-month. The whole
> Detroit went under, underwater.[214]

---

[206] Trial Tr. 96:16-20, Nov. 22, 2019.

[207] The transcript provides:

> MICHAEL:    The lady was gonna sell us this thing and he, I think he crooked us and, you
> know, we lost the property.
>
> MR. GERACE:   Oh. Who crooked you?
>
> MICHAEL:    The owner for River Mall.

Trial Tr. 96:22-25, Nov. 22, 2019.

[208] Trial Tr. 97:9-13, Nov. 22, 2019.

[209] Trial Tr. 97:15-19, Nov. 22, 2019.

[210] Trial Tr. 98:16-25, Nov. 22. 2019 and Trial Tr. 99:1-3, Nov. 22, 2019.

[211] Trial Tr. 99:4-7. Nov. 22, 2019.

[212] Trial Tr. 104:10-14, Nov. 22, 2019.

[213] Trial Tr. 104:25, Nov. 22, 2019 and Trial Tr. 105:1-5, Nov. 22, 2019.

[214] Trial Tr. 105:14-17, Nov. 22, 2019.

As for his investment in North Park, Michael testified that he invested his own money for his share in North Park and did not borrow this money from Dr. Nobel.[215] This testimony contradicted his previous deposition testimony wherein Michael testified that he had borrowed money from Dr. Nobel to invest in North Park.[216]  At this deposition, Michael testified that to pay back Dr. Nobel, they sold part of North Park to the Debtor.[217] Michael testified that he invested in North Park and Sandburg Mall because he trusted Mehran as Mehran had completed the research and due diligence on North Park.[218]

At trial, counsel for defendants referenced the North Park Agreement which prohibited certain activities, including a section which provides that "North Park shall not incur, assume or guarantee any other indebtedness."[219]  Article 8, section 8.1, subsection II of the North Park Agreement provides:

> **Certain Prohibited Activities:** Notwithstanding any provision hereof or of any other document governing the formation, management, or operation of the Limited Liability Company to the contrary, the following shall govern: For so long as the mortgage loan made by Madison Realty Capital, L.P. or its successors and/or assigns, as their interests may appear ("Lender"), to the Limited Liability Company, is outstanding, the Limited Liability Company shall not: ***(i) incur, assume, or guaranty any other indebtedness, except for trade payables in the ordinary course of its business of owning and operating the [North Park] Property;*** (ii) engage in, seek or consent to any dissolution, winding up, liquidation, consolidation, merger, asset sale or transfer or membership interest; (iii) file or consent to the filing of any bankruptcy, insolvency or reorganization case or proceeding; (iv) institute any proceedings under applicable insolvency law or otherwise seek any relief under any laws relating to the relief from debts or the protection of debtors generally; (v) seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian or any similar official for itself or any other entity; (vi) make an assignment of its assets for the benefit of its creditors or an assignment of the assets or another entity for the benefit of such entity's creditors; (vii) take any action in furtherance of the foregoing or (viii) amend this Operating Agreement without first obtaining approval of Lender. ***Emphasis added.***

---

[215] Trial Tr. 106:6:14, Nov. 22, 2019.
[216] Trial Tr. 106:15-25; Trial Tr. 107:1-10, Nov. 22, 2019.
[217] Trial Tr. 107:23-25; Trial Tr. 108:1-7, Nov. 22, 2019.
[218] Trial Tr. 108:25; Trial Tr. 109:1-18, Nov. 22, 2019.
[219] Trial Tr. 118:21-24; Trial Tr. 119:1-4, Nov. 22, 2019.

Then in questioning by counsel for the Defendants, Michael testified as follows:

| | |
|---|---|
| MR. FARINELLA: | To the best of your recollection, did North Park incur, assume or guarantee any indebtedness from Sandburg Mall? |
| MICHAEL: | Sandburg guaranteed note. |
| MR. FARINELLA: | Right.  So Sandburg, so is it your testimony that Sandburg Mall incurred indebtedness on behalf of North Park? |
| MICHAEL: | Yes. |
| MR. FARINELLA: | Okay.  So North Park was never used -- |
| MICHAEL: | No. |
| MR. FARINELLA: | -- as collateral – |
| MICHAEL: | No.[220] |

Michael also testified that Mehran located the North Park Property.[221]  In connection with the North Park Property and Sandburg Mall, Mehran told Michael what expenses to pay.[222] Additionally, Michael testified that pursuant to the terms of the North Park Agreement, Mehran and Michael were managers of North Park and as such, Mehran and Michael were required to maintain certain books, records, tax returns, financial reports and create capital accounts.[223] However, Michael testified that he did know what a capital account is.[224]  In addition, tax returns for North Park for years 2007, 2008, 2009 and 2010 were prepared "years late."[225]

---

[220] Trial Tr. 120:16-25, Nov. 22, 2019.
[221] Trial Tr. 90:5-8, Nov. 22, 2019.
[222] Trial Tr. 90:11-17, Nov. 22, 2019.
[223] Trial Tr. 92:3-16, Nov. 22, 2019.
[224] Trial Tr. 92:21-25, Nov. 22, 2019.
[225] Trial Tr. 93-94, Nov. 22, 2019.

With respect to the River City Agreement, Michael was unable to recall whether the Debtor in fact paid $100,000 in connection with his share.[226] Michael testified that the Debtor did not pay Michael this money and he does not remember whether the Debtor paid it.[227] However, Michael did recall he wrote checks to the Debtor in the amount of $1,000 a month in connection with the River City Agreement.[228]  Michael also testified he was the only person that had the authority to write these checks.[229]  As for the North Park Agreement, Michael testified that he wrote checks to the Debtor for approximately $7,000 per month.[230]Michael testified he stopped writing the monthly $1,000 distribution for the River City Agreement and monthly $7,000 distribution for the North Park Agreement because "after a few months [they] lost the other property also."[231]  Michael testified that the owner of the River City Mall deceived them as the owner of the River City Mall was supposed to sell them this property and give them part of the operation.[232]  After a few months, they realized they had lost money in this transaction.[233]

Michael testified that Sandburg Mall and the North Park Property were involved in a mortgage with First Trust because North Park had a problem so Sandburg Mall was  used as a guarantee to save North Park.[234]  Sandburg Mall incurred debt on behalf of North Park but North Park was never used as collateral.[235]  Michael also testified they lost money on both North Park and Sandburg Mall transactions,[236]  and North Park failed due to the 2008 financial market crash.

---

[226] Trial Tr. 95:1-9, Nov. 22, 2019.
[227] Trial Tr. 95:7-13, Nov. 22, 2019.
[228] Trial Tr. 95:15-17, Nov. 22, 2019.
[229] Trial Tr. 95:18-20, Nov. 22, 2019.
[230] Trial Tr. 96:11-15, Nov. 22, 2019.
[231] Trial Tr. 96:16-20, Nov. 22, 2019.
[232] Trial Tr. 96:22-25; Trial Tr. 97:9-13, Nov. 22, 2019.
[233] Trial Tr. 97:12-13, Nov. 22, 2019.
[234] Trial Tr. 97:15-19; Trial Tr. 117:3-8, Nov. 22. 2019.
[235] Trial Tr. 120:19-25, Nov. 22, 2019.
[236] Trial Tr. 121:6-8; Trial Tr. 121:6-8, Nov. 22, 2019.

As a result of the crash, North Park's biggest tenant vacated the property.[237]  Losing this tenant caused a significant loss of revenue.  The record revealed that when the parties purchased North Park, which was prior to the 2008 financial market crash, the office building part of North Park generated approximately $160,000 in gross rent and had approximately $70,000 to $80,000 of expenses.[238]  Eventually, the parties could not pay the expenses and mortgage associated with North Park, and North Park went into foreclosure.[239]

On re-cross, Michael testified North Park had no indebtedness[240] to Sandburg for the Sandburg Mall mortgage which was executed in 2008.[241]  He did not know whether Sandburg Mall received anything in exchange for using Sandburg Mall as collateral for the note to "save" North Park.[242]  This mortgage, in relevant part, provides:

> WHEREAS, pursuant to that certain Loan Agreement by and between NORTH PARK REALTY MANAGEMENT, LLC, a Michigan limited liability company, Borrower and Lender [First Bank and Trust Company of Illinois] and dated as of a date even herewith, Borrower [Sandburg Mall Realty Management, LLC] has concurrently herewith executed and delivered that certain Promissory Note of even date herewith (herein called the "Note"), payable to the order of Mortgagee [First Bank and Trust Company of Illinois] in the original principal sum of SIX MILLION SEVEN HUNDRED FIFTY THOUSAND AND 00/100THS DOLLARS ($6,750,000) and bearing interest on such principal from time to time outstanding at the rate specified in the Note, with a maturity date of March 24, 2011; and[243]

With respect to the Sandburg Mall bankruptcy, Michael was unable to recall whether he was a party to a Complaint filed by the Chapter 7 Trustee in that case, Jeana K. Reinbold.[244]

---

[237] Trial Tr. 121:13-16, Nov. 22, 2019.

[238] The record does not clarify whether these are monthly or annual amounts.  However, the testimony revealed North Park's largest tenant, United Health, paid approximately $50,000 to $60,000 per month in rent, the Court's inclination is these are monthly amounts. Trial Tr. 121:18-23, Nov. 22, 2019.

[239] Trial Tr. 121:21-23, Nov. 22, 2019.

[240] Trial Tr. 122:14-16, Nov. 22, 2019.

[241] Ex. P-5.

[242] Trial Tr. 129:1-3; 124:12-15; 128:8-11, Nov. 22, 2019.

[243] Ex. P-5, "Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing," April 8, 2008.

[244] Trial Tr. 99:19-23, Nov. 22, 2019.

Michael also testified that he, Dr. Nobel, Mehran, and Yousef, were listed as creditors in

the Sandburg Mall bankruptcy.[245] Meanwhile, the Debtor and North Park were not listed as

creditors in the Sandburg Mall bankruptcy.[246]   Michael completed his own due diligence in

connection with the North Park Property prior to purchasing it.[247]  He testified at trial:

<table>
<tr><td>MR. GERACE:</td><td>All right. Did you do due diligence when it came to investing in North Park?</td></tr>
<tr><td>MICHAEL:</td><td>I wish we, I wish we had done better due diligence, no.</td></tr>
<tr><td>MR. GERACE:</td><td>So you did do due diligence. You just wish you would have done better?</td></tr>
<tr><td>MICHAEL:</td><td>Yes.</td></tr>
<tr><td>MR. GERACE:</td><td>And if you did better would you have invested in North Park?</td></tr>
<tr><td>MR. FARINELLA:</td><td>Objection, speculation.</td></tr>
<tr><td>MICHAEL:</td><td>The market changed. The market was crashed. Everything was crashed.[248]</td></tr>
</table>

As for his financial contribution to the North Park Property, at trial Michael testified he did

not borrow any money from Dr. Nobel to invest in the North Park Property; rather, Michael

testified he invested his own money.[249]  During his deposition, Michael testified he had borrowed

money from Dr. Nobel to invest in the North Park Property.[250]   Thereafter, Trustee's Counsel

stated that when Michael was asked at his deposition how he repaid Dr. Nobel, Michael responded:

"[w]e sold part of the [North] Park to Farooq [the Debtor].  Then we paid it off."[251]   At trial,

---

[245] Trial Tr. 98:23-25 to 99:1-7, Nov. 22, 2019.
[246] Trial Tr. 99:4-7, Nov. 22, 2019.
[247] Trial Tr. 105:2-10, Nov. 22, 2019.
[248] Trial Tr. 104:25 to 105:1-10, Nov. 22, 2019.
[249] Trial Tr. 106:6-8, Nov. 22, 2019.
[250] Trial Tr. 107:9-10, Nov. 22, 2019; Ex. P-16, Michael Khakshoor Dep. 77:1-5, May 30, 2019.
[251] Trial Tr. 107:23-25, Nov. 22, 2019 and Ex. P-16, Michael Khakshoor Dep. 77:6-8, May 30, 2019.

Michael testified that he did not believe this was wrong because this meant that Dr. Nobel no

longer wanted to be part of North Park.[252]  Trustee's Counsel asked Michael whether he knew why

Dr. Nobel withdrew from North Park to which he testified he had "no idea."[253]

Michael also testified he was not presently involved in any other real estate investments

with Mehran.[254]  Michael also admitted that Mehran was running the North Park Property and

Sandburg Mall, which meant Mehran was making all the decisions in connection with these

properties.[255]

Next,  Mehran testified that Sandburg did not get a loan from North Park and essentially

Sandburg took a mortgage in 2008 to help North Park.[256]  After referencing page 1 of Exhibit P-5,

Mehran indicated a loan agreement existed between Sandburg and North Park.[257]  Counsel read

into the record a portion of page 1 of Exhibit P-5 which is the mortgage dated March 25, 2008

which provides:

> Whereas, pursuant to that certain Loan Agreement by and between North Park
> Realty Management, LLC a Michigan Limited Liability Company, Borrower and
> Lender, and dated as of the date even herewith, Borrower," which is Sandburg, "has
> concurrently herewith executed and delivered that certain Promissory Note of even
> date herewith payable to the order of Mortgagee [First Bank and Trust Company of
> Illinois] in the original principal sum of…$6,750,000.00 and bearing interest on
> such principal  from time to time outstanding at the rate specified in the Note with
> a maturity date of March 24, 2011."[258]

Article 8, section 8.1, subsection II of the North Park Agreement provides that "North Park

shall not "incur, assume, or guarantee any other indebtedness…."[259]

---

[252] Trial Tr. 108:6-7, Nov. 22, 2019.
[253] Trial Tr. 108:8-11, Nov. 22, 2019.
[254] Trial Tr. 104:10-12, Nov. 22, 2019.
[255] Trial Tr. 104:15-21, Nov. 22, 2019.
[256] Trial Tr. 134:19-20, Nov. 22, 2019; Ex. P-4; Trial Tr. 134:7-10, Nov. 22, 2019.
[257] Trial Tr. 137:15-25; 138:1-4, Nov. 22, 2019.
[258] Ex. P-5; Trial Tr. 137:15-23, Nov. 22, 2019.
[259] Ex. P-1; Trial Tr. 119:1-3, Nov. 22, 2019.

Mehran continued that with receiving decreased rent, they could no longer satisfy the current mortgage interest rate of approximately 17% and in order to secure a mortgage with an interest rate of 6%, the lender required additional collateral so Sandburg Mall had to be used as collateral.[260] Again, Mehran contended Sandburg was used as collateral to save North Park.[261] Mehran noted that although Sandburg did this as a "favor" to North Park "by being a second collateral," both North Park and Sandburg had similar partners and their money was involved in North Park -- they did not want their money invested in North Park to be wasted.[262] Additionally, money was taken from Sandburg to pay North Park's expenses.[263] Mehran then testified that he told the Debtor the mortgage interest rate was reduced from 17% to 6%, for which the Debtor was thankful and grateful. He testified that the Debtor did not ask for, nor was he given, the mortgage although "it was ready for him any time he wanted it."[264]

On cross-examination, counsel directed Mehran's attention to a complaint *In re Sandburg Mall v. Mehran Kohansieh*, which was filed in the United States Bankruptcy Court for the Central District of Illinois ("Illinois Complaint").[265] As provided on the record, the Illinois Complaint provides: "[a]lthough the Sandburg property was pledged as collateral for the First Bank loan and secured the mortgage, proceeds of the First Bank loan were used to purchase property located at 17117 West Nine Mile Road in Southfield, Michigan for the benefit of North Park."[266] In response, Mehran contended "[w]ell, it was not purchased, it was refinanced."[267] However, Mehran conceded that counsel correctly read the above allegation of the Illinois Complaint into the record

---

[260] Trial Tr. 138:22-25, Nov. 22, 2019 and 139:1-15, Nov. 22, 2019.
[261] Trial Tr. 138:22-25, Nov. 22, 2019.
[262] Trial Tr. 140:9-13, Nov. 22, 2019
[263] Trial Tr. 141:4-5, Nov. 22, 2019.
[264] Trial Tr. 140:18-20, Nov. 22, 2019 and 141:8-16, Nov. 22, 2019.
[265] Ex. P-10.; Trial Tr. 144:22-25, Nov. 22, 2019; 145:1-7, Nov. 22, 2019.
[266] Trial Tr. 145:3-7, Nov. 22, 2019.
[267] Trial Tr. 145:9, Nov. 22, 2019.

but contended that provision was incorrect.[268]   Ultimately, the Illinois Complaint was settled

without any admission of liability.[269]  The Notice of Compromise filed in connection with the

Illinois Complaint references different parties in the same case.[270]  Michael, Mehran and Yousef

claims are identified as $0.00 in the Illinois Complaint and Dr. Nobel's claim is identified as

$245,000.[271]

Mehran further testified that there was a first mortgage on the Sandburg property dated

February 7, 2007.[272]  This mortgage was used to purchase Sandburg and therefore was the first

mortgage on the Sandburg property between Sandburg Mall Realty Management Inc. (Mortgagor)

and Intervest Mortgage Corporation (Mortgagee).[273] Mehran testified that the Sandburg mortgage

had to be paid back in approximately two to three years.[274]   However, as read into the record,

Sandburg's first mortgage provided: "a payment of interest only…for the period from and

including the date of the Mortgage of this Note, to and including August 1, 2008…."[275]

Therefore, the first Sandburg mortgage provided: "[t]he monthly payments commencing

with the payment due on August 1, 2007 and for the balance of the term of this Mortgage and Note

shall be $12,650."[276]  The mortgage further states: "[c]ontinuing thereafter on the first day of each

calendar month to and including ***August 1, 2008 on which date all outstanding principal together***

***with all unaccrued and unpaid interest and any and all other amount whatsoever due here under***

***shall be due and payable in full.***"[277]  (***Emphasis added***).  Mehran testified that it was his

[268] Trial Tr. 145:8-11, Nov. 22, 2019.
[269] Trial Tr. 146:17-20, Nov. 22, 2019.
[270] "Notice of Compromise" filed in the United States Bankruptcy Court, Central District of Illinois. Ex. P-11.
[271] Ex. P-18 at 8 and 9.
[272] Ex. P-4.; Trial Tr. 150:11-14, Nov. 22, 2019.
[273] Trial Tr. 150:11-14, Nov. 22, 2019 and 150:17-19, Nov. 22, 2019.  Also, a copy of this mortgage was attached as Ex. P-4.
[274] Trial Tr. 150:22-23, Nov. 22, 2019.
[275] Trial Tr. 151:22-152:12, Nov. 22, 2019.
[276] Trial Tr. 152:1-6, Nov. 22, 2019.
[277] Trial Tr. 152:7-12, Nov. 22, 2019.

understanding, based on his relationship with the mortgage lender, if the mortgage could not be paid in one year, the term of the first Sandburg mortgage could be extended by paying another point.[278]  On cross-examination, Mehran testified that the first mortgage on Sandburg Mall was paid in full with the subsequent refinance of the North Park mortgage.[279] Mehran then testified that he refinanced North Park at a lower rate to pay off the principal amount owed to Madison Capital which had a 17% interest rate and put a second mortgage on Sandburg.[280]  Mehran further testified that they "got permission from the lender to allow [them] to put the second mortgage on Sandburg because the lender would not have done it if he want[ed], without [the] consent of the first mortgagee."[281]

Mehran stated he told the Debtor that the North Park property was being refinanced with additional collateral but he did not show the Debtor the written paperwork regarding this refinance.[282]  Mehran indicated the written paperwork regarding the North Park refinance was not shown to the Debtor because the Debtor did not request to see it.[283]

 Testimony revealed that as of April of 2008 a loan agreement existed between Sandburg Mall and North Park ("Loan Agreement").[284]  Mehran testified this Loan Agreement "was for the second loan that [ ] refinanced North Park" and the lender required this Loan Agreement.[285] Mehran contended he never saw the Loan Agreement.[286]  The lender required the parties to execute the Loan Agreement.[287]  Mehran testified that Yousef, Michael and Dr. Nobel were aware of using

---

[278] Trial Tr. 152:16-19, Nov. 22, 2019.
[279] Trial Tr. 153:5-16, Nov. 22, 2019.
[280] Trial Tr. 154:16-23, Nov. 22, 2019.
[281] Trial Tr. 154:16-23, Nov. 22, 2019.
[282] Trial Tr. 155:22-25; Trial Tr. 156:21-25; 157:1-21, Nov. 22, 2019.
[283] Trial Tr. 157:1-7, Nov. 22, 2019.
[284] Trial Tr. 155:9-11, Nov. 22, 2019.
[285] Trial Tr. 155:12-15; Trial Tr. 155:21, Nov. 22, 2019.
[286] Trial Tr. 155:18, Nov. 22, 2019.
[287] Trial Tr. 155:21, Nov. 22, 2019.

Sandburg as additional collateral.[288] Mehran emphasized he "never took any money from North

Park."[289]

    At his June 26, 2014 deposition Mehran testified as follows:

| | |
|---|---|
| MR. GERACE: | Okay.  First Bank agreed to lend you money on North Park but only if in addition to the North Park collateral, you would also collateralize –- |
| MEHRAN: | Sandburg Mall. |
| MR. GERACE: | – Sandburg Mall? |
| MEHRAN: | Yes. |
| MR. GERACE: | Okay.  So if you defaulted on the Sandburg Mall mortgage and the North Park mortgage, more than the North Park mortgage, they could foreclose on either property? |
| MEHRAN: | No. |
| MR. GERACE: | Okay.  Then tell me. |
| MEHRAN: | The Sandburg Mall was cross collateralized.  They were a second mortgage holder on the Sandburg Mall.  If you defaulted on North Park, they were going to foreclose on North Park, get a judgment against North Park, and utilize that judgment to go and collect from the second collateral that they had which was Sandburg which they're doing it right now and that property is in bankruptcy because of that. |
| MR. GERACE: | There's documents to that effect? |
| MEHRAN: | Absolutely.[290] |

    Additionally, Mehran testified:

---

[288] Trial Tr. 156:1-2, Nov. 22, 2019.
[289] Trial Tr. 156:5-10, Nov. 22, 2019.
[290] Ex. P-7, Dep. Mehran Kohansieh 75:10-76:8, June 26, 2014.

<table>
<tr><td>MR. GERACE:</td><td>What would happen if you didn't pay First Bank timely payments on the second mortgage with First Bank or Sandburg, anything?</td></tr>
<tr><td>MEHRAN:</td><td>That wasn't a second mortgage that we had to make payments on. It was cross collateralized meaning they had a lien on the property but that lien was a second position lien because the first lien was the mortgage on Sandburg Mall. So basically we were not obligated to pay any payment on that second mortgage. It was just as a security if at any time they have a shortfall on Sandburg Mall, they can come and collect from Sandburg Mall.[291]</td></tr>
</table>

Mehran indicated, based on his understanding "commingling means that you take the money from one company and you involve it with another company."[292] Mehran agreed with the assertion that such commingling occurred when the Sandburg Mall and North Park were used in the loan agreement.[293] Additionally, such commingling was prohibited by the North Park Agreement.[294] Mehran stated that he felt it was his fiduciary responsibility to save the North Park Property, as utilities were being cut off.[295] Additional funds of $300,000 were invested in North Park in an attempt to save it.[296] Mehran contends Sandburg loaned North Park the $300,000 additional funds and in exchange Sandburg did not receive any interest.[297]

Mehran testified that no capital accounts were created by North Park.[298] He also testified that tax returns for North Park were filed late for the years 2007, 2008, 2009 and 2010 because, despite being requested, the Debtor did not provide his Social Security number.[299] Mehran

---

[291] Pl.'s Motion for Disposition of the Am. Adv. Compl., ¶ 10, ECF. 103. ECF 103 cites to pg. 77 of Mehran's Deposition Transcript dated June 26, 2014. Ex. P-7.
[292] Trial Tr. 160:6-8, Nov. 22, 2019.
[293] Trial Tr. 158:25 to 159:1-7, Nov. 22, 2019.
[294] Ex. D-1.
[295] Trial Tr. 159:12; Trial Tr. 160:14-15, Nov. 22, 2019.
[296] Trial Tr. 160:17-19, Nov. 22, 2019.
[297] Trial Tr. 160:22-25 to 161:1-3, Nov. 22, 2019.
[298] Trial Tr. 161:20-23, Nov. 22, 2019.
[299] Trial Tr. 162:11-19, Nov. 22, 2019.

testified that his accountant was calling him five times a day to obtain the Debtor's Social Security number as this information was needed to finalize the K-1, and to file the tax returns.[300]  Finally, in 2014 the 2007 tax returns for North Park were produced.[301]  Mehran  testified that separate records, books and accounts were maintained for North Park.[302]  Mehran provided the Debtor with copies of these documents, bank statements, and electric bills.[303]

However, Mehran provided conflicting testimony as to whether these documents were provided in 2008.  At one point he is asked about these documents:

> MR. GERACE:          -- did you send him [the Debtor] records, books and
>                      accounts?
>
> MEHRAN:              He didn't ask for it[304]

Then the testimony proceeds:

> MR. GERACE :         All right. So when I asked you a question and you
>                      answer, "He didn't ask for it," does that mean no?
>
> MEHRAN:              No, I send him bank statements I recollect.[305]

Mehran was unsure as to whether financial statements, accounting statements, and preparation of tax returns were completed on a timely basis for North Park.[306]  Mehran simply asserted QuickBooks had been used.[307]  Mehran testified that he was the manager of both North Park and Sandburg.  Mehran also testified that he "was putting money from Sandburg into North

---

[300] Trial Tr. 163:2-5, Nov. 22, 2019.
[301] Trial Tr. 164:4-8, Nov. 22, 2019.
[302] Trial Tr. 165:10-12, Nov. 22, 2019.
[303] Trial Tr. 165:13-17, Nov. 22, 2019.  Note this portion of the transcript indicates "We send him bank statements; we send him – at some point when the other attorneys were asking for discovery, we gave him all the electric bills, all the payments that we made for electric bills." Trial Tr. 165:14-17, Nov. 22, 2019.  The use of the word "we" does not designate who else was involved in this, so at minimum, Mehran was part of the "we".
[304] Trial Tr. 165:22-25 to 166:1-3, Nov. 22, 2019.
[305] Trial Tr. 166:19-21, Nov. 22, 2019.
[306] Trial Tr. 168:1-5, Nov. 22, 2019.
[307] *Id.*

Park account to pay the electric."[308]  Mehran testified that liabilities of North Park were paid from North Park funds but North Park at some point could not maintain adequate capital and they "had to put some money in the accounts to pay some bills" but North Park was not obligated to Sandburg.[309]

Mehran also testified that the registered office in the North Park Agreement was 48 West 48th Street, New York, New York.[310]  This address is also the address listed as the registered office for Sandburg Mall.[311]  Additionally, Mehran testified as to the familial and business relationships between and among the parties.  With respect to Dr. Nobel, Mehran was Dr. Nobel's manager in the Sandburg Mall.[312]  Mehran was also Dr. Nobel's agent.[313]  Mehran effectively worked simultaneously for Dr. Nobel and Sandburg Mall.[314]  Mehran was tasked with watching Dr. Nobel's investment in Sandburg Mall as well as the investors' money in North Park.[315]  Mehran further testified that Dr. Nobel's wife is Michael's sister.[316]  He also testified that Mehran's wife and Michael's wife are first cousins.[317]  Despite this familial relationship, Mehran testified he "never knew Mr. Nobel before I [Mehran] get into the business with him with Sandburg Mall."[318]  Mehran also testified that prior to North Park, he had completed other business deals, including deals with Dr. Nobel in New Jersey.[319]  Additionally, prior to Sandburg Mall, he had completed at

[308] Trial Tr. 168:16 -25, Nov. 22, 2019 and 170:16-19 and 8-25, Nov. 22, 2019.
[309] Trial Tr. 168:11-12, Nov. 22, 2019.
[310] Note, this portion of the transcript does not indicate this address was located in New York, New York. But as evidenced by the North Park Agreement, the address of "48 West 48th Street" is located in New York, New York. Trial Tr. 17:19-21, Nov. 25, 2019.
[311] Trial Tr. 17:19-24, Nov. 25, 2019.
[312] Trial Tr. 17:25 to 18:18, Nov. 25, 2019.
[313] Trial Tr. 18:2-3, Nov. 25, 2019.
[314] Trial Tr. 18:4-5, Nov. 25, 2019.
[315] Trial Tr. 19:18-23, Nov. 25, 2019.
[316] Trial Tr. 18:12-13, Nov. 25, 2019.  Dr. Nobel also testified at this deposition in 2019 that Michael was his wife's brother.  Ex. P-17, Dr. Nobel Dep. Tr. 26:19-22, June 26, 2019.
[317] Trial Tr. 18:15-20, Nov. 25, 2019.
[318] Trial Tr. 18:23-24, Nov. 25, 2019.
[319] Trial Tr. 20:21-25, Nov. 25, 2019.

least two business deals with Dr. Nobel, including a deal in the Bronx, New York.[320]  Dr. Nobel

was able to finance these deals as he is a doctor and earns money in his medical practice.[321]

Dr. Nobel testified at his deposition on June 26, 2019 that:

| | |
|---|---|
| MR. GERACE: | Did North Park – owe you personally any money? |
| DR. NOBEL: | Because they used me – used me as a bank. … And also they owed Sandburg Mall. |
| MR. GERACE: | All right.  Was there any loan documents between North Park and you? |
| DR. NOBEL: | No. |
| MR. GERACE: | Was there any loan documents between North Park and Sandburg Mall? |
| DR. NOBEL: | So how did you – how did you know what they owed you? |
| DR. NOBEL: | I found an estate  -- a statement that was in an email that shows they transfer money wire to North Park, and I exhibited it, I put it in . . . |
| MR. GERACE: | So there was no documents that you know of, no formal loan documents memorializing loans from – owed to you to you by North Park? |
| DR. NOBEL: | No. |
| MR. GERACE: | Okay.  And no formal loan documents memorializing loans that North Park owed to Sandburg Mall? |
| DR. NOBEL: | I don't know.[322] |

---

[320] Trial Tr. 21:7-9; Trial Tr. 21:1-6, Nov. 25, 2019.
[321] Trial Tr. 21:10-13, Nov. 25, 2019.
[322] Pl.'s Motion for Disposition of the Am. Adv. Compl., ¶ 10, ECF. 103.  Ex. P-17, Dr. Nobel's Deposition Transcript dated June 26, 2019; Tr. 38:9-39:14.

Mehran testified that Sandburg Mall was owned by a lender and sold to him.[323]  He testified

the lender approached him about North Park. [324]North Park was a real estate owned ("REO")"

property and, therefore, was owned by the lender.[325] A nonrefundable deposit was placed on North

Park.[326] Because North Park was a REO, the Defendants were required to close on the sale of

North Park quickly and needed a loan from a hard money lender.  Madison Capital funded this

loan.[327]  Sandburg Mall and North Park were not Mehran's only real estate transactions.[328]  In

Mehran's opinion, North Park was a good deal and had a sound financial structure because "it was

anchored by United Healthcare for two floors and [United Healthcare] were paying over $35,000-

a-month" and North Park  had  other tenants.[329]

Additionally, Mehran's testimony revealed Dr. Nobel was hesitant to invest in North

Park.[330] Dr. Nobel's hesitation was memorialized in a January 22, 2016 letter from his attorneys,

Kaplan, Kenegos & Kadin (the "Letter").[331]  In pertinent part, this Letter provides:

> In October 2007, Dr. Nobel and his wife, Behjat Nobel, were considering investing
> in North Park Mall  in Southfield, Michigan along with several other individuals.
> Dr. Nobel and his wife Behjat Nobel deposited $2,000,000.00 in Chicago Title
> Escrow towards the $7.550 million purchase of the property located at 17117 West
> Nine Mile, Southfield, Michigan….
>
> After doing his due diligence, Dr. Nobel and his wife decided that they were not
> interested in the property.  Mr. Sakhe  agreed to purchase the Nobel's 29% interest
> for $2,000.000.00.  Mr. Sakhe deposited $300,000.00 as his initial share is also
> reflected in the Chicago Title Receipt Document.[332]

---

[323] Trial Tr. 71:4-8, Nov. 25, 2019.
[324] The transcript provides: "[w]e, we generate [a] relationship with our lender and they offered us North Park."
However, Mehran does not specify who is included in "we."  Trial Tr. 71:7-8, Nov. 25, 2019.
[325] Trial Tr. 52:3-7, Nov. 25, 2019.
[326] Trial Tr. 52:6-12, Nov. 25, 2019.  There is no indication as to who specifically placed this non-refundable deposit.
[327] Trial Tr. 52:6-12, Nov. 25, 2019.
[328] Trial Tr. 70:11-15, Nov. 25, 2019.
[329] Trial Tr. 71:17-25, Nov. 25, 2019.
[330] Trial Tr. 35:17-19, Nov. 25, 2019.
[331] Ex. P-8.
[332] Ex. P-8; Trial Tr. 34:14-23, Nov. 25, 2019.

Mehran testified that is understanding of the North Park transaction was that the Defendants asked Dr. Nobel to invest in North Park because they did not have sufficient funds to close the transaction:

> Your Honor, was that Mr. Nobel, we asked him because we were short to close the transaction so we asked him to bring the money. He brought the money. He was thinking to come in or not, be a partner or not, and at the end of the day he said that he'd just give us a loan and to give it back to him. When Mr. Sakhe, when we purchased the mall so we were $300,000 short. We went to Mr. Sakhe and asked him if he's willing to invest. He, we made an agreement with Farooq and his attorney that he's gonna contribute $300,000 towards the closing and he's gonna do his due diligence, and if his due diligence is not sufficient and he's not happy he's gonna get his $300,000 back.[333]

Dr. Nobel agreed to loan the money to the Defendants and Defendants would repay him.[334]  Additionally, Dr. Nobel provided $900,000 to help with purchasing North Park.[335]  Dr. Nobel obtained this money by refinancing the "Wamu East Orange" property by obtaining a home equity line of credit.[336]  This $900,000 was consistent with North Park's records.[337]This refinancing was completed by Dr. Nobel, Mehran and Obshoe.[338]  Dr Nobel loaned the Defendants approximately $2 million.[339]

Mehran further testified that Defendants approached the Debtor to determine whether his willingness to invest in North Park.[340]  In order to finalize the purchase of North Park, the Defendants needed an additional $300,000. On October 10, 2007, the Debtor wired the remaining $300,000 for the closing of North Park.[341]  The Debtor contributed these funds with the

---

[333] Trial Tr. 35:15-25, Nov. 25, 2019.
[334] Trial Tr. 35:18-19, Nov. 25, 2019.
[335] Ex. P-18 at "Nobel – 000007," which shows Dr. Nobel has a credit of $900,000.
[336] Trial Tr. 39:1-6, Nov. 25, 2019.
[337] Trial Tr. 54:23-25, Nov. 25, 2019.
[338] The record only mentions "Obshoe" once and therefore, no further information is known about "Obshoe."  Trial Tr. 39:5-8, Nov. 25, 2019.
[339] Trial Tr. 36:4-6, Nov. 25, 2019.
[340] Trial Tr. 35:20-21, Nov. 25, 2019.
[341] Trial Tr. 37:17-19; 38:21-22, Nov. 25, 2019.

understanding that the Debtor would conduct his own due diligence and, if the Debtor was not

satisfied, he would be repaid $300,000.[342] ("First Transaction") After several months had passed

and the Debtor had conducted his own due diligence, and upon the advice of his counsel, the

Debtor invested an additional $1.2 million in North Park.[343] ("Second Transaction") To repay a

portion of their $2 million debt to Dr. Nobel, Defendants requested the Debtor pay the additional

$1.2 million directly to Dr. Nobel.[344] Mehran contends the Debtor's attorney agreed to pay Dr.

Nobel.[345] Dr. Nobel provided Mehran with the wiring instructions and Mehran forwarded this

information to the Debtor's attorney.[346] The Debtor completed the Second Transaction by wiring

$1.2 million to Dr. Nobel. This is consistent with the General Journal entry for North Park dated

October 31, 2007, which indicated the Debtor paid $1.2 million.[347] The Defendants owed Dr.

Nobel a remaining balance of $800,000.[348] The remaining balance due to Dr. Nobel was supported

by North Park's books which showed Dr. Nobel loaned $400,000 to Michael and $400,000 to

Mehran.[349] By the end of 2008, North Park was in a state court receivership in Michigan.[350]

Mehran testified that he was the manager of North Park.[351] Generally speaking, Mehran

was also considered the chief financial officer of North Park.[352] His responsibilities included

handling finances, property issues, insurance and the money.[353]However, Mehran did not have the

---

[342] Trial Tr. 35:19-25, Nov. 25, 2019. This is defined above as the "First Transaction."
[343] Trial Tr. 36:1-4, Nov. 25, 2019. This is defined above as the "Second Transaction."
[344] Trial Tr. 36:4-6, Nov. 25, 2019.
[345] Trial Tr. 36:8-10, Nov. 25, 2019.
[346] Trial Tr. 36:11-13, Nov. 25, 2019.
[347] Trial Tr. 54:3-7, Nov. 25, 2019. Ex. P-18 at "Nobel-000005" which shows journal entry "30322-LOAN PAYMENT – SION NOBEL" in the amount of $1.2 million.
[348] Trial Tr. 36:8-10, Nov. 25, 2019. Ex. P-18 at "Nobel-000007."
[349] Trial Tr. 55:3-9, Nov. 25, 2019; Ex. P-18 at "Nobel-000007."
[350] Trial Tr. 64:1-3; 86:3-11, Nov. 25, 2019.
[351] Trial Tr. 20:3-4, Nov. 25, 2019.
[352] Trial Tr. 20:16-18, Nov. 25, 2019.
[353] Trial Tr. 20:3-12, Nov. 25, 2019.

authority to write checks associated with North Park.  Michael wrote the checks.[354]  Mehran further

testified he was also considered the chief financial officer of the Sandburg Mall.[355]

As the manager of North Park and signatory to the North Park Agreement, Mehran was

contractually obligated to comply with the terms set forth in the North Park Agreement.  As read

into the record, section "5.3 Reports" of the North Park Agreement provides:

> The managers shall close the books of account after the close of each calendar year,
> and shall prepare and send to each member a statement of such Member's
> distributive share of income and expense for income tax reporting purposes."[356]

When asked whether Mehran complied with this provision by providing these documents

at the end of any calendar year, Mehran testified:

> I sent him the bank statement which was clearly say it all.  It would say how much
> money came in, how much money went out.  He asked for it, we send it to him.[357]

Mehran understood North Park was financed with a hard money lender and the interest rate

was high and was expected to increase even higher.[358]   Counsel for the Trustee specifically

questioned Mehran as to whether the mortgage interest rate for North Park was 17% and asserted

the interest rate was 12%.[359] Upon being questioned, Mehran indicated he did not recall whether

the interest rate on North Park loan was 12%, but recalled this interest rate was expected to increase

to  17%.[360]  Mehran started searching for lenders that could offer a more conventional loan with a

lower mortgage rate of approximately 5% to  6%.[361]  Eventually Mehran located a lender that was

willing to  refinance  the  mortgage  on  North  Park;  however,  the  lender  required  additional

---

[354] Trial Tr. 20:5-15, Nov. 25, 2019.
[355] Trial Tr. 20:16-20, Nov. 25, 2019.
[356] Trial Tr. 24:5-24, Nov. 25, 2019
[357] Trial Tr. 24:25 to 25:2-4, Nov. 25, 2019.
[358] Trial Tr. 73:2-10, Nov. 25, 2019.
[359] Trial Tr. 32:17-19, Nov. 25, 2019.
[360] Trial Tr. 32:17-24, Nov. 25, 2019.
[361] Trial Tr. 73:4-6, Nov. 25, 2019.

collateral.[362]  Mehran contended that the "only remedy to be able to reduce my interest rate and to get a long-term loan with that lender."[363]  Mehran engaged in this refinancing deal with the intention to increase North Park's monthly revenue.[364]

Mehran asserted  that Dr. Nobel received copied of emails from First Bank/Illinois when Sandburg was mortgaged to benefit North Park.[365]  Mehran stated that he told  Dr. Nobel about refinancing North Park's mortgage to lower the interest rate from 17% to 6%.[366]   However, to finalize this deal Mehran testified that "the lender required additional collateral and the additional collateral was Sandburg Mall."[367]  Mehran further asserted he told the Debtor this loan needed to be completed because this "was the only remedy for me to do it to save the [North Park] property because at 17 percent there was no chance that this [North Park] property would have survived."[368]  Mehran contends he did not communicate in writing with the Debtor as he spoke on a daily basis with the Debtor about this loan.[369]  Mehran believed he did everything he could to try and save North Park but the revenue lost from United Healthcare could not be overcome.[370]  Mehran indicated North Park lost additional tenants which reduced North Park's income.[371]  However, the record showed United Healthcare paid rent every month in 2008 and a couple of months in 2009.[372]

---

[362] Trial Tr. 73:6-8, Nov. 25, 2019.
[363] Trial Tr. 73:8-10, Nov. 25, 2019.
[364] Trial Tr. 74:1-4, Nov. 25, 2019.
[365] These emails were not produced during discovery but were produced in compliance with this Court's Order dated June 25, 2020. ECF 106; ECF 110; Trial Tr. 27:2-9, Nov. 25, 2019.
[366] Trial Tr. 27:15-21, Nov. 25, 2019.
[367] Trial Tr. 27:15-25, Nov. 25, 2019.
[368] Trial Tr. 30:19-24, Nov. 25, 2019.
[369] Trial Tr. 32:1-16, Nov. 25, 2019.
[370] Trial Tr. 81:3-7, Nov. 25, 2019.
[371] Trial Tr. 85:17-19, Nov. 25, 2019.
[372] Trial Tr. 101:25 to 102:1-4; Trial Tr. 99:1-4, Nov. 25, 2019.

Mehran testified that because the interest rate on the original North Park mortgage was high, he attempted to refinance the mortgage to increase North Park's monthly revenue.[373] Sandburg Mall was used to refinance the mortgage on North Park.[374]

Mehran also testified that North Park was never encumbered by any other lien because the first lender did not allow any encumbrance under any circumstances.[375]  Mehran testified that the North Park transaction rendered Sandburg Mall insolvent but  Sandburg Mall did not render North Park insolvent.[376]  When questioned as to why Sandburg Mall filed bankruptcy, Mehran testified Sandburg Mall was encumbered by North Park and North Park was foreclosed.  Therefore the lender sought recourse with the Sandburg Mall as the Sandburg Mall was used as collateral to refinance the North Park mortgage.[377]  Mehran testified that North Park failed before Sandburg Mall and Sandburg Mall failed as a result of North Park's failure. . .[378]  Mehran testified that "[i]t [Sandburg Mall] was sold in the auction for one-fifth of the price that we paid for it."[379]  As for financial responsibility, Mehran testified that North Park was responsible for 100% of North Park's mortgage but Sandburg Mall faced the burden of this $6.7 million mortgage.[380]

For the period of October 2007 through December 2007, North Park generated a negative net income of approximately $170,000.[381]  As of  December 31, 2008 North Park showed a negative net income of approximately $831,000.[382]  Due to the lack of income, Mehran and Michael did not receive their distributions while the Debtor received some of his distributions.[383]

---

[373] Trial Tr. 73:22-25; Trial Tr. 74:1-4, Nov. 25, 2019.
[374] Trial Tr. 74:5-8, Nov. 25, 2019.
[375] Trial Tr. 74:14-24, Nov. 25, 2019.
[376] Trial Tr. 75:7-15, Nov. 25, 2019.
[377] Trial Tr. 76:12-20, Nov. 25, 2019.
[378] Trial Tr. 77:7-11, Nov. 25, 2019.
[379] Trial Tr. 77:15-18; Trial Tr. 78:1-5, Nov. 25, 2019.
[380] Trial Tr. 78:1-5; Trial Tr. 79:7-13, Nov. 25, 2019.
[381] Ex. P-26; Trial Tr. 53:1-25, Nov. 25, 2019
[382] Trial Tr. 53:7-9, Nov. 25, 2019; Ex. P-26.
[383] Trial Tr. 85:17-25, Nov. 25, 2019.

Eventually there was not enough money to pay for the electricity for North Park and Mehran stopped paying the Debtor his distribution.[384] Even Mehran lost money in North Park.[385]

Counsel asserted Sandburg and North Park were transferring monies back and forth.[386] In response, Mehran contended, based on his knowledge, Sandburg transferred money only when North Park needed it.[387] Mehran testified that North Park may have returned the money to Sandburg Mall that it had borrowed.[388] If North Park transferred monies to Sandburg, these transfers were made in connection with money that North Park had borrowed from Sandburg.[389] These transfers were recorded in bank statements, North Park's financial books, and Sandburg Mall's financial books.[390]

At Mehran's June 26, 2014 deposition, he testified North Park also wired approximately $120,000 to $150,000 to Marion Investment which was a property located in Marion, Illinois ("Marion Property").[391] The deposition transcript provides:

> MR. GERACE:    All right. Could you summarize by telling us where did Mr. Sakhe's money go on any of the real restate or every one of the real estate ventures that he's lost money on?
>
> MR. THOMPSON:    Other then what's already been testified to?
>
> MR. GERACE:    When?

---

[384] Trial Tr. 85:22-25, Nov. 25, 2019.

[385] Trial Tr. 81:11-13, Nov. 25, 2019.

[386] Trial Tr. 33:3-9, Nov. 25, 2019; Ex. P-18 at "Nobel – 000009," which is captioned "North Park Realty Management LLC – Transactions by Account as of December 31, 2014." This document shows the various entries captured as "Sandburg," which include entries dated: October 8, 2007, July 14, 2008, September 12, 2008, October 10, 2008, November 6, 2008, November 17, 2008, December 8, 2008, December 12, 2008, December 31, 2008, February 18, 2009, February 19, 2009, April 21, 2009, July 16, 2009, and October 7, 2009.

[387] Trial Tr. 33:10-11, Nov. 25, 2019.

[388] Trial Tr. 33:13-14, Nov. 25, 2019.

[389] Trial Tr. 33:12-14, Nov. 25, 2019.

[390] Trial Tr. 33:13-20, Nov. 25, 2019. Ex. P-18 at "Nobel – 000004", "Sandburg Mall Realty Management, LLC – Transactions by Account as of December 31, 2012" shows "Total...DUE/FROM – NORTH PARK REALTY" with a debit and credit of $255,901.19." This journal entry also shows a balance of $0.00.

[391] Ex. P-7; Trial Tr. 65:10-20; 90:4-5, Nov. 25, 2019.

| MR. THOMPSON: | Through this whole deposition? |
| MR. GERACE: | Well, I asked him to summarize. |
| MR. RADOW: | I'll object to the form, it's calling for a narrative but it's okay because you've been doing that anyway so go ahead. |
| MEHRAN: | The $300,000 went towards the purchase at the closing on the closing date. $1.2 million was paid to Dr. Nobel for the money that he advanced for the purchase of the property. $100,000 went into the River City Mall for the extensive roof work that we did which cost us over $200,000 to replace the roof. That's it. |
| MR. GERACE: | And the 150 that went to – |
| MEHRAN: | The 150 went from North Park to the title company, Chicago Title, for the purchase of the Marion property.[392] |

However, during trial he was unable to recall whether this transaction had occurred.[393]

When questioned on cross-examination at trial, Mehran testified that the Debtor and Mehran actually visited the Marion Property and Mehran had wired $120,000.[394]  Mehran however was unable to recall whether the $120,000 was used as a deposit or the money had been sent to the lender to conduct due diligence.[395]  Mehran confirmed he did not have anything in writing confirming he advised the Debtor to authorize $120,000 from North Park to the Marion Property.[396]

Mehran contended North Park owed the parties money in connection with paying the utilities and water and therefore   North Park did not lose $120,000 when this money was

---

[392] Ex. P-7, Mehran Kohansieh Dep. 127:16-25; 128:1-17, June 26, 2014.
[393] Trial Tr. 67:11-13, Nov. 25, 2019.
[394] Trial Tr. 89:21-25 to 90:1-5, Nov. 25, 2019.
[395] Trial Tr. 89:21-25 to 90:1-15, Nov. 25, 2019.
[396] Trial Tr. 96:2-7, Nov. 25, 2019.

transferred from North Park for the Marion Property.[397] Ultimately, Mehran and the Debtor did

not purchase the Marion Property because Mehran and the Debtor were unable to secure additional

funding to purchase the Marion Property.[398]

As for the Illinois bankruptcy filing by Sandburg Mall, Mehran was listed as a creditor in

the Illinois bankruptcy but he never received his distribution.[399] Specifically, Mehran was listed

as holding an unsecured non-priority claim; however, the value of Mehran's claim was

unknown.[400] Mehran testified if Sandburg Mall had not been encumbered to benefit North Park,

then Sandburg Mall would have been a successful transaction.[401] Sandburg Mall had the burden

of the $6.7 million loan for North Park.[402] Through the Illinois bankruptcy proceeding, Sandburg

was sold in an auction for approximately one-fifth of its purchase price.[403] Mehran testified that

they lost North Park because an anchor tenant, United Healthcare, vacated North Park in 2009.[404]

The record shows that United Healthcare was  paying in full every month in 2008 and the first

couple months of 2009.[405] Despite these rental payments, Mehran could not recall when North

Park was in receivership, but the Trustee indicated North Park was in receivership in State Court

in 2008.[406] To explain this discrepancy, Mehran testified that when other tenants of North Park

learned that United Healthcare was leaving, a domino effect happened that caused other tenants to

vacate North Park as well.[407] As for the QuickBooks records, Mehran testified that the

QuickBooks reports were date and time stamped. The testimony showed these date and time

---

[397] Trial Tr. 91:9-12; Trial Tr. 91:9-12, Nov. 25, 2019.
[398] Trial Tr. 95:13-16; Trial Tr. 95:13-20, Nov. 25, 2019.
[399] Trial Tr. 42:2-6, Nov. 25, 2019.
[400] Trial Tr. 44:10-20, Nov. 25, 2019.
[401] Trial Tr. 79:7-10, Nov. 25, 2019.
[402] Trial Tr. 79:7-13, Nov. 25, 2019.
[403] Trial Tr. 78:1-5, Nov. 25, 2019.
[404] Trial Tr. 98:4-13, Nov. 25, 2019.
[405] Trial Tr. 98:18-20, Nov. 25, 2019.
[406] Trial Tr. 100:8-11, Nov. 25, 2019.
[407] Trial Tr. 99:5-12, Nov. 25, 2019.

stamps may indicate when the reports were printed but could also indicate when the reports were created.[408]

United Health Care paid rent in 2008 and a couple of months in 2009 until it moved in 2009.[409] Tax returns for North Park were only filed in 2014.[410] Mehran contends these tax returns were filed late because he did not have the Debtor's Social Security number and therefore was unable create a K-1.[411] Mehran stated "the main reason because if you don't have a Social Security for one member you cannot file the tax return because then one K-1 is gonna be missing."[412] Again, Mehran was unable to recall when North Park's tax documents were created.[413] He also indicated that tax returns were filed, but were rejected by the Internal Revenue Service because of the Debtor's failure to provide his Social Security number even though requested.[414] However, Mehran was unable to provide any documentation from the Internal Revenue Service confirming the tax returns had been rejected.[415]

North Park and Sandburg Mall were not the only properties the Debtor lost. Mehran testified he had completed an additional transaction with the Debtor. This transaction involved a multi-residential property located in East Orange, New Jersey.[416] Mehran indicated this property

---

[408] Trial Tr. 50:24-25 to 51:2-15, Nov. 25, 2019.  Additionally, the testimony provided:

| THE COURT: | That doesn't necessarily refer to when these [reports] were prepared? |
| MEHRAN: | No. When every time you print a report from QuickBooks it would just put that date on it. Not necessarily mean that it was created that date." |

Trial Tr. 51:20-24, Nov. 25, 2019.
[409] Trial Tr. 97-100, Nov. 25, 2019.
[410] Trial Tr. 25:18-21, Nov. 25, 2019.
[411] Trial Tr. 25:18-21, Nov. 25, 2019.
[412] Trial Tr. 25:22-25, Nov. 25, 2019.
[413] Trial Tr. 56:23-25 to 57:1-25 to 58:3-5, Nov. 25, 2019.
[414] Trial Tr. 59:2-7, Nov. 25, 2019.
[415] Trial Tr. 59:14-2, Nov. 25, 2019.
[416] Trial Tr. 83:2-9, Nov. 25, 2019.

was also lost.[417]   Mehran, Dr. Nobel and Michael also lost a property in the Bronx; however,

Mehran testified that the Debtor was not involved with this property.[418]  Finally, Mehran testified

that the Debtor was receiving his capital contributions from November 2007 until about March

2009.[419]  At the conclusion of the testimony, Counsel for the Trustee represented that Dr. Nobel

was not available and that his deposition of June 26, 2019 was in the record.[420]

In summation, the Trustee argued, Dr. Nobel has a familial arrangement with Michael,

Mehran and Yousef.[421]  Due to the amount of money invested in North Park, Dr. Nobel  had to

save North Park to protect his own financial investments and the financial investments of Michael,

Mehran and Yousef, Dr. Nobel  did not save North Park as a favor, but rather Dr. Nobel saved

North Park to protect his investment.[422]  The Trustee argued that  the Loan Agreement, in which

Sandburg Mall was  used as collateral for the North Park  refinance, was never produced and the

Defendants did not comply with Court orders in refusing to produce the Loan Agreement.[423]

The Trustee emphasized the he Defendants refinanced the North Park mortgage in order to

save North Park  but also  to further Dr. Nobel's  interest to get his money back.[424]  Dr. Nobel was

trying to protect and secure the monies he lent to Mehran and Michael in connection with North

Park. The Trustee asserted the parties manipulated the movement of money back and forth.[425]

The Trustee urged that while Mehran claims to have told the Debtor of particular actions

taken to save North Park, Mehran was unable to provide anything in writing to prove he told the

---

[417] Trial Tr. 83:4-9, Nov. 25, 2019.
[418] Trial Tr. 88:7-17, Nov. 25, 2019.
[419] Trial Tr. 105:13-25 to 106:1-10, Nov. 25, 2019.
[420] Trial Tr. 107:20-25 to 108:1-4, Nov. 25, 2019.
[421] Trial Tr. 109:2-25, Nov. 25, 2019.
[422] Trial Tr. 110:1-10, Nov. 25, 2019.
[423] Trial Tr. 110:11-14, Nov. 25, 2019.
[424] Trial Tr. 110:19-24, Nov. 25, 2019.
[425] Trial Tr. 110:8-10, Nov. 25, 2019.

Debtor of the actions he took to save North Park.[426] The Trustee noted that the North Park Agreement required that "everything has to be in writing."[427] The Trustee concludes Dr. Nobel simply needed the return of his financial investment from North Park and the Defendants used the Debtor to facilitate the return of Dr. Nobel's money from North Park.[428]

The Trustee indicated Dr. Nobel, Michael, and Mehran should be held jointly and severally liable because they took advantage of the Debtor.[429] The Trustee seeks judgment of $1.5 million plus interest at the federal or state permissible rate dependent on the count, particularly the counts for fraudulent transfer, common law fraud, and unjust enrichment.[430]

In response, Defendants contended the Trustee did not provide any evidence to support his claim that Defendants "schemed to defraud" the Debtor of $1.5 million and such fraud was only discovered in 2014.[431] Counsel for the Defendants asserted the Debtor did not present any evidence that such a scheme was uncovered in 2014.[432]

Next counsel raised the issue of whether the monies transferred from the Debtor's business account are property of the bankruptcy estate.[433] Michael testified that he believed Mr. Sakhe sent the money from his business account.[434] Counsel argued, if the Trustee successfully demonstrated these monies were property of the bankruptcy estate, then the Court must examine if the breach of contract and fraudulent conveyance claims are proven.[435] To succeed on the fraudulent transfer

---

[426] Trial Tr. 110:25 to 111:1-5, Nov. 25, 2019.
[427] Trial Tr. 111:6-8, Nov. 25, 2019.
[428] Trial Tr. 111:13-15, Nov. 25, 2019.
[429] Trial Tr. 111:25 to 112:1-7, Nov. 25, 2019.
[430] Trial Tr. 112:4-7, Nov. 25, 2019.
[431] Trial Tr. 112:20-24, Nov. 25, 2019.
[432] Trial Tr. 112:20-24; Trial Tr. 113:6-8, Nov. 25, 2019.  There is conflicting testimony as to when Material World closed.  The Debtor testified in his deposition that Material World closed in 2000 to 2012 and then testified at trial that Material World closed in 2008.  Trial Tr. 46:1-18, Nov. 22, 2019.
Trial Tr. 113:12-18, Nov. 26, 2019.
[434] Trial Tr. 113:12-25; Trial Tr. 114:1-12, Nov. 25, 2019.
[435] Trial Tr. 113:19-21, Nov. 25, 2019.

claims and breach of fiduciary duty claims there must be a showing of actual fraud and Defendants committed fraud and conspired to do so.[436] Rather, counsel contends the Defendants' testimony demonstrates the Defendants and the Debtor invested in North Park and this investment was unsuccessful.[437]

Counsel emphasized the evidence demonstrated that the Debtor invested in North Park in or about 2007 and North Park paid the Debtor $7,000 per month as required by the North Park Agreement until about March 2009, which is when United Healthcare, the largest tenant vacated the North Park Property.[438] Counsel further argued North Park was placed in a receivership because of the vacancy caused by United Healthcare in conjunction with the state of the financial economy in 2008.[439] Accordingly, North Park was simply a bad investment, not a scheme to defraud the Debtor.[440]

To support his assertion that North Park was simply a bad investment,[441] counsel asserts the Debtor sought out to invest in North Park,[442] the Debtor knew Mehran for some time and believed Mehran was a good businessman,[443] but most importantly, prior to investing in North Park, the Debtor sought and relied on the advice of counsel and due diligence was performed, and the transaction approved.[444]

With respect to Count Seven, Piercing the Corporate Veil, counsel contends the Trustee has not presented evidence to support his assertion that the corporate veil should be pierced.

---

[436] Trial Tr. 113:19-5, Nov. 25, 2019.
[437] Trial Tr. 114:1-4, Nov. 25, 2019.
[438] Trial Tr. 114:14-16, Nov. 25, 2019.
[439] Trial Tr. 114:14-18, Nov. 25, 2019.
[440] Trial Tr. 114:18-19, Nov. 25, 2019; 115:1, Nov. 25, 2019.
[441] At trial, counsel for the Defendants stated, "putting it simply, this is a business investment that went bad." Trial Tr. 7:22-23, Nov. 22, 2019.
[442] Trial Tr. 114:20-25 to 115:1, Nov. 25, 2019
[443] Trial Tr. 114:21-22, Nov. 25, 2019.
[444] Trial Tr. 114:20-25, Nov. 25, 2019.

Rather, counsel argues the Defendants engaged in sound business decisions and therefore, the Defendants are not individually and personally liable in this matter.[445]  Therefore, this Court could find that North Park could be held liable for breaching the North Park Agreement.[446]

With respect to Count Eight, Fraudulent Transfer of $1.5 million, counsel contends the Trustee did not demonstrate (1) the $1.5 million was part of the bankruptcy estate; and (2) transferring the $1.5 million caused the insolvency.[447] Counsel contended the Debtor transferred the $1.5 million in 2007 and did not file bankruptcy until November of 2015.[448]

Count Eight and Count Nine - Fraudulent Transfer, Count Ten - Transferee Liability, Counts Eleven and Twelve - Common Law Fraud, and Count Thirteen - Conspiracy to Commit Fraud are tort actions that require an exponential showing of activity that concludes that fraud occurred.[449] Counsel argues the evidence presented in this trial does not demonstrate fraud nor does  the evidence remotely adhere to the standard of fraud.[450]

Count Fourteen - Negligent Misrepresentation, Count Fifteen - Unjust Enrichment, and Count Sixteen - Common Law Conversion are tort actions rooted in the possession of property.[451] One cannot convert property that does not belong to someone else.[452]  Here, counsel for the Defendants contends that there was no evidence presented to support the assertion that $1.5 million was the bankruptcy estate's property.[453]  That would support the $1.5 million requested judgment. Counsel asserted that the monies came from the Debtor's separate business account and that the

---

[445] Trial Tr. 115:1-14, Nov. 25, 2019
[446] *Id.*
[447] Trial Tr. 115:15-19, Nov. 25, 2019.
[448] Trial Tr. 115:19-22, Nov. 25, 2019.
[449] Trial Tr. 115:23-25 to 116:1-5, Nov. 25, 2019.
[450] Trial Tr. 116:2-5, Nov. 25, 2019.
[451] Trial Tr. 116:6-9, Nov. 25, 2019.
[452] Trial Tr. 116:9-10, Nov. 25, 2019.  Counsel stated on the record "You cannot convert something that does not belong to someone else."
[453] Trial Tr. 116:10-12, Nov. 25, 2019.

Debtor was unable to provide proof from bank accounts or financial records  as to the source of the $1.5 million.[454] Counsel  concluded Plaintiff Trustee failed to meet his  burden of proof in demonstrating the Defendants are liable on the Counts alleged in the Amended Adversary Complaint except perhaps the breach of contract by North Park.[455]  However, Counsel further contended the Defendants' conduct was not malfeasance, but simply the Defendants acted in such a manner driven by their desire to save to North Park after losing  United Healthcare.  Losing this tenant resulted in the loss of profits, which resulted in the Defendants losing North Park in a foreclosure.[456]  Simply, North Park was a bad investment.[457]

### *Post-trial Submissions*

On February 24, 2020, Plaintiff submitted "Plaintiff's Proposed Findings of Facts and Conclusions of Law."[458] Thereafter on March 25, 2020, Plaintiff moved for Disposition of the Amended Adversary Complaint per Plaintiff's Proposed Findings of Facts and Conclusions of Law or alternatively to strike Defendants' Answers to the Complaint and Entering Judgment Against Defendants in the Amount Established by the Trustee at Trial.[459]

Thereafter, on June 1, 2020, this Court entered an Order directing Defendants to file "Proposed Findings of Facts and Conclusions of Law" and produce certain emails referenced during the November 2019 trial.[460]  Specifically, during the trial,  Mehran testified that he advised Dr. Nobel about  the mortgage on Sandburg Mall that involved North Park.[461] Dr. Nobel "was copied on, on the subordination emails between First Bank" when he was subordinating Sandburg

---

[454] Trial Tr. 116:17-19, Nov. 25, 2019.
[455] Trial Tr. 116:20-25, Nov. 25, 2019.
[456] Trial Tr. 117:1-8, Nov. 25, 2019.
[457] Trial Tr. 117:7-8, Nov. 25, 2019.
[458] ECF 102.
[459] ECF 103.
[460] ECF 106; Trial Tr. 117:11-17; 118:19-23; 119:4-5, Nov. 25, 2019.
[461] Trial Tr. 27:2-5, Nov. 25, 2019.

Mall for North Park.[462]  On the record the parties agreed: "so there is an agreement after the close

of this hearing to make reasonable efforts to turn over those emails."[463]

On June 23, 2020, by way of correspondence to this Court, Defendants produced three

emails purporting to show that Dr. Nobel was aware of the subordination of the loan.[464]  Mehran

sent an email on May 28, 2009 to Dennis Ainger, Vice President/In-House Counsel of First Bank

and Trust Company of Illinois and copied Dr. Nobel.  This email reads:

> Dennis,
>
> I hope all is well.  I know that you, and Bruce [Hersh] had exchanged phone calls,
> and I was wondering the status of the process.  I spoke with Intervest today, and
> their attorney haven't heard from you.  As you know the loan is expired, and in
> order for us to be able to extend the loan, the subordination has to be in place.
>
> Thanks for your help.
>
> Mike. [Kohen]

There are two subsequent emails dated May 29, 2009 between Dennis Ainger, and Michael

that copy Dr. Nobel.  These emails were produced but the contents were blacked out; however, the

subject line of both emails is "RE: Subordination."

On June 22, 2020, Defendants submitted "Defendant's Proposed Findings of Facts and

Conclusions of Law."[465]

On July 13, 2020, Plaintiff filed "Plaintiff's Response to Defendants' Michael Khakshoor,

Mehran Kohansieh and Sion Nobel's Proposed Findings of Facts and Conclusions of Law."[466]

---

[462] Trial Tr. 27:5-9, Nov. 25, 2019.
[463] Trial Tr. 29:4-6, Nov. 25, 2019.
[464] ECF 110, Ex. C.
[465] ECF 108.
[466] ECF 111.

## Legal Standards And Analysis

The Court first notes that Plaintiff at trial withdrew counts Thirteen and Nineteen ("Conspiracy to Commit Fraud"), Count Twenty-Three ("Demand for an Accounting") and Count Twenty-Four ("Contempt") of the Amended Adversary Complaint.

### Statute of Limitations

Prior to determining whether breach of contract existed, this Court must determine whether the Plaintiff's causes of actions are allowable under the applicable statute of limitations. This Court finds the Plaintiff's causes of actions are permitted under the statute of limitations set forth in 11 U.S.C. § 546(a) and N.J.S.A. § 2A:14-1.

### 11 U.S.C. § 546(a)

As for 11 U.S.C. § 546(a), the Trustee contends the Amended Adversary Complaint complies with the statute of limitations imposed upon the Trustee. 11 U.S.C. § 546(a) provides:

An action or proceeding under section 544, 545, 547, 548, or 553 of this title [11 USC § 544, 545, 547, 548, or 553] may not be commenced after the earlier of—

(1) the later of—

(A) 2 years after the entry of the order for relief; or

(B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title [11 USC § 702, 1104, 1163, 1202, or 1302] if such appointment or such election occurs before the expiration of the period specified in subparagraph (A); or

(2) the time the case is closed or dismissed.

On December 21, 2011, the Debtor filed the New York State Court Action.[467]  North Park, Michael and Mehran are the defendants in the New York State Court Action. In the New York State Court Action, the Debtor allege: (1) ***First Cause of Action - Breach of Contract:*** North Park, Michael and Mehran breached 4.3 of the North Park Agreement by failing to tender the $7,000

---

[467] New York Verified Compl., Index No. 653545/2011; Defs.'  Proposed Findings of Fact, Ex. D, ECF 108.

monthly special distribution payments to the Debtor since December 2008; (2) ***Second Cause of Action - Breach of Contract:*** North Park, Michael and Mehran breached section 9(c) of the River City Agreement by failing to tender the $1,000 monthly special distribution payments to the Debtor since December 2008; (3) ***Third Cause of Action - Breach of Contract:*** North Park, Michael and Mehran breached section 2 of the River City Agreement by failing to return to the Debtor the sum of $100,000; (4) ***Fourth Cause of Action - Wrongful Interference with an Existing Contract:*** North Park, Michael and Mehran engaged in intentional, wanton and malicious acts which caused the Debtor to suffer economic damages of no less than $3,000,000; (5) ***Fifth Cause of Action - Breach of Fiduciary Duty:*** Mehran and Michael breached their fiduciary duty by being negligent in their management, supervision and operation of North Park which resulted in the Debtor suffering economic damages of no less than $3,000,000; (6) ***Sixth Cause of Action -  Breach of Fiduciary Duty:*** Michael and Mehran breached their fiduciary duty through their systematic behavior of misappropriation and embezzlement of corporate assets at the expense of North Park which resulted in the Debtor suffering economic damages of no less than $3,000,000; (7) ***Seventh Cause of Action - Breach of Fiduciary Duty:*** Mehran and Michael breached their fiduciary duties by illegally and wrongfully engaging in continuous misappropriation of approximately $40,000 per month of North Park's corporate assets which resulted in the Debtor suffering economic damages of no less than $3,000,000;  (8) ***Eighth Cause of Action - Breach of Fiduciary Duty:*** Mehran and Michael breached their fiduciary duty of care and loyalty by mismanaging, neglecting, misappropriating assets, wrongly converting assets and self-dealing which resulted in the Debtor suffering economic damages of no less than $3,000,000; (9) ***Ninth Cause of Action - Piercing the Corporate Veil:*** Michael and Mehran engaged in and committed wrongful and negligent acts in the process of managing North Park thus piercing the corporate veil; (10) ***Tenth Cause of Action***

***- Implied Covenant of Good Faith and Fair Dealing:*** North Park, Mehran and Michael breached the implied covenant of good faith and fair dealing by continuously frustrating and circumventing the Debtor's efforts to gain information from them which resulted in the Debtor being damaged in an amount not less than $3,000,000; (11) ***Eleventh Cause of Action - Unjust Enrichment:*** Mehran and Michael were unjustly enriched from misappropriating funds and embezzling corporate assets which lead the Debtor to incur damages in the amount of not less than $2,500,000; (12) ***Twelfth Cause of Action - Attorneys' Fees:*** the Debtor sought legal fees in connection with the New York State Court Action.

Thereafter, on November 25, 2015, the Debtor filed a Voluntary Chapter 7 petition for bankruptcy.[468]  On November 30, 2015, Eric R. Perkins, Esq. was appointed the Trustee in this matter by the United States Trustee.[469]

The New York State Court Action was removed to the United States District Court of the District of New York and then to the United States District Court of the District of New Jersey. On June 7, 2016, this matter was referred to this Court.[470] By Order dated November 6, 2017, the Trustee's Motion for Leave to File an Amended Complaint pursuant to Fed. R. Bankr. P. 7015 and Fed. R. Civ. P. 15 was granted.[471]  The Amended Adversary Complaint was filed on November 8, 2017.

Based on the aforementioned, the Trustee was appointed on November 30, 2015 and this Adversary Proceeding commenced on June 7, 2016 which is well within the two years of the appointment of the Trustee as provided for in 11 U.S.C. § 546(a).  Therefore, the Trustee's causes of action are permitted under 11 U.S.C. § 546(a).

---

[468] Main Case, ECF 1.
[469] Main Case, ECF 3.
[470] ECF 1.
[471] ECF 9.

## **N.J.S.A. § 2A:14-1**

Next, this Court must determine whether Plaintiff's allegations of breach of contract of the North Park Agreement and fraud are permissible under the statute of limitations set forth in N.J.S.A. § 2A:14-1.[472]

N.J.S.A. § 2A:14-1 provides:

> Every action at law for trespass to real property, for any tortious injury to real or personal property, for taking, detaining, or converting personal property, for replevin of goods or chattels, for any tortious injury to the rights of another not stated in sections 2A:14-2 and 2A:14-3 of this Title, or for recovery upon a contractual claim or liability, express or implied, not under seal, or upon an account other than one which concerns the trade or merchandise between merchant and merchant, their factors, agents and servants, shall be commenced within 6 years next after the cause of any such action shall have accrued.

N.J.S.A. § 2A:14-1 imposes a six-year statute of limitations. The Plaintiff asserts "New Jersey courts apply an equitable doctrine known as the "discovery rule" to delay commencement of the [statute] of limitations period." [473] The statute of limitations will toll until an injured party "discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim." *Catena v. Raytheon Co.*, 447 N.J. Super. 43, 52-53 (App. Div. 2016) (citing *Lopez v. Swyer,* 62 N.J. 267, 272 (1973)). Therefore, a cognizable claim for breach of contract and/or fraud must be filed within six years of the date when Debtor "discovered" that he may have such a claim.

---

[472] The North Park Agreement is devoid of a "Choice of Law" provision. Therefore, this Court notes, both parties briefed New Jersey law in support of their relative positions. Hence, as this Court has jurisdiction over this matter, and New Jersey law is applicable, this Court analyzes the North Park Agreement under New Jersey state law.
[473] Am. Adv. Compl. at 4, ¶ 53. ECF 11.

**North Park Agreement - Breach of Contract Claim(s)**

The Trustee alleges the Defendants breached the North Park Agreement in Count One and Count Four of the Amended Adversary Complaint. It is undisputed that section 4.3 of the North Park Agreement requires North Park to pay the Debtor a monthly distribution of $7,000.  North Park's accounting records demonstrate North Park paid the Debtor from approximately November 2007 until December 2008.[474]  Then in January 2009, North Park paid the Debtor $1,000.[475]  In February 2009, North Park paid the Debtor $1,500 in March 2009.[476]  At minimum, the Debtor had constructive notice and reasonable knowledge that a potential cause of action existed against the Defendants for failure to tender the contractually obligated monthly payment of $7,000 in December 2008.  Based upon this notice, the Debtor must have brought a breach of contract claim within six years of December 2008, which is December 2014.  Here, the breach of contract causes of action were initially asserted in the New York State Court Action that was filed on December 21, 2011.  Breach of contract was asserted against North Park, Michael, and Mehran. The New York State Court Action was filed well within the six-year statute of limitations imposed by N.J.S.A. § 2A:14-1.  Therefore, this Court finds the breach of contract claims were filed within the statute of limitations set forth in N.J.S.A. § 2A:14-1 and may proceed.

**Statute of Limitations of the River City Agreement - Breach of Contract Claim(s)**

Although the River City Agreement states it "shall be governed by and construed in accordance with the laws of the State of Iowa"  both parties argued New Jersey law in their

---

[474] The amount of these payments varied from $1,000 to $9,000.  Ex. P-18.
[475] This is noted as "General Journal." Ex. P-18 at  "Nobel-000013," "North Park Realty Management LLC – Transactions by Account as of December 31, 2014."
[476] Ex. P-18, "Nobel-000013," "North Park Realty Management LLC – Transactions by Account as of December 31, 2014."

Post-Trial Submissions.[477] Written contracts are subject to a ten-year statute of limitations. Section

614.1(5) of the Iowa Code provides:

> Written contracts — judgments of courts not of record — recovery of real property
> and rent. a. Except as provided in paragraph "b", those founded on written
> contracts, or on judgments of any courts except those provided for in subsection 6,
> and those brought for the recovery of real property, within ten years.  b. Those
> founded on claims for rent, within five years.

Iowa Code § 614.1(5).

The statute of limitations commences on the date the contract is breached.  *Hotchkiss v.*

*Int'l Profit Assocs.*, 2014 WL 3511786, at *5 (Iowa Ct. App. July 16, 2014).

In this matter the Trustee alleges the Defendants breached the River City Agreement in

Counts Two Three, and Five of the Amended Adversary Complaint. It is undisputed that section

9(c) of the River City Agreement requires the Defendants to pay the Debtor monthly distributions

of $1,000.

The River City Agreement also required Michael and Mehran to personally guarantee the

return to the Debtor his $100,000 investment in the event the Defendants breached the River City

Agreement.  Section (2) of the River City Agreement provides:

> Subject to Zetterlund's retention of a Fifty-One percent (51%) interest in the
> company, which interest will automatically terminate and revert to Assignors and
> Assignee upon Zetterlund's receipt of the balance due from Assignors and
> Assignee, and Zetterlund's being released from all financial responsibility and debt
> of the Company, including release of any personal guarantee for the mortgage with
> M&T Bank subject to the foregoing, Assignors hereby sell, transfer, convey and set
> over to Assignee the Assigned Interest, to have and to hold the Twenty Percent
> (20%) Assigned Interest unto Assignee, its successors and assigns forever, it being
> understood that this Assignment shall include every right, without limitation, that
> Assignors has or may have in the Assigned Interest and in that portion of the
> Company and under the Company Documents which is represented by the Assigned
> Interest.  In conjunction herewith, Assignors will make available for inspection to
> Assignee all books, records, and other property and assets of the Company, whether
> tangible or intangible, upon Assignee's reasonable request for access to said
> documents.  In the event Assignors fail to comply with the terms and conditions of

---

[477] Ex. P-3; Defs.' Proposed Findings of Fact ¶ 15, ECF 108 and Pl.'s Proposed Findings of Facts, ¶ 2, ECF 102.

the aforementioned Amended and Restated Assignment and Assumption of Stock including but not limited to the obligated payments to Zetterlund or failure to obtain the release of Zetterlund's obligation and personal guarantee to M&T Bank within the time period as stated in the Amended and Restated Assignment and Assumption of Stock, then ***Assignors, jointly and severally, hereby agree to personally guarantee the return of $100,000.00 to Assignee within thirty (30) days. Assignors shall be responsible for payment of any costs and expenses for collection of said sums due, including but not limited to reasonable attorney's fees. (Emphasis added).***

The River City Agreement defines the "Assignors" as Mehran Kohansieh and Michael Khakshoor and the "Assignee" is Farooq Sakhe. Therefore, under section (2) of the River City Agreement, Mehran and Michael guaranteed the return of $100,000 to the Debtor within thirty days in the event they, the Assignors, failed to comply with the terms and conditions of the River City Agreement.[478] The Assignors were also responsible under the agreement for payment of any costs and expenses for collection, including but not limited to reasonable attorneys' fees.

The River City Agreement provided that these $1,000 monthly distribution payments were due to commence on January 30, 2008.[479] Debtor testified he received these payments for a few months.[480] This Court finds the Defendants breached the River City Agreement on or about April/May 2008.[481]

Therefore, the Debtor must have filed any cognizable breach of contract claim in connection with the River City Agreement no later than April/May 2018, which is within the ten-year statute of limitations set forth in Iowa Code § 614.1(5).

Here, the breach of contract causes of action in connection with the River City Agreement were initially raised in the New York State Court Action. The Second and Third causes of action

---

[478] Ex. P-2, Section (2).
[479] Ex. P-3 Section 9(c).
[480] Trial Tr. 30:1-3, Nov. 22, 2019.
[481] This Court notes that none of the parties testified to when these payments precisely stopped. Hence, the Court relies on the Debtor's testimony that he received these payments for a "few" months. This Court concludes that "few months" means these payments ceased in April/May 2008.

of the New York State Court Action pertain to the Defendants breach of the River City Agreement.[482]   As noted above, the New York State Court Action was filed in December 2011 and the Defendants breached the River City Agreement in April/May 2008.  This breach is within the ten-year statute of limitations set forth in Iowa Code § 614.1(5).  Therefore, the breach of contract claims in connection with the River City Agreement may proceed.

### Fraud and Conversion Claim(s)

Counts Eight, Nine, Eleven, Twelve, Sixteen, Seventeen, Eighteen, and  Twenty-Two of the Amended Adversary Complaint pertain to fraud and conversion.[483]  At issue is when the Debtor may have discovered when such a cognizable cause of action for fraud existed. The Trustee contends the Defendants' alleged scheme to defraud the Debtor of $1.5 million was only uncovered during the June 26, 2014 deposition of Mehran.[484]  Mehran testified at this deposition regarding using Sandburg Mall as collateral to refinance the North Park mortgage:

> [W]e have a problem with Sandburg which the problem arises from North Park. Sandburg Mall was part of – it was cross collateralized by the bank.  It was cross collateralized by North Park when we got the loan and obviously the loan was foreclosed on North Park, they're persuing [sic] the judgment that they have to Sandburg.  Sandburg right now is in bankruptcy because of that situation.[485]

At this deposition Mehran also testified regarding the cross-collateralization:

MR. GERACE:     Okay.  So it sounds like five months after you closed you were able to get a bank loan to pay off the hard money lenders?

MEHRAN:         Only because we cross collateralized another property that had nothing to do with one of the members here and that was

---

[482] New York V. Compl. Index No. 653545/2011.

[483] Fraud is also alleged in Count Thirteen and Count Nineteen of the Amended Adversary Complaint.  However, the Trustee withdrew these counts.

[484] Ex. P-7; Am. Adv. Compl. at ¶ 54. ECF 11.  In response, the Defendants contended "paragraph '54' purports to state legal conclusions to which no response is required; to the extent (if any) that any further response is required, Defendants deny the allegations of Paragraph '54' to the extent that the alleged date of June 26, 2014 is inaccurate and misleading." Defs.' Michael and Mehran's Ans. at ¶ 54. ECF 35.

[485] Ex. P-7, Dep. Tr. Mehran Kohansieh 29:12-19, June 26, 2014 and Pl.'s Proposed Findings of Facts, ¶ 88. ECF 102.

the main reason for the bank to agree to give us a loan.  It wouldn't have happened if that cross collateralized wouldn't be there.

MR. GERACE:    Okay.  Now, is the cross collateralized addressed in this argument?

MEHRAN:    No, it's not.

MR. GERACE:    But this agreement and the money used to purchase this property is cross collateralized with another loan?

***

MR. GERACE:    All right.  What was it cross collateralized with?

MEHRAN:    Another property in Illinois called Sandburg Mall.[486]

Defendants' argue that the Debtor did not allege any scheme to defraud until approximately 2015, which is approximately eight years after the Debtor made his initial investment in North Park.[487] Therefore, Defendants contend that the statute of limitations lapsed for the fraud causes of action.

As iterated above, the issue of whether the Defendants engaged in fraud is not determined by when the Debtor made his initial investment in North Park but rather, the analysis hinges on when the Debtor may have discovered such that a cognizable cause of action existed.[488] Here, the record supports a finding that Defendants' alleged scheme to defraud was discovered through Mehran's deposition which occurred on June 26, 2014.[489] Mehran testified that North Park was in receivership by the end of 2008.[490]

---

[486] Pl.'s Proposed Finding of Facts, ¶ 89, ECF. 102; Ex. P-7, Dep. Mehran Kohansieh 73:15-25 to 74: 1-2; 75:1-6, June 26, 2014.

[487] Defs.' Proposed Findings of Fact, ¶¶  84, 87 which states: "[t]he investment in North Park was in October 2007. The Debtor did not allege any scheme to defraud until approximately 2015 when he went bankrupt, approximately 8 years after the 2007 investment." ECF 108.

[488] See *Catena v. Raytheon Co.*, 447 N.J. Super. 43, 52-53 (2016) (citing *Lopez v. Swyer,* 62 N.J. 267, 272 (1973)).

[489] New York Supreme Court Tr. 6:13-17, ECF 109;  Am. Adv. Compl. ¶ 26.  ECF 11.

[490] Trial Tr. 102:3-4, Nov. 25, 2019.

Based on the six-year statute of limitations set forth in N.J.S.A. § 2A:14-1, causes of action for fraud must have been brought no later than June 2020.  Defendants contend approximately one year after the investment  the Defendants stopped paying the $7,000 monthly distribution from North Park.[491]  At that time the Debtor requested bank statements in connection with North Park and such bank statements were provided by Mehran to the Debtor's attorney.[492]  Despite having these bank statements, the Debtor did not allege fraud until approximately eight years later.[493]

The Debtor testified he contacted his attorney to request  bank statements from North Park approximately one year after  he stopped receiving the $7,000 monthly distribution payments.[494] Defendants assert these special distribution payments ceased in January 2009, when the North Park Property became insolvent.[495] The Trustee also asserts these special distribution payments ceased in January 2009.[496]  Based on the six-year statute of limitation set forth in N.J.S.A. § 2A:14-1, causes of action for fraud must have been brought no later than January 2015.

This Court notes fraud was not pled as a cause of action in the Verified Complaint of the New York State Court Action.[497]  Rather, the Debtor's counsel filed a Motion to Amend the Verified Complaint ("Motion to Amend") to add fraud claims and to add two additional defendants: Yousef Khakshoor and Dr. Nobel.[498]  On February 5, 2015 the Motion to Amend, was denied without prejudice because the proposed amended verified complaint was defective as it did not identify who committed the fraudulent acts, what fraudulent acts were committed, or identify the fraudulent misrepresentations or omissions that were made at that time.[499]  Additionally, the

---

[491] Trial Tr. 32:14-21, Nov. 22, 2019.
[492] Defs.' Proposed Findings of Fact, ¶ 89, ECF 108.
[493] *Id.*
[494] Trial Tr. 32:14-21, Nov. 22, 2019.
[495] Defs.' Proposed Findings of Fact, ¶ 247, ECF 108.
[496] Pl.'s Proposed Findings of Facts, ¶ 228, ECF 102.
[497] New York V. Compl. Index No. 653545/2011.
[498] New York Supreme Court Tr. 3:7-19; 4:2-12, Feb. 5, 2015.  ECF 109.
[499] *Id.* at 16:6-17.

papers in support of the Motion to Amend did not demonstrate that such leave should be granted

as the Debtor did not provide any explanation for his delay in filing the Motion to Amend.[500]

Finally, the Court concluded that the Debtor could file an Order to Show Cause to amend the

Verified Complaint so long as the deficiencies identified in the Motion to Amend were cured.[501]

On March 10, 2016 the Supreme Court of the State of New York, New York County ruled the

Motion to Amend was moot as the New York State Court Action was removed to the United States

District Court for the Southern District of New York.[502]  The Court noted: "[t]he Court, however,

deferred so-ordering the transcript or entering a short form order following notice that plaintiff

[Debtor] had filed a voluntary petition for bankruptcy."[503]

Although both the Trustee and Defendants present differing evidence as to when the Debtor

discovered potentially cognizable fraud claims, this Court finds the evidence supports the Trustee's

assertion that allegations of fraud were only discovered through the deposition of Mehran which

occurred on June 26, 2014.[504] Therefore, any potentially cognizable fraud claims should have been

filed no later than June 26, 2020 in order to comply with the six-year statute of limitations required

by N.J.S.A. § 2A:14-1.

Here, the Amended Adversary Complaint was filed within the requisite statute of

limitations as it was filed on November 8, 2017. Counts Eight, Nine, Eleven, Twelve, Seventeen,

and Eighteen, of the Amended Adversary Complaint contain allegations of fraud. Counts Sixteen

and Twenty-two of the Amended Adversary Complaint allege conversion.  This Court finds the

Trustee's allegations of fraud and conversion may proceed.

---

[500] *Id.* at 16:18-23.
[501] *Id.* at 18:10-17.
[502] ECF 108, Ex. F.
[503] ECF 108, Ex. F.
[504] Ex. P-7; Pl.'s Proposed Findings of Facts, ¶ 88. ECF 102.

### *Counts One, Two, Three, Four and Five - Breach of Contract*

Counts One through Five allege breach of contract as to the North Park Agreement and the River City Agreement.  With respect to these counts—a party alleging a breach of contract satisfies its pleading requirement if it alleges "(1) a contract existed; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party performed its own contractual duties." *See Video Pipeline, Inc. v. Buena Vista Home Ent., Inc.,* 210 F. Supp. 2d 552, 561 (D.N.J. 2002) (citing *Pub. Serv. Enter. Group, Inc. v. Phila. Elec. Co.,* 722 F. Supp. 184, 219 (D.N.J. 1989) (citing 5 Wright & Miller, Federal Practice & Procedure, § 1235 at 189–90); *see also In re Cendant Corp. Sec. Litig.,* 139 F. Supp. 2d 585, 604 n.10; *motion to certify appeal denied*, 166 F. Supp. 2d 1 (D.N.J. 2001) (noting that New Jersey law requires pleading of performance of movant's own contractual duties).  Herein, this Court adjudicates Counts One through Five - breach of contract.

### *Counts One and Four - Breach of § 4.3 of the North Park Agreement*

Counts One and  Four allege breach of section 4.3 of the North Park Agreement pursuant to 11 U.S.C. § 541 as the Trustee alleges that under this section, all claims and causes of action of the Debtor are considered property of the bankruptcy estate and the Trustee has standing to pursue these claims and causes of action.  Count One alleges Michael, Mehran, and Yousef breached section 4.3 of the North Park Agreement by having failed to tender the $7,000 monthly payment to the Debtor.  Count Four alleges North Park breached section 4.3 of the North Park Agreement by having failed to tender the $7,000 monthly payment to the Debtor.  The Trustee demands a judgment in his favor and against North Park, Mehran and Michael for 60 months of special distributions in the amount of $420,000 due and owing to the Debtor plus a default interest 8% per

annum on all outstanding balances due from February 2009 through December 2013, and costs

and expenses of collection including but limited to reasonable attorneys' fees.[505]

Prior to determining whether a party breached a contract, this Court must determine

whether a valid enforceable contract existed.  Here, it is undisputed that on or about October 25,

2007, Mehran, Michael, Yousef and the Debtor executed the North Park Agreement.  The parties

did not present any evidence questioning the validity or enforceability of the North Park

Agreement.  Rather, Mehran testified that the North Park Agreement represented the full and

complete agreement between Mehran  and every  member of the North Park Agreement.[506]  Upon

reviewing the North Park Agreement and the record, this Court finds the North Park Agreement is

a valid enforceable contract.

Next this Court must determine whether the Defendants breached section 4.3 of the North

Park Agreement.  This provision provides:

> 4.3 **Special Distribution to Sakhe**.  Notwithstanding the terms contained herein,
> the Managers and LLC shall commit to a special monthly distribution of seven
> thousand ($7,000.00) dollars to Farooq Sakhe as an advance to profit distribution
> on the first day of each calendar month.  The failure to tender the aforementioned
> payments to Sakhe by the Managers and LLC within ten (10) calendar days shall
> result in a default penalty interest of 8% per annum on all outstanding balances due
> and owed to Sakhe.  *In the event the Managers and LLC fails to pay Sakhe, then*
> *the LLC shall pay Sakhe's costs and expenses of collection including but not*
> *limited to reasonable attorney's fees. (Emphasis added.)*[507]

As noted above, section 4.3 refers to the defined terms of "Managers" and "LLC."  These

terms are defined within the North Park Agreement.  Specifically, section "1.1 Formation" of the

North Park Agreement defines "LLC" as a "Limited Liability Company."  Then section "1.2

Name" names the "LLC" as the North Park Realty Management, LLC.  Whereas section "2.1

---

[505] Pl.'s Proposed Findings of Facts, ¶ ¶ 131, 132 ECF. 102.
[506] Trial Tr. 23:7-10, Nov. 25, 2019.
[507] Ex. P-1.

Managers" of the North Park Agreement indicates Mehran and Michael were the "Managers." The contractual language set forth in section 4.3 of the North Park Agreement is unambiguous as it requires North Park to pay the Debtor $7,000 per month as an advance to profit distribution. Under the terms of the North Park Agreement, this payment was due and owing on the first day of each month.

The Amended Adversary Complaint alleges Michael, Mehran, Yousef, and North Park stopped paying the Debtor the $7,000 per month as of December 2008.[508] The record shows, in accordance with section 4.3 of the North Park Agreement, the Debtor received $7,000 per month from on or about October 2007/November 2007 until approximately December 2008.[509]

According to North Park's accounting records, the Debtor received the following payments:[510]

| Date | Check | Amount |
|------|-------|--------|
| November 5, 2007 | 1023 | $7,000.00 |
| December 5, 2007 | 1079 | $7,000.00 |
| January 11, 2008 | 1124 | $7,000.00 |
| February 11, 2008 | 1168 | $9,000.00 |
| March 6, 2008 | 1206 | $9,000.00 |
| April 4, 2008 | 1251 | $8,000.00 |
| May 13, 2008 | 1308 | $7,000.00 |
| June 5, 2008 | 1330 | $7,000.00 |
| June 23, 2008 | 1363 | $3,000.00 |
| July 2, 2008 | 1384 | $7,000.00 |
| July 15, 2008 | 1403 | $3,000.00 |
| July 31, 2008 | 1411 | $1,000.00 |
| August 12, 2008 | 1450 | $7,000.00 |
| August 15, 2008 | 1466 | $3,000.00 |
| September 2, 2008 | 1487 | $1,000.00 |
| September 8, 2008 | 1501 | $8,000.00 |

[508] Am. Adv. Compl. ¶ ¶ 58, 77. ECF 11.
[509] Trial Tr. 72:9-13, Nov. 25, 2019; The record supports the finding that the Debtor received certain payments from November 2007 until March 2009.  Trial Tr. 106:1-7, Nov. 25, 2019.
[510] Ex. P-19 at "Nobel-000013," "North Park Realty Management LLC – Transactions by Account as of December 31, 2014."

| Date | Check | Amount |
|------|-------|--------|
| October 8, 2008 | 1526 | $7,000.00 |
| October 13, 2008 | 2073 | $1,000.00 |
| October 31, 2008 | 1543 | $1,000.00 |
| November 7, 2008 | 1607 | $1,000.00 |
| December 2, 2008 | 1644 | $7,000.00 |
| February 13, 2009 | 1776 | $1,500.00 |
| March 9, 2009[511] | 1816 | $1,000.00 |
| **TOTAL** | | **$113,500.00** |

These payments totaled $113,500.  The February and March 2009 payments were in the amount of $1,500 and $1,000, respectively. Therefore, this Court finds that, as of December 2008 the Defendants ceased paying the Debtor the contractually obligated $7,000 per month.

Also, North Park's Account records show the Debtor received payments from April 2009 until September 2009.[512]  The evidence shows these payments were noted as "Capital Returned" to the Debtor.[513]

| Date | Check | Amount |
|------|-------|--------|
| April 2, 2009 | 1834 | $1,200.00 |
| May 5, 2009 | 1877 | $1,000.00 |
| May 8, 2009 | 1886 | $  500.00 |
| May 13, 2009 | 1887 | $1,000.00 |
| May 27, 2009 | 1902 | $  500.00 |
| July 23, 2009 | 1973 | $1,000.00 |
| August 13, 2009 | 1997 | $1,000.00 |
| August 31, 2009 | 2014 | $1,000.00 |
| September 17, 2009 | 2033 | $1,000.00 |
| September 29, 2009 | 2047 | $1,000.00 |
| **TOTAL** | | **$9,200.00** |

---

[511] There is also an entry titled "General Jour…" dated 1/28/09 and noted as "PD B…" in the amount of $1,000 that is not included in this list. Ex. P-18, Nobel-000013.

[512] Ex. P-18, "Nobel-000011," "North Park Realty Management LLC – Transactions by Account as of December 31, 2014."

[513] *Id.*

For the Trustee to be successful under a breach of contract claim, the Trustee must demonstrate the Debtor complied with the contractual obligations set forth in the North Park Agreement.  Here, the North Park Agreement did not require the Debtor to do anything. Rather under the North Park Agreement, the Debtor was "not obligated or required to make any additional contributions to LLC's capital.  Sakhe shall not suffer any dilution of his percentage interest in the event other or new Members contribution additional capital to the LLC."[514]  Therefore, this Court finds the Debtor complied with his contractual obligations under the North Park Agreement.

With respect to Counts One and Four, the evidence supports the conclusion:  (1) a contract existed as this was the North Park Agreement; (2) the Defendants breached the North Park Agreement; (3) damages flowed therefrom; and (4) the Debtor complied with the contractual conditions set forth in the North Park Agreement.

Additionally, this Court notes that the Trustee contends that  Defendants violated the North Park Agreement by commingling North Park's assets with Sandburg Mall's assets.[515]  Section "IV" of the North Park Agreement provides:  "C. It [North Park] shall not commingle funds or assets with those of any affiliate or any other person."[516]  Additionally, the North Park Agreement provides: "[t]he Managers of the LLC [North Park] shall not encumber the LLC [North Park] with any loan obligations and security interest without written notice to all the Members and consent of a 2/3 majority of ownership interest."[517]

---

[514] Ex. P-1, ¶ "3.2 Additional Contributions."
[515] Pl.'s Proposed Findings of Facts at ¶ 84. ECF 102.
[516] Ex. P-1.
[517] Ex. P-1¶ "2.1 Managers, Mehran Kohansieh "aka Mike Kohansieh or Mike Kohen."

Here, Mehran testified that involving Sandburg Mall and the North Park Property in any loan agreement was commingling.[518] Therefore, this Court finds there was a breach of the North Park Agreement based on commingling the assets of North Park and Sandburg Mall.

Accordingly, with respect to Counts and Four of the Amended Adversary Complaint this Court finds that North Park breached section 4.3 of the North Park Agreement by failing to pay the Debtor the monthly distribution payments of $7,000.

### *Damages - Counts One and Four*

Counts One and Four of the Amended Adversary Complaint seek relief against North Park and individually against Michael, Mehran and Yousef.[519] This relief includes a judgment in favor of the Trustee and against North Park, Michael and Mehran: (1) judgment for all amounts due and owing since December 2008; (2) default penalty interest rate of 8% per annum on all amounts past due; (3) punitive damages; (4) reasonable attorneys' fees and costs; and (5) granting such other and further relief as this Court finds equitable and just.[520]

This Court finds the damages sought by the Trustee are governed by section 4.3 of the North Park Agreement. In relevant part, this provision provides:

> **The failure to tender the aforementioned payments to Sakhe by the Managers and LLC within ten (10) calendar days shall result in a default penalty interest of 8% per annum on all outstanding balances due and owed to Sakhe. In the event the Managers and LLC fails to pay Sakhe, then the LLC shall pay Sakhe's costs and expenses of collection including but not limited to reasonable attorney's fees.**

---

[518] Trial Tr. 159:1-7, Nov. 22, 2019.
[519] Claims against Yousef were withdrawn by the Trustee. Pl.'s Proposed Findings of Facts, ¶ 5, ECF 102.
[520] Am. Adv. Compl. at "WHEREFORE" at 13; Am. Adv. Compl. at "WHEREFORE" at 16, ECF 11.

### *Punitive Damages*

As for the Trustee's request for an award of punitive damages, punitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable. *Restatement (Second) of Contracts* § 355 (1979). The Third Circuit Court of Appeals noted:

> Under New Jersey law breaches of contract, even if intentionally committed, do not warrant an award of punitive damages in the absence of a showing that defendant also breached a duty independent of that created by the contract. *See, e.g.*, *W.A. Wright, Inc. v. KDI Sylvan Pools, Inc.*, 746 F.2d 215, 217 (3d Cir. 1984) ("'[p]unitive damages are not recoverable for a breach of contract unless the conduct constituting the breach is also a tort for which punitive damages are recoverable'" (quoting *Restatement (Second) of Contracts* § 355 (1979)).

*Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1194 (3d Cir. 1993).

Here, North Park, Michael and Mehran's actions do not constitute a tort for which punitive damages are recoverable. Therefore, this Court finds the evidence presented is not sufficient to support the imposition of punitive damages against North Park, Michael or Mehran. Although several exceptions have been carved out of the general rule that punitive damages are unavailable in breach of contract actions, *see, e.g., Coryell v. Colbaugh*, 1 N.J.L. 77, 77-78 (1791) (punitive damages allowed for breach of promise to marry); *Sec. Aluminum Window Mfg. Corp. v. Lehman Assoc., Inc.*, 108 N.J. Super. 137, 143 (App. Div. 1970) (breach of fiduciary relationship between a seller and real estate broker), these exceptions have been premised upon the finding of a special relationship between the parties. These special relationships impose a duty of trust upon the contracting entities. "It is the breach of this trust, rather than the breach of the contract, which gives rise to an award of punitive damages." *W.A. Wright, Inc. v. KDI Sylvan Pools, Inc.*, 746 F.2d 215, 217 (3d Cir. 1984).

### (1) *Damages - North Park*

The Trustee seeks against North Park: (1) judgment for all amounts due and owing since December 2008; (2) the default penalty interest rate of 8% per annum on all amounts past due; (3) punitive damages; and (4) reasonable attorneys' fees against North Park.  This Court notes, the term "LLC" as used in section 4.3 of the North Park Agreement is North Park.  Therefore, this Court finds section 4.3 of the North Park Agreement provides for damages against North Park calculated at a default penalty interest rate in the amount of  8% per annum on all amounts past due and owing to the Debtor and reasonable attorneys' fees and costs.[521]  North Park's breach of the North Park Agreement is not sufficient to support a finding that North Park committed a tort. Therefore, punitive damages against North Park are not recoverable for its breach of the North Park Agreement.

Accordingly, judgment shall be entered against North Park and in favor of the Trustee for all amounts past due and owing to the Debtor plus default penalty interest at a rate of 8% per annum for all amounts past due and reasonable attorneys' fees and costs.  Punitive damages are DENIED as the evidence does not support an award of punitive damages.  The Plaintiff shall submit a calculation of those damages which shall include costs and expenses of collection, including but not limited to reasonable attorneys' fees and costs.  The Defendants shall have the opportunity to be heard as to these amounts before the Court enters judgment.

---

[521] The parties have not provided this Court with the calculation as to this amount.  Rather, the Plaintiff's Findings of Facts and Conclusions of Law asserts that the Debtor is owed at least five years of distributions of $7,000 per month totaling $420,000, plus default penalty interest of 8% per annum on the outstanding balance due and owing from February 2009 to December 2013, and costs and expenses of collection, including but not limited to reasonable attorneys' fees. Pl.s' Proposed Findings of Facts ¶ 233.  ECF 102.  The Defendants Finding of Facts and Conclusions of Law calculate this amount to be approximately $420,000 plus costs and interest, which judgment amount the Defendants assert should not be entered in favor of the Trustee and against the Defendants. Defs.' Proposed Findings of Fact, ¶ 253, ECF 108.

### (2) *Damages – Michael, Mehran and Yousef*

As iterated above, by Counts One and Four of the Amended Adversary Complaint, the Trustee seeks: (1) judgment for all amounts due and owing since December 2008; (2) the default penalty interest rate of 8% per annum on all amounts past due; (3) punitive damages; and (4) reasonable attorneys' fees against Michael, Mehran and Yousef.  The Trustee withdrew his claims against Yousef.[522]  This Court only adjudicates Counts One and Four with respect to Mehran and Michael.

It is undisputed that Michael and Mehran were the managers of North Park.[523] Additionally, section 4.3 of the North Park Agreement refers to "Managers," which is defined in section 2.1 of the North Park Agreement to include Mehran and Michael.

Liability is imposed on managers of a corporation "[o]nly upon proof of fraud or injustice will the corporate veil be pierced to impose liability on the corporate principals."  *Tully v. Mirz*, 457 N.J. Super. 114, 124 (App. Div. 2018) (internal citations omitted).  The issue of piercing the corporate veil is discussed in more detail later in this opinion.  In summation this Court does not find the corporate veil was pierced.

Accordingly, the Trustee's demand for an entry of judgment in his favor and against Mehran and Michael for Counts One and Four are DENIED.  Damages against Yousef are inappropriate as the Trustee withdrew his claims against Yousef.

### *Breach of the River City Agreement*

Counts Two, Three and Five of the Amended Adversary Complaint allege the River City Agreement was breached.  Counts Two and Five allege Michael, Mehran, and River City breached

---

[522] Pl.'s Proposed Findings of Facts, ¶ 5, ECF 102.
[523] Trial Tr. 83:3-12; Trial Tr. 20:3-4, Nov. 25, 2019.

section 9(c) of the River City Agreement by failing to tender payment of the $1,000 monthly special distribution to the Debtor since December 2008.[524]

Count Three alleges Michael and Mehran breached section 2 of the River City Agreement by failing to return the Debtor's $100,000 investment upon default under any of the terms contained therein.[525] The Trustee asserts Michael and Mehran are jointly and severally liable for damages in an amount of at least $100,000 plus interest on all amounts awarded, punitive damages and reasonable attorneys' fees and costs.  Additionally, the Trustee alleges the River City Agreement had been breached jointly and severally by River City, Michael and Mehran for which the Debtor is entitled to $100,000 jointly and severally from Michael and Mehran and payment of any costs and expenses for collection of said sums due, including but limited to reasonable attorneys' fees.[526]

As iterated above, the River City Agreement is governed by the laws of the State of Iowa. Therefore, similar to New Jersey law, Iowa law provides:

> To prove a breach of contract claim, a party must show: (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach. The first three elements address the existence of a contract.

*Iowa Mortgage Ctr., L.L.C. v. Baccam*, 841 N.W.2d 107, 110-11 (Iowa 2013).

Hence, prior to determining whether the River City Agreement was breached, this Court must determine whether the River City Agreement is a contract and the terms thereof. It is undisputed on or about January 11, 2008, the Debtor, Mehran, and Michael executed a document entitled "Assignment and Assumption of Stock," which is referred to as the "River City

---

[524] Am. Adv. Compl. at ¶¶ 63, 64, 82, and 83.  ECF 11.
[525] Am. Adv. Compl. at ¶¶ 69 and 70. ECF 11.
[526] Pl.'s Proposed Findings of Facts, ¶ 254, ECF 102.

92

Agreement." The parties did not present any evidence questioning the validity or enforceability of the River City Agreement. Upon reviewing the River City Agreement and the record, this Court finds the River City Agreement is an enforceable contract.

This Court must also determine whether the Debtor complied with the River City Agreement. Based on the record, neither the Trustee, Defendants, nor the Debtor presented any evidence indicating the Debtor violated any terms of the River City Agreement. Therefore, this Court finds the Debtor complied with the terms set forth in the River City Agreement.

### *Count Two - Breach of § 9(c) of the River City Agreement*

Count Two of the Amended Adversary Complaint alleges Mehran and Michael breached Section 9(c) of the River City Agreement by failing to tender the monthly special distribution of $1,000 to the Debtor. Pursuant to 11 U.S.C. § 541, all claims and causes of action of the Debtor are considered property of the bankruptcy estate and the Trustee has standing to pursue these claims and causes of action. This Court must determine whether Michael and Mehran, breached the River City Agreement by failing to comply with section 9(c). This provision provides:

> c. **Special Distribution to Sakhe**. Notwithstanding the terms contained herein, the Company shall commit to a special monthly distribution of one thousand ($1,000.00) dollars to Farooq Sakhe as an advance to profit distribution on the 30th day of January, 2008 and continuing monthly on the fifth day of each calendar month thereafter. Beginning as of February 5, 2008 and continuing through June 2008, the special distribution to Sakhe shall be paid only if there is remaining net profits available after satisfying all accounts payable, bills, expenses, costs, deposit into reserves and allocations for capital and tenant improvements. In the event distribution is not made to Sakhe, then said monthly distributions shall be deferred until such time as the funds become available and shall be treated as priority over Assignors distribution. Beginning on July 5, 2008, and continuing thereafter, the special distribution to Sakhe shall be made as a regular expense of the Company, regardless of the availability of net profits **and payment to be personally guaranteed by Kohansieh. (Emphasis added).**

The above provision references the defined terms of "Assignor" and "Company." Pursuant to the River City Agreement, the "Assignors" are Mehran Kohansieh and Michael Khakshoor. The

River City Agreement further states the "Company" is "River City Mall, Inc." which "is a

corporation organized and existing under the laws of the State of Iowa…."

A guaranty is a contract by one person to another for the fulfillment of a promise of a third

person. A guarantor's obligation must be determined from the parties' written contract. "[T]he rules

concerning the interpretation and construction of contracts are applicable to guaranties." *Bank of*

*the West v. Michael R. Myers Revocable Tr.*, 2009 WL 2960404, at *3 (Iowa Ct. App. Sept. 2,

2009). "[A] guaranty is a contract and must be interpreted according to its clear terms so as to

effect the objective expectations of the parties." *Housatonic Bank & Tr. Co. v. Fleming*, 234 N.J.

Super. 79, 80 (App. Div. 1989).

The River City Agreement is unambiguous--the Debtor was to receive $1,000 per month

commencing on January 30, 2008.[527]  Michael testified that he was the only person that could write

these checks to the Debtor.[528]  The record does not provide an exact date by which the Debtor

stopped receiving these monthly $1,000 payments; however, the testimony showed the Debtor

only received these $1,000 monthly payments for a "few months."[529]  Additionally, Michael was

the only person who could write the $1,000 checks to the Debtor.[530]  Hence, these checks were

written by Michael.[531]  Michael conceded he stopped writing the $1,000 monthly checks to the

Debtor "[b]ecause after a few months [they] lost the other property."[532]  This Court finds that River

City breached section 9(c) of the River City Agreement by failing to tender the $1,000 monthly

payments to the Debtor.

---

[527] Ex. P-1, Section 9(c).
[528] Trial Tr. 95:15-23 to 96:1-10, Nov. 22, 2019.
[529] Trial Tr. 30:1-3, Nov. 22, 2019.
[530] Trial Tr. 95:18-20, Nov. 22, 2019.
[531] Trial Tr. 95:15-23, Nov. 22, 2019.
[532] Trial Tr. 96:16-20, Nov. 22, 2019.

### *Damages - Michael and Mehran*

Count Two of the Amended Adversary Complaint seeks an award of damages against Michael and Mehran for breaching section 9(c) of the River City Agreement. Damages sought are (1) judgment for all amounts due and owing  since December 2008; (2) interest on all amounts past due; (3) punitive damages; (4) reasonable attorneys' fees and costs; and (5) such other relief as this Court finds equitable and just in the circumstances.  Plaintiff's Findings of Facts and Conclusions of Law also assert damages that should be awarded against Michael, Mehran and River City, including: (1) the Debtor receive the sum of $100,000 jointly from Michael and Mehran; and (2) payment of any costs and expenses for collection of these sums including reasonable attorneys' fees.[533]

This Court notes the $1,000 monthly special distribution payments to the Debtor were personally guaranteed by Mehran.  In relevant part, section 9(c) of the River City Agreement provides:

> In the event distribution is not made to Sakhe, then said monthly distributions shall be deferred until such time as the funds become available and shall be treated as priority over Assignors' distribution. Beginning on July 5, 2008, and continuing thereafter, the special distribution to Sakhe shall be made as a regular expense of the Company, regardless of the availability of net profits ***and payment to be personally guaranteed by Kohansieh. (Emphasis added).***[534]

Based on this contractual language, this Court finds that Mehran personally guaranteed the $1,000 monthly special distribution payments to the Debtor.  Therefore, Mehran is personally liable to the Trustee for the damages incurred as a result of the failure to tender the $1,000 monthly distribution payments to the Debtor.  Judgment shall be

---

[533] Pl.'s Proposed Findings of Facts, ¶ 254,  ECF 102.
[534] Ex. P-2.

entered in favor of the Trustee and against Mehran in the amount of the $1,000 monthly

special distribution payments that are due and owing to the Debtor.

### ***Punitive Damages - Mehran and Michael***

In Count Two of the Amended Adversary Complaint the Trustee seeks an award of

punitive damages in connection with Michael and Mehran's failure to pay the Debtor the

$1,000 monthly distribution payments as provided for in section 9(c) of the River City

Agreement.   As previously noted, the River City Agreement is governed by Iowa law.

Iowa Code § 668A.1 governs punitive damages which provides:

1.  In a trial of a claim involving the request for punitive or exemplary damages,
    the court shall instruct the jury to answer special interrogatories or, if there is
    no jury, shall make findings, indicating all of the following: a. Whether, by a
    preponderance of clear, convincing, and satisfactory evidence, the conduct of
    the defendant from which the claim arose constituted willful and wanton
    disregard for the rights or safety of another. b. Whether the conduct of the
    defendant was directed specifically at the claimant, or at the person from which
    the claimant's claim is derived. 2. An award for punitive or exemplary damages
    shall not be made unless the answer or finding pursuant to subsection 1,
    paragraph "a", is affirmative. If such answer or finding is affirmative, the jury,
    or court if there is no jury, shall fix the amount of punitive or exemplary
    damages to be awarded, and such damages shall be ordered paid as follows: a.
    If the answer or finding pursuant to subsection 1, paragraph "b", is affirmative,
    the full amount of the punitive or exemplary damages awarded shall be paid to
    the claimant. b. If the answer or finding pursuant to subsection 1, paragraph
    "b", is negative, after payment of all applicable costs and fees, an amount not
    to exceed twenty-five percent of the punitive or exemplary damages awarded
    may be ordered paid to the claimant, with the remainder of the award to be
    ordered paid into a civil reparations trust fund administered by the state court
    administrator. Funds placed in the civil reparations trust shall be under the
    control and supervision of the executive council, and shall be disbursed only
    for purposes of indigent civil litigation programs or insurance assistance
    programs. 3. The mere allegation or assertion of a claim for punitive damages
    shall not form the basis for discovery of the wealth or ability to respond in
    damages on behalf of the party from whom punitive damages are claimed until
    such time as the claimant has established that sufficient admissible evidence
    exists to support a prima facie case establishing the requirements of subsection
    1, paragraph "a".

Iowa Code § 668A.1

After the Iowa legislature effected Iowa Code § 668A.1, the Supreme Court of Iowa in

*Magnusson Agency v. Public Entity Nat'l Co.-Midwest*, 560 N.W.2d 20, 29 (Iowa 1997) set forth

the standard for imposing punitive damages:

> Generally, a breach of contract, even if intentional, is insufficient to support a
> punitive damage award. . . .  We will only uphold an award of punitive damages for
> breach of contract when the breach
>
> (1) constitutes an intentional tort, and
>
> (2) is committed maliciously, in a manner that meets the standards of Iowa Code §
>     668A.1.
>
> That statute requires proof, by a preponderance of clear, convincing, and
> satisfactory evidence, that the defendant's conduct amounted to a willful and
> wanton disregard for the rights or safety of another.

*In re Magnusson*, 560 N.W.2d at 29 (internal citations omitted; paragraphing added) (denying

punitive damages for lack of proof of an intentional tort when defendant breached an agency

contract).  *Accord Seastrom v. Farm Bureau Life Ins. Co.*, 601 N.W.2d 339, 347 (Iowa 1999)

(denying punitive damages for lack of proof of an insurance carrier's intentional tort or of "willful

and wanton disregard for the rights of plaintiffs" when it denied a claim).  As the Iowa Court of

Appeals observed subsequently in *Hansen Co. v. RedNet Envtl. Servs., L.L.C.*, 2017 WL 4570406,

at * 6 (Iowa Ct. App. Oct. 11, 2017), "[W]e can only conclude that illegal or wrongful conduct

done maliciously is no longer sufficient to support punitive damages in a breach-of-contract claim

absent an intentional tort."  Here, the evidence supports the finding that Mehran and Michael did

not make the $1,000 monthly special distribution payments to the Debtor in part due to the 2008

financial crisis.

Based on this contractual language Count Two of the Amended Adversary Complaint, is GRANTED in part in so far as judgment will also be entered in favor of the Trustee and against Mehran on his personal guarantee of payment of the $1,000 monthly special distributions, including appropriate interest.  It is noted here that Michael did not personally guarantee such payments. This Court also finds that the evidence presented is not sufficient to find Mehran and Michael's conduct of breaching the River City Agreement constitutes an intentional tort.  Punitive damages against Mehran and Michael are DENIED as no evidence was provided to support the imposition of punitive damages.  Attorneys' fees and costs are not guaranteed in section 9(c) of the River City Agreement.  The exact amount of damages asserted and interest therein shall be fixed after submission by Plaintiff of the calculation of damages due, Defendants shall have the opportunity to be heard as to these amounts before the Court enters judgment.

### *Count Three - Breach of § (2) of the River City Agreement*

Count Three of the Amended Adversary Complaint alleges Michael and Mehran breached section (2) of the River City Agreement and pursuant to 11 U.S.C. § 541 as the Trustee alleges that under this section, all claims and causes of action of the Debtor are considered property of the bankruptcy estate and the Trustee has standing to pursue these claims and causes of action  This provision provides:

(3) Subject to Zetterlund's retention of a Fifty-One percent (51%) interest in the company, which interest will automatically terminate and revert to Assignors and Assignee upon Zetterlund's receipt of the balance due from Assignors and Assignee, and Zetterlund's being released from all financial responsibility and debt of the Company, including release of any personal guarantee for the mortgage with M&T Bank subject to the foregoing,  Assignors hereby sell, assign, transfer, convey and set over to Assignee the Assigned Interest, to have and hold the Twenty Percent (20%) Assigned Interest unto Assignee, its successors and assigns forever, it being understood that this Assignment shall include every right, without limitation, that Assignors has or may have in the Assigned Interest and in that portion of the Company and under the Company Documents which is represented by the Assigned Interest.  In conjunction herewith, Assignors will make available for inspection all

books, records, and other property and assets of the Company, whether tangible or intangible, upon Assignee's reasonable request for access to said documents. In the event Assignors fail to comply with the terms and conditions of the aforementioned Amended and Restated Assignment and Assumption of Stock including but not limited to the obligated payments to Zetterlund or failure to obtain the release of Zetterlund's obligation and personal guarantee to M&T Bank within the time period as stated in the Amended and Restated Assignment and Assumption of Stock***, then Assignors, jointly and severally, hereby agree to personally guarantee the return of $100,000.00 to Assignee within thirty (30) days.*** Assignors shall be responsible for the payment of any costs and expenses for collection of said sums due, including but not limited to reasonable attorney's fees. (***Emphasis added***).

The above paragraph unambiguously requires Mehran and Michael to personally guarantee to return $100,000 to the Debtor within thirty days of their failure to comply with the terms in the River City Agreement. Mehran and Michael breached section 9(c) of the River City Agreement. Mehran and Michael's breach of section 9(c) triggered section two, which holds Mehran and Michael jointly and severally and personally liable to pay the Debtor $100,000 and payment of costs for collection including reasonable attorneys' fees. Therefore, this Court finds that Mehran and Michael are jointly and severally liable to the Trustee for the sum of $100,000 plus costs and expenses of collection, including reasonable attorneys' fees.

### ***Punitive Damages***

In Count Three of the Amended Adversary Complaint the Trustee seeks punitive damages against Mehran and Michael for breaching section 2 of the River City Agreement. As iterated above, the River City Agreement is governed by Iowa state law which provides that punitive damages are permitted when the breach "constitutes an intentional tort, or other illegal or wrongful act, if committed maliciously." *Hansen Co.*, 2017 WL 4570406, at *5-*6. The evidence presented does not demonstrate that Michael and Mehran's conduct in breaching section 2 of the River City Agreement constitutes an intentional tort.

Count Three of the Amended Adversary Complaint is GRANTED in part in so far as judgment will be entered in favor of the Trustee and against Mehran and Michael jointly and severally on their personal guarantee for return of $100,000 to the Plaintiff. Punitive damages against Mehran and Michael are DENIED as no evidence was presented to support imposition of punitive damages.  Based on the contractual language set forth above, Mehran and Michael are liable for the repayment of any costs and expenses for collection of $100,000 including reasonable attorneys' fees.  The exact amount of damages, and any appropriate interest, reasonable attorneys' fees and costs shall be fixed after submission by Plaintiff of the calculation of damages due. Defendants shall have the opportunity to be heard as to these amounts before the Court enters judgment.

### *Count Five - Breach of Contract*

Count Five sounds in breach of contract against River City.

River City is not a named defendant herein. Accordingly, Count Five will be dismissed with prejudice.

### *Count Six - Breach of Fiduciary Duty*

Pursuant to 11 U.S.C. § 541, the Trustee alleges that all claims and causes of action of the Debtor are considered property of the bankruptcy estate and the Trustee has standing to pursue these claims and causes of action. Count Six of the Amended Adversary Complaint alleges Mehran and Michael, as managing members of North Park, owed a fiduciary duty of loyalty and were required to exercise reasonable skill and care while managing North Park and that Mehran and Michael breached their duties.[535] This breach  included  their mismanagement, neglect, misappropriation or wrongful conversion of assets, and self-dealing which resulted in Mehran and

---

[535] Am. Adv. Compl. at ¶¶ 88 and 89. ECF 11.

Michael individually and jointly benefiting from this systemic behavior of misappropriation and embezzlement of corporate assets at the expense of North Park and its members.[536]    Additionally, the Amended Adversary Complaint alleges Mehran and Michael neglected management, supervision and operation of North Park by failing to: (i) supervise staff and vendors; (ii) maintain tenant leases; (iii) perform all obligations as a landlord; (iv) make necessary repairs; and (v) pay all essential utilities and bills when due.[537]    Mehran and Michael's intentional, wanton, and malicious acts were without justification and precluded and interfered with the Debtor's interest and rights under the North Park Agreement.[538]    Count Six of the Amended Adversary Complaint seeks judgment in favor of the Trustee and against Mehran and Michael for: (1) judgment in the amount of at least $1.5 million; (2) interest on all amounts awarded; (3) punitive damages; and (4) reasonable attorneys' fees and costs.

To prevail under a claim of breach of fiduciary duty, New Jersey law requires a plaintiff to prove: "(1) the existence of a fiduciary relationship, (2) a breach of the duty imposed by that relationship, and (3) harm to the plaintiff." *Canon Fin. Servs., Inc. v. Bray*, 2015 WL 851816, at *4 (D.N.J. Feb. 25, 2015); *F.G. v. MacDonell,* 150 N.J. 550, 561–64 (1997).

### *(1) Existence of a fiduciary relationship*

As for the existence of a fiduciary duty, here, section 2.1 of the North Park Agreement identifies Mehran and Michael as the managers of North Park.[539]    Under the North Park Agreement, Mehran and Michael were "responsible for the upkeep, operation, rentals, collections and all other duties generally associated with a 'multi-family property manager.'"[540]    At trial,

---

[536] Am. Adv. Compl. at ¶ 89. ECF 11.
[537] Am. Adv. Compl. at ¶ 90. ECF 11.
[538] Am. Adv. Compl. at ¶ 91. ECF 11.
[539] Ex. P-1 at "2.1 of the North Park Agreement."
[540] Ex. P-1 at "2.1 of the North Park Agreement."

Mehran testified he was in fact the manager of North Park.[541]  Michael also testified that he was

one of the managers of North Park but he "wasn't much" involved in the everyday management

of North Park.[542]  Prior to signing the North Park Agreement, he read the provisions of the North

Park Agreement that pertained to him being a manager of North Park.[543]  Michael testified that he

wrote checks in connection with North Park and he was the only person allowed to do so.[544]  Based

on the aforementioned, this Court finds Michael and Mehran had a fiduciary duty  to North Park

as Mehran and Michael were identified as the mangers of North Park in the North Park

Agreement.[545]

### *(2) Breach of duty imposed by the relationship*

Next, this Court must determine whether Michael and Mehran breached their fiduciary

duty as managers of North Park.  Under New Jersey law, directors of a corporation are required to

"discharge their duties in good faith and with that degree of diligence, care and skill which

ordinarily prudent people would exercise under similar circumstances and in like positions." *In re*

*Teleservices Group, Inc.,* 2009 WL 4250055, at *7 (D.N.J. Nov. 25, 2009). "Where a director in

fact exercises a good faith effort to be informed and to exercise appropriate judgment, he or she

should be deemed to satisfy fully the duty of [care]." *Teleservices Group, Inc.,* at *7 (citing *In re*

*Caremark Int'l Inc. Derivative Litig.,* 698 A.2d 959, 968 (Del. Ch. 1996)). "[D]ue care in the

decision[ ]making context is process due care only.... Substantive review of business decisions...

is effected when decisions are tested for bad faith or waste." *Id.* (citing *Stanziale v. Nachtomi,* 416

F.3d 229, 240 (3d Cir. 2005)).

---

[541] Trial Tr. 170:16-17, Nov. 22, 2019.
[542] Trial Tr. 83:3-6, Nov. 22, 2019.
[543] Trial Tr. 84:15-16, Nov. 22, 2019.
[544] Trial Tr. 83:13-19, Nov. 22, 2019.
[545] Trial Tr. 83:1-12, Nov. 22, 2019.

"Fiduciaries breach their duty of loyalty by intentionally failing to act in the face of a known duty to act, demonstrating a conscious disregard for their duties." *Id.* (citing *Bridgeport Holdings Inc. Liquidating Tr. v. Boyer,* 388 B.R. 548, 564 (Bankr. D. Del. 2008) (citing *Stone v. Ritter,* 911 A.2d 362, 369 (Del. 2006))). In assessing whether a director violates his duty of loyalty, the Court must inquire as to whether the director has a conflicting interest in the transaction. *Id.* Directors qualify as "interested" if they "either appear on both sides of a transaction [ ] or expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Id.* (citing *In re Seidman,* 37 F.3d 911, 934 (3d Cir. 1994) (citation and internal quotes omitted)). Encompassed within the duties of loyalty and care is the fiduciary's "responsibility to act in good faith." *Id.* (citing *Guttman v. Huang,* 823 A.2d 492, 506 n.34 (Del. Ch. 2003).

The evidence presented demonstrates that Michael and Mehran did not comply with the express terms and conditions of the North Park Agreement, including but not limited to, payment to the Debtor of a monthly $7,000 special distribution.  Additionally, Mehran and Michael comingled North Park's assets with assets of Sandburg Mall.  This was also in direct contradiction to the North Park Agreement.  This Court therefore finds Mehran and Michael breached certain contractual obligations under the North Park Agreement.

### *(3) Harm to Plaintiff*

Finally, this Court must determine whether Michael and Mehran's conduct harmed the Debtor.

Here, bad faith and waste have not been proven to the Court by Plaintiff. In addition to the full record, trial, witness credibility, etc., this Court notes some facts to the contrary:  Sandburg Mall was encumbered for the benefit of North Park.  Sandburg Mall was used as collateral to

secure financing to decrease North Park's mortgage interest rate from 17% to 6%. North Park was subjected to the 2008 financial crisis, which contributed to it lost its largest tenant. Based on the record, this Court does not find that the duty of care or loyalty was breached, nor is there an actionable claim for a breach of fiduciary duty. Accordingly, Count Six is DISMISSED with prejudice.

### *Count Seven - Piercing the Corporate Veil of North Park*

Pursuant to 11 U.S.C. § 541, the Trustee alleges all claims and causes of action of the Debtor are considered property of the bankruptcy estate and the Trustee has standing to pursue these claims and causes of action. Count Seven of the Amended Adversary Complaint alleges Mehran and Michael engaged in and committed wrongful and negligent acts in their management of North Park such that the corporate veil of North Park should be pierced and personal liability should attach  individually Mehran and Michael.  In Plaintiff's Proposed Findings of Facts and Conclusions of Law, Plaintiff seeks to pierce the corporate veil of North Park and have personal liability attach to  Mehran and Michael and to hold them jointly and severally liable for any judgments against North Park.[546]   These acts include allegations that Mehran and Michael comingled North Park's corporate  funds with their personal assets and  with Sandburg's assets. The Trustee alleges the Debtor's funds and interests in North Park  were commingled, misappropriated, cross-collateralized and converted for the personal purposes of Mehran and Michael or for the use of insider family members.[547] The Trustee also alleges Mehran and Michael comingled corporate funds with their personal assets and investments in Sandburg Mall.[548] Plaintiff asserts that Mehran and Michael misappropriated and embezzled corporate assets for their

---

[546] Pl.'s Proposed Findings of Facts, ¶ ¶ 210 to 212, ECF 102.
[547] *Id.* at 214.
[548] *Id.* at 213.

personal use, fraudulently transferred corporate assets to their personal investments, misrepresented material facts regarding the financial condition of North Park to the Debtor and managed North Park as a sole proprietorship.  The Trustee asserts these actions warrant piercing of the corporate veil of North Park and finding, Mehran and Michael are personally liable for the Debtor's damages.

As noted by the Third Circuit, piercing the corporate veil is a "tool of equity," *Carpenters Health & Welfare Fund v. Kenneth R. Ambrose, Inc.,* 727 F.2d 279, 284 (3d Cir. 1983), a "remedy that is involved when [a subservient] corporation is acting as an *alter ego* of [a dominant corporation]." *Bd. of Trustees of Teamsters Loc. 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 171–72 (3d Cir. 2002) (citing Peter J. Lahny IV, *Securitization: A Discussion of Traditional Bankruptcy Attacks and an Analysis of the Next Potential Attack, Substantive Consolidation,* 9 Am. Bankr. Inst. L. Rev. 815, 865 (2001).  In order to succeed on a claim for piercing the corporate veil under New Jersey law, a plaintiff must show:(1) one corporation "is organized and operated as to make it a mere instrumentality of another corporation," and (2) "the dominant corporation [is] using the subservient corporation to perpetrate fraud, to accomplish injustice, or to circumvent the law." *Major League Baseball Promotion Corp. v. Colour–Tex, Inc.,* 729 F. Supp. 1035, 1046 (D.N.J. 1990); *Craig v. Lake Asbestos of Quebec, Ltd.,* 843 F.2d 145, 149 (3d Cir. 1988). Factors to be considered in determining whether to pierce the corporate veil include "gross undercapitalization ... 'failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder

or stockholders.'" *Craig*, 843 F.2d at 150 (quoting *American Bell, Inc. v. Fed'n of Tel. Workers,* 736 F.2d 879, 886 (3d Cir. 1984)).

In Count Seven, the Trustee demands judgment in his favor against Michael and Mehran: (1) piercing the corporate veil; (2) judgment of at least $1.5 million; (3) interest on all amounts awarded; (4) punitive damages; and (5) reasonable attorneys' fees, and costs. Here, the record shows North Park was a Limited Liability Company that was formed with the execution of the North Park Agreement.[549] The record is devoid of sufficient facts to support the assertion that North Park was organized and operated as a mere instrumentality of another corporation. Rather, the record demonstrates North Park was founded on the premise of acquiring the North Park Property which is real property with an address of 17117 West Nine Mile Road, Southfield, Michigan and using the North Park Property to generate income.[550] The pledging of Sandburg Mall's assets for the benefit of North Park arguably caused no ascertainable proven harm to North Park. The 2008 financial crisis impacted the North Park Property as United Healthcare, North Park's largest tenant, which was paying approximately $35,000 to $60,000 in rent per month, vacated the North Park Property in March 2009.[551] In light of the facts presented and the circumstances provided in this case, this Court finds North Park was not an instrumentality of another corporation and North Park was not used to perpetrate fraud, injustice, or to circumvent the law. Accordingly, Count Seven is DISMISSED with prejudice.

---

[549] Ex. P-1.
[550] Trial Tr. 19:6-12, Nov. 22, 2019; 18:24-25.
[551] Trial Tr. 84:23-24, Nov. 25, 2019. Testimony is conflicted. Michael testified United Healthcare was paying $50,000 to $60,000 per month however Mehran testified that the tenant United was paying $35,000 per month. Trial Tr. 105:14-17, Nov. 22, 2019; Trial Tr. 64:5-6; Trial Tr. 114:15-16, Nov. 25, 2019.

### *Counts Eight and Nine - Fraudulent Transfer*

Counts Eight and Nine of the Amended Adversary Complaint assert fraudulent transfer pursuant to 11 U.S.C. §§ 544(b) and 550, N.J.S.A. § 25:2-25(b), N.J.S.A. § 25:2-27(a) and N.J.S.A. § 25:2-30. Counts Eight and Nine allege the Debtor's 2007 transfer of $1.5 million to the Defendants was a fraudulent transfer under § 544(b); N.J.S.A. § 25-25(b), N.J.S.A. § 25:2-27(a) and N.J.S.A. § 25:2-30.[552]

The Trustee asserts that by operation of § 544(b) of the Bankruptcy Code, the Trustee is entitled to utilize any applicable non-bankruptcy law to seek avoidance of any transfer.[553] The Trustee further asserts that the Debtor's 2007 transfer of $1.5 million to the Defendants constitutes a transfer within the meaning of the New Jersey Fraudulent Transfer Act.[554] This transfer was fraudulent as to the Internal Revenue Service, as well as other creditors whether their claim arose before or after the transfer was made, because the Debtor did not receive a reasonably equivalent value in exchange for this transfer and the Debtor was engaged or about to engage in a business transaction or transaction for which his remaining assets were unreasonably small in relation to the business or transaction; or the Debtor reasonably should have believed that he would incur debts beyond his ability to pay as those debts became due.[555] The Trustee further alleges that this transfer was fraudulent as to the Internal Revenue Service because its claim arose before this transfer was made; the Debtor made this transfer without receiving a reasonably equivalent value in exchange for this transfer and the Debtor was rendered insolvent at that time or became insolvent as a result of this transfer.[556]

---

[552] Am. Adv. Compl. ¶¶100 and 101.  ECF 11.
[553] Am. Adv. Compl. ¶ 98.  ECF 11.
[554] Am. Adv. Compl. ¶ 100. ECF 11.
[555] Am. Adv. Compl. ¶ 101. ECF 11.
[556] Am. Adv. Compl. ¶ 108. ECF 11.

Section 544(b) of 11 U.S.C. in relevant part provides:

> (1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title [11 USC § 502] or that is not allowable only under section 502(e) of this title [11 USC § 502(e)].

Section 550 of 11 U.S.C. in relevant part provides:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title [11 USCS § 544, 545, 547, 548, 549, 553(b), or 724(a)], the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from— (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee. 11 U.S.C. § 550

New Jersey adopted the Uniform Transfer Act.[557]  N.J. Stat. § 25:2-25 provides:

> a. A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (a) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due. b. A creditor making a claim for relief under subsection a. of this section has the burden of proving the elements of the claim for relief by a preponderance of the evidence.

The purpose of this provision "is to prevent a debtor from placing his or her property beyond a creditor's reach."  *Gilchinsky v. Nat'l Westminster Bank N.J.*, 159 N.J. 463, 475 (1999). "Underlying the Act is the notion that a debtor cannot deliberately cheat a creditor by removing his property from 'the jaws of execution.'"  *Id.* (internal citations omitted).  In determining whether a transfer constitutes a fraudulent conveyance, there are two relevant inquiries: "(1) whether the

---

[557] N.J. Stat. § 25:2-25.

debtor [or person making the conveyance] has put some asset beyond the reach of creditors which would have been available to them at some point in time but for the conveyance"; and "(2) whether the debtor transferred property with an intent to defraud, delay, or hinder the creditor." *Id.* at 475-76 (internal citations omitted) (numbering added).

To determine whether a debtor transferred property with fraudulent intent, courts examine a list of factors called "badges of fraud," which "represent circumstances that so frequently accompany fraudulent transfer that their presence gives rise to an inference of intent." *Gilchinsky*, 159 N.J. at 476.   N.J.S.A. § 25:2-26 codifies a non-exclusive list of factors ("badges of fraud") to help the Court determine whether debtor transferred property with fraudulent intent:

In determining actual intent under paragraph (1) of subsection a. of R.S.25:2-25 consideration may be given, among other factors, to whether:

a.  The transfer or obligation was to an insider;

b.  The debtor retained possession or control of the property transferred after the transfer;

c.  The transfer or obligation was disclosed or concealed;

d.  Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

e.  The transfer was of substantially all the debtor's assets;

f.  The debtor absconded;

g.  The debtor removed or concealed assets;

h.  The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

i.  The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

j.  The transfer occurred shortly before or shortly after a substantial debt was incurred; and

    k.  The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

N.J.S.A. § 25:2-26.  When applying the badges of fraud, the Supreme Court of New Jersey instructed courts:

> [t]o balance the factors enumerated in *N.J.S.A.* 25:2-26, as well as any other factors relevant to the transaction. . . . The proper inquiry is whether the badges of fraud are present, not whether some factors are absent. Although the presence of a single factor, *i.e.* badge of fraud, may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud.

*Gilchinsky*, 159 N.J. at 477.

    In *Motorworld, Inc. v. Benkendorf*, 228 N.J. 311, 326-27 (2017), the Supreme Court of New Jersey declared:

> The [Uniform Fraudulent Transfer Act] requires that in order for a transfer to be constructively fraudulent, the debtor must not receive a reasonably equivalent value in exchange for the transfer. N.J.S.A. § 25:2-27(a). In applying that standard we consider the UFTA's fundamental objective: to protect creditors from transactions that are either intended to defraud them or otherwise deprive them of assets to which they are entitled.

(Internal citations omitted).

N.J.S.A. § 25:2-27(a) provides:

> A transfer made or obligation incurred by a debtor is voidable as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

The Supreme Court of New Jersey determined that determining "reasonably equivalent value" is a two-step process. *Motorworld,* 228 N.J. at 327 citing to *In re Eckert*, 388 B.R. 813, 835 (Bankr. N.D. Ill. 2008). First "[a] court must first determine whether the debtor received value,

and then examine whether the value is reasonably equivalent to what the debtor gave up." *Ibid.* "Value and reasonably equivalent value are measured at the time of the transaction." *See ibid.* (measuring equivalent value under federal fraudulent conveyance act); *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 569-70 (Tex. 2016) (measuring value and reasonably equivalent value according to Texas fraudulent transfer law).  *Motorworld,* 228 N.J. at 327.

N.J.S.A. § 25:2-30 in relevant part provides:

> A transfer or obligation is not voidable under paragraph (1) of subsection a. of R.S.25:2-25 against a person who took in good faith and for a reasonably equivalent value given the debtor…

N.J.S.A. § 25:2-23, provides that "[a] debtor is insolvent if, at fair valuation, the sum of the debtor's debts is greater than all of the debtor's assets."  N.J. Stat. Ann. § 25:2-23(a).  In addition, "[a] debtor who is generally not paying his debts as they become due is presumed to be insolvent." *Id.* at (b).  In calculating the debtor's assets, the statute excludes property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this article.  *Id.* at (d).  In addition, "[d]ebts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset." *Id.* at (e).

By these Counts, the Trustee demands judgment in his favor and against the Defendants pursuant to §§ 544 and 550 of the Bankruptcy Code, N.J.S.A. § 25:2-25; N.J.S.A. § 25:2-27(a) and N.J.S.A. § 25:2-30 to: (1) avoiding the Debtor's transfer of $1.5 million; (2) recovering $1.5 million for the benefit of the Debtor's bankruptcy estate; (3)  attorneys' fees; (4) interest from the date the Debtor transferred $1.5 million; and (5) punitive damages.

Here, the record shows the Debtor actively sought legal advice prior to executing the North Park Agreement. By executing this agreement, it is undisputed in exchange for transferring $1.5 million, the Debtor received a 29% interest in North Park.

As for insolvency, the Debtor testified that he was unable to pay his bills and mortgage when he stopped receiving the monthly distribution payments from North Park and River City.[558] During this time, the Debtor testified that he owned real property in Fort Lee, New Jersey and was living in this property.[559] The Debtor testified he purchased this property for $550,000 and owed approximately $350,000.[560] The Debtor testified this property was foreclosed upon in 2016.[561] However, the Debtor testified that he remained in this property from 2008 until 2016.[562] This Court finds the Debtor was apparently able to meet his living expenses until filing bankruptcy in November 2015 as his home in Fort Lee, New Jersey was not foreclosed upon until 2016, nine years after his investment in North Park.[563] This Court further notes the record does not provide sufficient evidence to demonstrate that the Debtor was insolvent or made insolvent as a result of the Transfers or of the failure to tender the monthly distribution payments that were due and owing to the Debtor in connection with his investments in North Park and River City Additionally, the record does not contain sufficient evidence demonstrating a lack of reasonably equivalent value in consideration for the Debtor's $1.5 million investment in North Park. The Debtor testified that he retained Mr. Chang to review the North Park Agreement. Mr. Chang advised him that "[North Park] was a great deal and [as a result] he decided to go for deal" and invest a total of $1.5 million into North Park.[564] As provided in the record, the real estate market conditions were drastically

---

[558] Trial Tr. 33:22-25 to 34:1, Nov. 22, 2019.
[559] Trial Tr. 34:2-7, Nov. 22, 2019.
[560] Trial Tr. 55:8-16, Nov. 22, 2019.
[561] Trial Tr. 55:17-23, Nov. 22, 2019.
[562] Trial Tr. 55:24-25; Trial Tr. 56:1, Nov. 22, 2019.
[563] Trial Tr. 57:4-16, Nov. 22, 2019.
[564] Trial Tr. 20:18-22; Trial Tr. 21:14-17, Nov. 22, 2019.

altered by the 2008 financial crisis so much so that United Healthcare moved out of the North Park

Property. United Healthcare was the North Park Property's largest tenant, paying monthly rent of

approximately $60,000.[565] The evidence presented was not sufficient to find that the Debtor's $1.5

million transfer for a 29% interest in North Park was not reasonably equivalent value.[566]

This Court finds the record does not contain sufficient proofs demonstrating the Debtor's

$1.5 million investment in North Park was a fraudulent transfer pursuant to § 544(b); N.J.S.A.

§ 25-25(b), N.J.S.A. § 25:2-27(a) and N.J.S.A. § 25:2-30. Accordingly, Counts Eight and Nine of

the Amended Adversary Complaint are DISMISSED with prejudice.

### *Count Ten - Transferee Liability*

Count Ten is a claim for transferee liability under 11 U.S.C. section 550 of the Bankruptcy
Code in relevant part provides:

> (a) Except as otherwise provided in this section, to the extent that a transfer is
> avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title [11
> USCS § 544, 545, 547, 548, 549, 553(b), or 724(a)], the trustee may recover, for
> the benefit of the estate, the property transferred.

In *In re Parcel Consultants, Inc.,* 287 B.R. 41, 46 (Bankr. D.N.J. 2002). the court

considered the meaning of "transferee" for purposes of § 550 and held:

> [I]n order to be a "transferee" of the debtor's funds, one must (1) actually receive
> the funds, and (2) have full dominion and control over them for one's own account,
> as opposed to receiving them in trust or as agent for someone else. *In re Parcel
> Consultants, Inc.,* 287 B.R. 41, 46 (Bankr. D.N.J. 2002).

In defining the terms "dominion and control," courts have held that "a transferee must have

the legal right to use the funds to whatever purpose he or she wishes, be it to invest in 'lottery

tickets or uranium stocks.'" *In re Parcel Consultants, Inc.,* 287 B.R. at 46 (citing *In re Anton Noll,*

*Inc.,* 277 B.R. 875, 879 (1st Cir. B.A.P. 2002)); *see also Bonded Financial Service, Inc. v.*

---

[565] Trial Tr. 105:14-18, Nov. 22,2019.
[566] Ex. P-1.

*European American Bank,* 838 F.2d 890, 893 (7th Cir. 1988)("Although the Bankruptcy Code does not define 'transferee', and there is no legislative history on the point, we think the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes.").

### *3. "Entity for Whose Benefit Such Transfer Was Made"*

In the seminal decision of the Seventh Circuit Court of Appeals, *Bonded Financial Service, Inc. v. European American Bank,* the Seventh Circuit held:

> [A] subsequent transferee cannot be the "entity for whose benefit" the initial transfer was made. The structure of the statute separates initial transferees and beneficiaries, on the one hand, from "immediate or mediate transferee[s]", on the other. The implication is that the "entity for whose benefit" is different from a transferee, "immediate" or otherwise. The paradigm "entity for whose benefit such transfer was made" is a guarantor or debtor-someone who receives the benefit but not the money. 838 F.2d 890, 895 (7th Cir. 1988)).

The *Bonded* court further held that "[s]omeone who receives the money later on is not an 'entity for whose benefit such transfer was made'; only a person who receives a benefit from the initial transfer is within this language." *Id.*

The *Bonded* court also determined that based on the "inference from the structure" of § 550(a), the section "distinguishes transferees (those who receive the money or other property) from entities that get a benefit because someone else received the money or property." *Id.* In other words, "the categories 'transferee' and 'entity for whose benefit such transfer was made' are mutually exclusive…" *Id.* This holding was adopted by the United States District for the District of New Jersey in *YA Global Inv., L.P. v. Global Outreach, S.A.,* 2011 WL 2294168, at *11 (D.N.J. June 6, 2011). In that case, the District Court analyzed whether § 550(a)(1) and § 550(a)(2) are mutually exclusive, holding "[t]he Court thus agrees with the Seventh Circuit in *Bonded*, and the weight of authority following

114

that decision, that the categories in subsections (a)(1) and (a)(2) are mutually exclusive."

*Id.* at *32.

Generally, pursuant to § 550 of the Bankruptcy Code, once the Transfer is avoided pursuant to § 544, the Trustee is entitled to recover, for the benefit of the Debtor's estate, the value of the avoidable Transfer.

Section 544 gives the trustee, as of the commencement of the case, the rights and powers of certain third-party actors. *See* 11 U.S.C. § 544. Significantly, § 544 operates without regard to any knowledge of the trustee or any creditor or bona fide purchaser, and without regard to whether such a creditor or bona fide purchaser actually exists. *Id.*

The Amended Adversary Complaint alleges that Defendant Nobel was the initial transferee of the avoidable  transfer and the assets of the Debtor and that pursuant to  11 U.S.C. § 550 of the Bankruptcy Code, once the transfer is avoided pursuant to § 544, the Trustee is entitled to recover the value of the avoidable transfer for the benefit of the bankruptcy estate.

By this Count the Trustee requests an Order and judgment (1) under § 550 of the Bankruptcy Code allowing the Trustee to recover the Debtor's $1.5 million from Dr. Nobel; (2) attorneys' fees; (3) interest from the date the Debtor transferred $1.5 million; and (4) punitive damages.  As the Court has not found fraudulent transfer liability on the part of the Defendants, under §§ 544 and 550 and applicable non-bankruptcy law, there is no actionable claim for transferee liability. Accordingly, Count Ten is DISMISSED with prejudice.

### *Counts Eleven, Twelve, Seventeen and Eighteen – Common Law Fraud*

Counts Eleven, Twelve, Seventeen, and Eighteen of the Amended Adversary Complaint are generally pled as common law fraud under 11 U.S.C. § 544(b) and N.J.S.A. § 25:2-32 and 11 U.S.C. § 541.

In Counts Eleven and Seventeen, the Trustee alleges that to the detriment of the Internal Revenue Service, a creditor, the Defendants committed common law fraud by representing to the Debtor that the Debtor's transfer of $1.5 million was for the purchase of the North Park Property; the Defendants knew this representation was untrue; the Defendants' intended for the Debtor to rely on this representation; it was reasonable for the Debtor to rely on this representation; the Debtor relied on this representation; and the Debtor lost $1.5 million due to the Defendants' actions.[567]  The Trustee further alleges that to the detriment of the Internal Revenue Service, a creditor,  the Defendants committed law fraud by representing that North Park would not incur, guaranty, or assume any other indebtedness unrelated to the North Park Property; the Defendants knew that this representation was untrue; the Defendants' intended that the Debtor rely on this representation; it was reasonable for the Debtor to rely on this representation; the Debtor relied on this representation; and the Debtor lost $1.5 million due to the Defendants' actions.[568]

N.J.S.A. § 25:2-32 provides:

> Unless displaced by the provisions of the "Uniform Voidable Transactions Act," R.S.25:2-20 et seq., the principles of law and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause, supplement its provisions.

New Jersey recognizes a common law fraud cause of action. Under New Jersey law, a plaintiff seeking to recover for fraud must prove five elements: "(1) a material misrepresentation

---

[567] Am. Adv. Compl. ¶¶ 117, 121, 140, and 143. ECF 11.

of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 317 (3d Cir. 2014) (citing *Banco Popular N. Am. v. Gandi,* 876 A.2d 253, 260 (N.J. 2005)).

By Counts Eleven, Twelve, Seventeen, and Eighteen, the Trustee demands judgment in his favor and against Defendants for common law fraud: (1) avoiding the Debtor's transfer of $1.5 million; (2) a money judgment of $1.5 million; (3) attorneys' fees; (4) interest from the date the Debtor transferred $1.5 million; and (4) punitive damages.

The Plaintiff has failed to provide any demonstrable proof of a material misrepresentation of a presently existing or past fact; knowledge or belief by the defendant of its falsity; intention of the Defendant that the Plaintiff rely on such misrepresentation; nor reasonable reliance by the Plaintiff.  The Debtor had legal counsel at the time he entered into the North Park Agreement and invested $1.5 million.

During the 2008 financial crisis, real estate values plummeted and the record demonstrates that [569] North Park was struggling after losing its largest tenant.[570] Testimony indicates Sandburg Mall was used as collateral to refinance the North Park mortgage to decrease that mortgage interest rate from 17% to 6% in order to save the North Park Property.[571] Such action required the encumbering of the Sandburg property of which the Debtor did not have an interest. All parties had a common interest in saving the North Park property and their respective business success. Accordingly, Counts Eleven, Twelve, Seventeen and Eighteen are DISMISSED with prejudice.

---

[569] Trial Tr. 105:14-17, Nov. 22, 2019.
[570] Trial Tr. 121:13-16, Nov. 22, 2019.
[571] Trial Tr. 154:16-19; Trial Tr. 139:11-15, Nov. 22, 2019.

### *Counts Fourteen and Twenty - Negligent Misrepresentation*

Counts Fourteen and Twenty of the Amended Adversary Complaint, assert negligent misrepresentation pursuant to 11 U.S.C. § 544(b) and N.J.S.A. § 25:2-25(b); N.J.S.A. § 25:2-27(a) and N.J.S.A. § 25:2-32 and 11 U.S.C. § 541. The Trustee alleges the Defendants engaged in negligent misrepresentation involving the Debtor and resulting in injury to the Debtor by making (1) incorrect statements which were negligent; (2) the Debtor justifiably relied on these incorrect statements; and (3) in relying on these incorrect statements the Debtor incurred $1.5 million in damages for economic losses sustained as a consequence of that reliance. By Counts Fourteen and Twenty, the Trustee demands judgment in his favor and against Defendants for negligent misrepresentation: (1) avoiding the Debtor's transfer of $1.5 million; (2) a money judgment of $1.5 million; (3) attorneys' fees; (4) interest from the date the Debtor transferred $1.5 million; and (5) punitive damages.

"Under New Jersey law negligent misrepresentation requires a showing that defendant negligently provided false information and that plaintiff incurred damages proximately caused by its reliance on that information." *Highlands Ins. Co. v. Hobbs Grp., LLC.*, 373 F.3d 347, 351 (3d Cir. 2004) (citing *Karu v. Feldman,* 574 A.2d 420, 425 (N.J. 1990)). "In that respect a defendant may be liable (because it owes a duty) to any reasonably foreseeable recipient who relies on the information." (*Id.*) The Defendant would also have had to owe Plaintiff a relevant duty of care, which is quintessentially a question of law for the court. *City Check Cashing, Inc. v. Mfrs. Hanover Tr. Co.,* 166 N.J. 49, 59 (1990).

In *Highlands Ins. Co. v. Hobbs Group,* 373 F.3d at 351, the Third Circuit noted that "under New Jersey law negligent misrepresentation requires a showing that defendant negligently provided false information and that plaintiff incurred damages proximately caused by its reliance

on that information. In that respect a defendant may be liable (because it owes a duty) to any foreseeable recipient who relies on the information." *See Karu v. Feldman,* 119 N.J. 135, 148 (N.J. 1990).

Here, the record shows prior to investing in North Park, the Debtor conducted his due diligence and sought advice from counsel.[572]  This Court finds  that the record does not support a finding that the Defendants negligently or otherwise provided false information to the Debtor, nor that the Debtor incurred damages proximately caused by his reliance on that information. Accordingly, the causes of action for negligent misrepresentation are not proven.  For the reasons set forth herein, Counts Fourteen and Twenty are DISMISSED with prejudice.

### Counts Fifteen and Twenty-One - Unjust Enrichment

Counts Fifteen and Twenty-One allege unjust enrichment. With respect to Count Fifteen, the Trustee alleges by operation of § 544(b) of the Bankruptcy Code, the Trustee is entitled to utilize any applicable non-bankruptcy law to seek avoidance of any transfer.[573] The Trustee alleges pursuant to N.J.S.A § 25:2-32, to the extent the facts underlying the Trustee's fraudulent conveyance claim under N.J.S.A. § 25:2-25(b) and N.J.S.A. § 25:2-27(a) also establish other recognized causes of action against the Defendants, such claims may be pursued.[574] To the detriment of the Internal Revenue Service, the Defendants were unjustly enriched by fraudulently inducing the Debtor to invest $1.5 million into North Park and $100,000 into River City, which the Defendants directly benefited from, and their retention of the Debtor's money would be unjust.[575]  With respect to Count Twenty-One, the Trustee alleges by operation of § 541 of the Bankruptcy Code, all claims and causes of action of the Debtor are considered property of the

---

[572] Pl.' Proposed Findings of Facts, ¶ 38, ECF. 102.
[573] Am. Adv. Compl. at 26, ¶131. ECF 11.
[574] Am. Adv. Compl. at 26, ¶132. ECF 11.
[575] Am. Adv. Compl. at 26, ¶133. ECF 11.

bankruptcy estate and the Trustee has standing to pursue claims and causes of action for unjust enrichment.[576]

By Counts Fifteen and Twenty-One, the Trustee demands judgment in his favor and against the Defendants for unjust enrichment: (1) avoiding the Debtor's $1.5 million transfer; (2) a money judgment of $1.5 million; (3) attorneys' fees; (4) interest from the date the Debtor transferred $1.5 million to the Defendants; and (5) punitive damages.

To establish a claim for unjust enrichment under New Jersey law, "a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.,* 135 N.J. 539, 554 (N.J. 1994); *see also Callano v. Oakwood Park Homes Corp.,* 91 N.J. Super. 105, 108-09 (App. Div. 1966). For an unjust enrichment claim to succeed, there must be a showing that "the plaintiff expected remuneration from the defendant, or if the true facts were known to plaintiff, he would have expected remuneration from defendant, at the time the benefit was conferred." *Callano,* 91 N.J. Super. at 109; *see also VRG Corp.,* 135 N.J. at 554. The New Jersey Supreme Court has previously explained that unjust enrichment is a form of quasi-contractual liability, and that "quasi-contract cases involve either some direct relationship between the parties or a mistake on the part of the person conferring the benefit." *Callano,* 91 N.J. Super. at 109.

To succeed under an unjust enrichment claim, the Trustee must demonstrate that the Defendants expected remuneration from the Debtor.  The record shows the Defendants encumbered Sandburg for the benefit of North Park with the intention to reduce North Park's mortgage interest rate.  However, at this time, the economic climate was unstable and the real estate market throughout the United States was suffering.  Specifically, North Park felt the impact

---

[576] Am. Adv. Compl. at 31, ¶151. ECF 11.

of this instability as their largest tenant vacated North Park during this time.  This Court does not

find the claim of unjust enrichment has been proven.  Accordingly, Counts Fifteen and Twenty-

One are DISMISSED with prejudice.

### *Counts Sixteen and Twenty-Two - Common Law Conversion*

Counts Sixteen and Twenty-Two are causes of action for common law conversion. By way

of the Amended Adversary Complaint, the Trustee alleges by operation of § 544(b) of the

Bankruptcy Code, the Trustee is entitled to utilize any applicable non-bankruptcy law to avoid any

transfer.[577]  Pursuant to § 541 of the Bankruptcy Code, all claims and causes of action of the Debtor

are considered property of the bankruptcy estate and the Trustee has standing to pursue such claims

and causes of action.[578] The Trustee further alleges pursuant to N.J.S.A. § 25:2-32, to the extent

that the facts underlying the Trustee's fraudulent conveyance claim under N.J.S.A. § 25:2-25(b)

and N.J.S.A. § 25:2-27(a) also establish other recognized causes of action against the Defendants,

such claims may be pursued.[579]  The Trustee alleges that to the detriment of the Internal Revenue

Service, a creditor, the Defendants engaged in common law conversion by utilizing the Debtor's

$1.5 million investment, which was intended solely for the operation of North Park and River City,

to fund and operate Sandburg Mall without the Debtor's knowledge or consent.[580]

By Counts Sixteen and Twenty-Two, the Trustee demands judgment in his favor and

against the Defendants for common law conversion for: (1) avoiding the Debtor's $1.5 million

transfer; (2) a money judgment of $1.5 million; (3) attorneys' fees; (4) interest from the date the

Debtor transferred the $1.5 million; and (5) punitive damages.

---

[577] Am. Adv. Compl. at 27, ¶ 135. ECF 11.
[578] Am. Adv. Compl. at 32, ¶ 154. ECF 11.
[579] Am. Adv. Compl. at 27, ¶ 136. ECF 11.
[580] Am. Adv. Compl. at 27, ¶¶ 137; 155. ECF 11.

"Under New Jersey law, '[c]onversion is essentially the wrongful exercise of dominion and control over the property of another in a manner inconsistent with the other person's rights in that property.'" *Peloro v. United States*, 488 F.3d 163, 173-74 (3d Cir. 2007) (quoting *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 771 (3d Cir. 1990)).

The elements of common law conversion are: "(1) the existence of property, (2) the right to immediate possession thereof belonging to plaintiff, and (3) the wrongful interference with that right by defendant." *City of Atl. City v. Zemurray St. Capital, LLC*, 2017 WL 6638203, at *17, (D.N.J. Dec. 29, 2017).

### *(1) The existence of property*

As for the first element of common law conversion, the Trustee must demonstrate the existence of property. Here, the Debtor invested in the North Park and River City properties. It is undisputed that these properties existed.

### *(2) The right to immediate possession thereof belonging to plaintiff*

With respect to the second element of common law conversion, the Trustee must demonstrate the Debtor had the right to immediate possession of these funds. The record supports this Court's finding that the Debtor invested $1.5 million in North Park and $100,000 in River City with the understanding that making such investments was a business transaction. The Debtor retained counsel to review the North Park Agreement prior to executing it. This Court finds the Trustee's argument that the Defendants took possession of the Debtor's $1.5 million to fund and operate Sandburg Mall is unfounded.

### (3) *Wrongful interference with that right by defendants*

As for the final element of common law conversion, the Trustee must demonstrate the Defendants wrongfully interfered with the Debtor's rights.  As iterated above, the record supports this Court's finding that the Debtor voluntarily engaged in these business transactions by investing $1.5 million in North Park and $100,000 in River City.   North Park was subject to market conditions including the 2008 financial crisis as North Park lost its largest tenant. These conditions contributed to the foreclosure of North Park.  The record does not support the Trustee's claims that the Defendants wrongfully interfered with the Debtor's rights or that Dr. Nobel, Mehran and/or Michael converted the Debtor's interests in North Park or River City for their personal benefit.[581]

The Trustee's claim for common law conversion has not been proven.  Accordingly, Counts Sixteen and Twenty-Two are DISMISSED with prejudice.

### CONCLUSION

Based on the foregoing reasons, with respect to Counts One and Four the Trustee's demand for an entry of judgment in his favor and against North Park is GRANTED as described herein and the balance of the requested relief is DENIED; as to Count Two the Trustee's demand for entry of judgment in his favor and against Mehran is GRANTED as described herein and the balance of the requested relief is DENIED; as to Count Three the Trustee's demand for entry of judgment in his favor and against Mehran and Michael is GRANTED as described herein and the balance of the requested relief is DENIED; the remaining Counts: Six, Seven, Eight, Nine, Ten, Eleven, Twelve, Fourteen, Fifteen, Sixteen, Seventeen, Eighteen, Twenty, Twenty-One, and Twenty-Two are DENIED with prejudice. The exact amount of damages asserted and interest therein shall be fixed after submission by Plaintiff of the calculation of damages due.  Plaintiff shall submit this

---

[581] Pl.'s Proposed Findings of Facts, ¶ 175, ECF 102.

calculation within twenty days of the date of this Opinion.  Defendants shall have the opportunity to be heard as to these amounts before the Court enters judgment.  Any objections of the Defendants to these calculations shall be filed and served within seven days of service of the proposed Judgment upon the Defendants.

An Order shall be submitted in accordance with this Opinion.[582]

*Rosemary Gambardella*
_____
ROSEMARY GAMBARDELLA
UNITED STATES BANKRUPTCY JUDGE

DATED:         December 17, 2021

---

[582] This Court notes Defendants challenged jurisdiction on the basis that removal was untimely and was not proper as Defendants allege Plaintiff did not comply with Fed. R. Bankr. 9027(a)(2) as Plaintiff failed to upload the entire docket of the removed case.  Therefore, Defendants argue this Court should enforce the New York State Supreme Court's Order and limit Plaintiff to pursue only claims that were set forth in the New York Verified Complaint.  Defs' Proposed Findings of Fact, ¶¶ 276-84.  In response, Plaintiff asserts Defendants' objection to removal does not acknowledge that the Defendants were represented by separate counsel throughout the New York State Court Action and were timely served with all notices of transfer and removal from New York State Court to the Southern District of New York, to the District of New Jersey, and then to this Court.  Pl.'s Proposed Findings of Facts, ¶¶ 16 and 17, ECF. 111.  Furthermore, this Court notes that while certain Counts regarding fraudulent transfer, transferee liability, common law fraud, conspiracy to commit fraud, negligent misrepresentation, and common law conversion were not pled, the breach of contract claims were pled in the New York Verified Complaint.  New York Verified Compl., Index No. 65345/2011; Am. Adv. Compl, ECF 11.  These Counts were adjudicated in part in favor of the Trustee and against the Defendants as more fully described herein.  The Court finds, as noted at the outset of this Opinion, that it has appropriate jurisdiction to adjudicate said Counts.  28 U.S.C. §§ 1334 and 157(b)(2)(A) and (H).